UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| RICK E. NEWMAN, | : | Case No. C-1-01 0067 |
| | : | |
| Plaintiff, | : | Judge Herman J. Weber |
| | : | |
| v. | : | PLAINTIFF RICK E. NEWMAN'S |
| | : | MEMORANDUM IN OPPOSITION |
| | : | TO DEFENDANTS' MOTIONS |
| THE PROCTER & GAMBLE | : | FOR SUMMARY JUDGMENT |
| COMPANY, ET AL., | : | |
| | : | |
| Defendants. | : | |

_____

Plaintiff Rick E. Newman ("Mr. Newman") opposes the motions for summary judgment filed by Defendant The Procter & Gamble Company ("P&G") and Defendant Mesa, Inc. ("Mesa") because:

1. Mesa owed a duty to Mr. Newman, and it is up to the trier of fact to determine if Mesa breached this duty to Mr. Newman and thus caused Mr. Newman's injuries; and

2. P&G incorrectly alleges that Mr. Newman has not produced expert testimony which opines that his subsequent injuries and atrial fibrillation episodes were proximately caused by his exposure to, and inhalation of, sulfur dioxide gas at P&G's Ivorydale facility on March 17, 1999, when in fact Mr. Newman has produced such expert testimony.

Since P&G's and Mesa's motions do not demonstrate the absence of genuine issues of material fact with respect to the elements of Mr. Newman's claims, P&G's and Mesa's motions must be denied. See Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (summary judgment shall be denied if there are "'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'").

**I.     Factual Background to Mr. Newman's Exposure to Sulfur Dioxide Gas at P&G's Ivorydale Facility on March 17, 1999, and His Subsequent Injuries.**

On March 17, 1999, Mr. Newman was exposed to, and inhaled, sulfur dioxide gas while he was insulating a soap tank located in Building 179 at the P&G Ivorydale facility in St. Bernard, Ohio. *Deposition of Rick E. Newman ("Newman Deposition"), pg. 82; Deposition of Joseph M. Cruse ("Cruse Deposition"), pgs. 52-53, 70; Deposition of Patrick Molloy ("Molloy Deposition"), pg. 96*. Mr. Newman's exposure to the sulfur dioxide gas injured him, subsequently causing atrial fibrillation – an uncommon and incurable heart condition – which Mr. Newman did not have prior to March 17, 1999. *Deposition of Paul D. Hirsh, M.D. ("Hirsh Deposition"), pgs. 17, 29-30, 33, 37, 64-65, 82-83*. Between March 17, 1999 and October 2001, Mr. Newman has had four documented episodes of atrial fibrillation; since October 2001, several more episodes of atrial fibrillation and/or irregular heart activity have been documented. *Hirsh Deposition, pgs. 30, 37, 85, 98; Newman Medical Records* (attached as **Exhibit A**). Every episode of atrial fibrillation exposes Mr. Newman to a risk of stroke or embolus going somewhere else in his body which could cause further serious injury or death. *Hirsh Deposition, pgs. 41-42*. Future episodes of atrial fibrillation are expected as "[t]he absolute best case would he [Mr. Newman] has an episode of atrial fibrillation now every couple of years," which would warrant various forms of costly therapy depending on the frequency and severity of the episodes. *Hirsh Deposition, pgs. 61-64, 96-103*.[1]

---

[1] "Atrial fibrillation has a devastating effect on ones ability to have a normal life, a normal life expectancy, to enjoy life, to earn a living, and that the complications of the disease warrant very aggressive therapy." *Hirsh Deposition, pgs. 97-98*.

At the time of his exposure to the sulfur dioxide gas, Mr. Newman was employed by Viox Services, Inc., an independent contractor hired by P&G. *Newman Deposition, pg. 5; P&G Answer, paragraphs 6-7*. Mesa was another independent contractor hired by P&G, and at the time of Mr. Newman's exposure to the sulfur dioxide gas on March 17, 1999, Mesa employees were installing a unit heater in Building 179. *Deposition of John T. Gregg ("Gregg Deposition"), pgs. 10-11*. Neither Viox nor Newman knew there was sulfur dioxide gas present in the pipes of Building 179. *Cruse Deposition, pg. 42*.

There is no dispute as to whether sulfur dioxide gas was present in the pipes of Building 179 or that sulfur dioxide is a compound that may be hazardous to people. *P&G Answer, paragraph 9; Cruse Deposition, pgs. 41, 70, 72; Molloy Deposition, pg. 68, 76, 81, 96*. There also is no dispute that sulfur dioxide gas was released in Building 179 on March 17, 1999 as the "sulfur dioxide" alarm sounded in Building 179 that afternoon. *Newman Deposition, pg. 37; Cruse Deposition, pgs. 52, 70, 72; Molloy Deposition, pg. 96, Gregg Deposition, pgs. 24-25, Deposition of Lloyd Stephenson ("Stephenson Deposition"), pgs. 32-33; Deposition of Neil Buckley, pg. 33*. The main issue in dispute is between the two Defendants, P&G and Mesa, as to who was responsible for allowing the sulfur dioxide gas to be released in Building 179.[2] Further, while Mesa apparently contests whether it owed Mr. Newman a duty of care and whether that duty was breached, P&G does not address

---

[2] P&G contends that Gregg, a Mesa employee, opened a pipeline valve which released the sulfur dioxide gas. *Molloy Deposition, pgs. 50, 83; Cruse Deposition, pgs. 63, 66*. In response, Mesa contends that Gregg did not open a pipeline valve. *Gregg Deposition, pg. 46; Stephenson Deposition, pg. 84; Molloy Deposition, pg. 64*.

3

these negligence elements in its motion for summary judgment.[3] Instead, P&G only addresses the negligence element regarding whether Mr. Newman's exposure to the sulfur dioxide gas proximately caused his injuries. The Court previously denied P&G's prior motion for summary judgment which alleged that P&G did not owe a duty of care to Mr. Newman under premises liability law. See Court's Order, dated December 21, 2001.

**II.    Summary Judgment Is Not Appropriate Because (1) Mesa Owed a Duty of Care to Mr. Newman, and There Is Evidence that Mesa Breached Its Duty, and (2) Mr. Newman Has Produced Expert Testimony that His Exposure to Sulfur Dioxide Gas Proximately Caused His Subsequent Injuries and Atrial Fibrillation Episodes.**

   **A.    Summary Judgment Standards for P&G and Mesa as the Moving Parties, and for Mr. Newman as the Non-Moving Party.**

In moving for summary judgment, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Sixth Circuit has noted that a party may move for summary judgment if it can demonstrate that the non-moving party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. See Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989).

---

[3] The elements of a negligence claim under Ohio law, as previously stated by the Court, are (1) a duty to protect another from injury [duty], (2) a failure to discharge that duty [breach], and (3) injury proximately resulting from that failure [breach proximately causing subsequent injury]. See Wellman v. East Ohio Gas Co., 160 Ohio St. 103, syllabus ¶ 3, 113 N.E.2d 629 (Ohio 1953). Since the Court is exercising diversity jurisdiction in this action, Ohio state substantive law will control. Ferens v. John Deere Co., 494 U.S. 516, 524 (1990); Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938).

Therefore, in responding to a motion for summary judgment, Rule 56(e) of the Federal Rules of Civil Procedure "requires the non-moving party to go beyond the pleadings," and present some type of evidentiary material in support of its position. Celotex Corp., 477 U.S. at 324. Summary judgment shall be denied "if there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). "Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party." United States v. Atlas Lederer Co., 97 F.Supp.2d 834, 835 (S.D. Ohio 2000) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). Further, "[i]f the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder." Id. (citing 10A Charles Alan Wright, et al., Federal Practice and Procedure § 2726).

    **B.    Mesa Owed a Duty of Care to Mr. Newman, and There Is Evidence that Mesa Breached Its Duty.**

Mesa, as an independent contractor, owed Mr. Newman, an employee of another independent contractor working on the same premises, a duty of care not to cause him injury. See McGeary v. Reed, 105 Ohio App. 111, 114, 151 N.E.2d 789, 793 (Ohio App. 1957). In McGeary, the appellate court confronted a situation similar to the one in this case in that McGeary, an employee of an independent contractor, claimed that the negligence of the employees of Reed, another independent contractor, proximately caused

his injuries. The McGeary court stated the following rule as to the duties owing between independent contractors working on the same premises:

> Where two or more independent contractors . . . are engaged in work on the same premises, it is the duty of each contractor, in prosecuting his work, to use ordinary and reasonable care not to cause injuries to the servants of another contractor; and an employee of one contractor may recover against another contractor for injuries caused by the negligence of the latter contractor ...

Id.

Since it is clear that Mesa owed Mr. Newman a duty of care, a factual determination must be made as to whether Mesa breached its duty, thus making summary judgment inappropriate. See Commerce & Industry Ins. Co. v. City of Toledo, 45 Ohio St.3d 96, 98, 543 N.E.2d 1188, 1192 (Ohio 1989) ("Whether a defendant properly discharged his duty of care is normally a question for the jury."); Cogar v. Scheetz Construction Co., C.A. No. 18501, 1998 Ohio App. LEXIS 81, *5 (Jan. 14, 1998) (reversing summary judgment for defendant after determining that defendant independent contractor owed a duty of ordinary care to employee of other independent contractor) (attached as **Exhibit B**). Further, there is sufficient evidence that Mesa breached its duty of care since P&G, based on its own investigation, concluded that Mesa's employees caused the sulfur dioxide gas to be released in Building 179. *See, generally, Molloy Deposition, pgs. 21 - 46*.

The Court, therefore, must deny Mesa's motion for summary judgment on Mr. Newman's claims against it.

**C.    Mr. Newman Has Produced Expert Testimony that His Exposure to Sulfur Dioxide Gas Proximately Caused His Subsequent Injuries and Atrial Fibrillation Episodes**.

P&G's sole argument for summary judgment focused on the "competency" of the expert testimony produced by Mr. Newman supporting his claim that his exposure to, and inhalation of, sulfur dioxide gas caused his subsequent injuries.  P&G's argument, however, is baseless as the experts testifying on Mr. Newman's behalf have opined that it is more likely than not that Mr. Newman's exposure to the sulfur dioxide gas caused his subsequent injuries, and the basis for their testimony meets the standards established by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

**1.    Mr. Newman's Experts Have Testified that It Is More Likely than Not that Mr. Newman's Injuries Were Caused by His Exposure to Sulfur Dioxide Gas.**

Two experts testifying on behalf of Mr. Newman, Dr. Hirsh and Roger L. Wabeke, have opined that it is more likely than not that Mr. Newman's injuries were the result of his exposure to sulfur dioxide gas.  *Hirsh Deposition, pgs. 37, 64-65; Deposition of Roger L. Wabeke ("Wabeke Deposition"), pgs. 132, 170-71.*[4]  This testimony meets the Stinson standard referenced in P&G's motion for summary judgment as these experts have testified that there is a greater than fifty percent likelihood that Mr. Newman's exposure to the sulfur dioxide gas caused his injuries.  Summary judgment, therefore, is not appropriate as Mr. Newman has presented a prima facie case of negligence against P&G, specifically as to causation based on probability.  See Stinson v. England, 69 Ohio St.3d

---

[4] Mr. Wabeke's deposition transcript is being filed contemporaneously with the filing of this Memorandum.

451, 455, 633 N.E.2d 532, 537 (Ohio 1994) ("In order to present a jury question and avoid a directed verdict, [a plaintiff is] required to satisfy the burden of production by establishing a prima facie case.").

### 2. Mr. Newman's Expert Testimony on Causation Is Sufficiently Reliable Under Daubert.

Dr. Hirsh, Mr. Newman's cardiologist,[5] opined that Mr. Newman's recurrent atrial fibrillation was caused by his exposure to sulfur dioxide gas on March 17, 1999. *Hirsh Deposition, pgs. 64-65*.[6] Dr. Hirsh's conclusion was based on the fact that he could not detect – after examining Mr. Newman and reviewing his medical history and symptoms – any other cause for atrial fibrillation in Mr. Newman, such as hypertension, alcoholism, hyperthyroidism, nervous system problems, asthma, chronic lung conditions, structural heart disease, coronary disease, excessive use of stimulants, or that Mr. Newman's atrial fibrillation episodes were caused by exercise or stress. *Hirsh Deposition, pgs. 33, 82-84*. This approach, known as "differential diagnosis," fulfills the Daubert standards in the Sixth

---

[5] Dr. Hirsh is board certified in internal medicine, cardiology, and interventional cardiology; cardiology, like pulmonology, is a subspecialty of internal medicine. *Hirsh Deposition, pgs. 5-6*.

[6] Dr. Hirsh also explained how inhalation exposure causes atrial fibrillation. *Hirsh Deposition, pgs. 29-30, 38-40, and in general the effect of inflammatory material in the lungs, pgs. 25-29*.

Circuit.[7]  See Hardyman v. Norfolk & Western Railway Co., 243 F.3d 255 (6th Cir. 2001).[8] In Hardyman, the Sixth Circuit found that the district erred when it excluded plaintiff's expert causation testimony, based on differential diagnosis, and rejected the district court's rationale that such testimony was 'conclusory and unsupported by objective, reliable methodology.' Id. at 261, 267.

In support of the Hardyman decision, the Sixth Circuit also relied on the Fourth Circuit's finding that an expert's causation testimony, based on differential diagnosis, was sufficiently reliable under Daubert to be admitted.  See Westberry v. Gislaved Gummi AB, 178 F.3d 257 (4th Cir. 1999).  In Westberry, the plaintiff's expert opined that plaintiff's work-related inhalation of talc caused his severe sinus problems, with the employer arguing that such testimony was inadmissible because there was no scientific or epidemiological studies or laboratory data to support such a conclusion.  Westberry, 178 F.3d at 262.  The Fourth Circuit rejected the employer's arguments, and found that the expert's differential diagnosis was "sufficiently reliable," and thus, properly admitted by the district court.  Id. at 266.

Based on the Hardyman and Westberry rationales, Dr. Hirsh's causation testimony

---

[7] The Sixth Circuit noted that "[i]n Daubert, the Supreme Court provided extensive guidance for the application of the dictates of [Evidence] Rule 702.  The Court explained that Rule 702 displays a 'liberal thrust' with the 'general approach of relaxing the traditional barriers to 'opinion testimony.'" Jahn v. Equine Services, PSC, 233 F.3d 382, 388 (6th Cir. 2000) (citing Daubert, 509 U.S. at 588).

[8] In Hardyman, the Sixth Circuit defined "differential diagnosis" as "the method by which a physician determines what disease process caused a patient's symptoms.  The physician considers all relevant potential causes of the symptoms and then eliminates alternative causes bases on a physical examination, clinical tests, and a thorough case history." Id. at 260 (citing Federal Judicial Center, Reference Manual on Scientific Evidence 214 (1994)).  Dr. Hirsh also explained the differential diagnosis process in his deposition.  *Hirsh Deposition, pgs. 13-14.*

9

is proper and meets the <u>Daubert</u> standards. The Court, therefore, must deny P&G's motion for summary judgment on Mr. Newman's claims against it.

### 3. P&G's Arguments Are Incorrect or Inconsequential.

In its summary judgment motion, P&G unsuccessfully attempts to discredit Dr. Hirsh's testimony. However, the "facts" cited by P&G in its motion are either incorrect or inconsequential to the summary judgment issue.

First, P&G incorrectly argued that Mr. Newman did not suffer a pulmonary injury when he inhaled the sulfur dioxide gas. On March 18, 1999, the day after he was exposed to the sulfur dioxide gas, Mr. Newman was sent to the emergency room at Bethesda Care in Norwood, Ohio because he had trouble breathing, a bad cough, a congested chest, and a sore throat; at Bethesda Care, Mr. Newman was diagnosed with chemical pneumonitis (which is an inflammation of the respiratory tract tissues due to chemical inhalation) and was treated with steroids. *Newman Deposition, pgs. 55, 58; Deposition of Virginia Loewenstine, M.D. ("Loewenstine Deposition"), pg. 45; Wabeke Deposition, pgs. 97, 162*; *Exhibit 112 to Loewenstine Deposition* (attached as **Exhibit C**).[9] Dr. Loewenstine testified that steroids were prescribed because "[t]he purpose of the steroids in lung conditions or exposures is to decrease the inflammation." *Loewenstine Deposition, pg. 35*.

Second, P&G incorrectly emphasized the significance of the lack of residual lung damage arising from Mr. Newman's exposure to the sulfur dioxide gas. As explained by

---

[9] Kenneth C. Anderson, Mr. Newman's pulmonologist, also diagnosed Mr. Newman with chemical pneumonitis, and Dr. Hirsh testified that inhalation exposure of sulfur dioxide gas could cause pneumonitis. *Deposition of Kenneth C. Anderson, M.D. ("Anderson Deposition"), pgs. 58-60; Hirsh Deposition, pg. 51*.

Dr. Hirsh in his deposition, any residual impairment to Mr. Newman's lungs is not consequential to this action since the initial injury lasted long enough to cause Mr. Newman permanent heart damage. *Hirsh Deposition, pg. 35*.[10]

Third, P&G failed to account for Mr. Wabeke's testimony regarding the various human reactions to sulfur dioxide and that different people react differently to an exposure when it incorrectly argued that Mr. Newman did not display the "classic symptoms of sulfur dioxide exposure," even though Mr. Newman had trouble breathing, a bad cough, a congested chest, and a sore throat on the very next day after his exposure to the sulfur dioxide gas – symptoms other individuals have experienced when exposed to sulfur dioxide gas. *Wabeke Deposition, pgs. 56, 100-101; Deposition of Harry B. Plotnick, pg. 64*.

Finally, P&G's reliance on Dr. Anderson's lack of opinion regarding whether an exposure to sulfur dioxide could cause atrial fibrillation is inconsequential to this action. Dr. Anderson candidly admitted that he is a pulmonologist, not a cardiologist, and could not opine on whether exposure to sulfur dioxide could cause atrial fibrillation. *Anderson Deposition, pg. 79*. P&G's emphasis of this point is surprising because if Dr. Anderson opined that there was a connection between sulfur dioxide exposure and atrial fibrillation, P&G undoubtedly would argue that Dr. Anderson was not qualified to make such an opinion.

---

[10] Dr. Hirsh also testified that x-rays could not detect the presence of scar cells in Mr. Newman's lungs, and that there is no objective test to prove that scarring exists. *Hirsh Deposition, pgs. 77, 79.*

## III.   Conclusion

Based on the foregoing facts and law, both P&G's and Mesa's motions for summary judgment on Mr. Newman's claims against them should be denied.

>Respectfully submitted,
>
>ARNZEN & WENTZ, P.S.C.
>
>BY: <u>s/ Mary K. Molloy</u>
>MARY K. MOLLOY (0003067)
>MARK G. ARNZEN
>BEVERLY R. STORM
>600 Greenup Street
>P.O. Box 472
>Covington, Kentucky 41012-0472
>(859) 431-6100
>E-mail: mmolloy@arnzenlaw.com

## CERTIFICATION OF SERVICE

  I hereby certify that a copy of the above was mailed via U.S. mail, postage prepaid, this 8th day of September 2003 to the following:

John C. Scott, Esq.
Joe Mordino, Esq.
Faulkner & Tepe, LLP
2200 Fourth & Vine Street
5 West Fourth Street
Cincinnati, Ohio 45202

Scott R. Thomas, Esq.
Jeanette N. Dannenfelser, Esq.
Furnier & Thomas, LLP
One Financial Way
Suite 312
Cincinnati, Ohio 45242

                s/ Mary K. Molloy