1

1           UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF OHIO

3              WESTERN DIVISION

4

5    RICK E. NEWMAN,              :

6         Plaintiffs,            :

7    vs.                         :    Case No. C-1-01-0067

8    THE PROCTER & GAMBLE        :
     COMPANY, et al.,
9
          Defendants.           :
10

11         Deposition of ROGER WABEKE, a Witness

12   herein, taken as upon direct examination by the Defendants,

13   and pursuant to the Federal Rules of Civil Procedure,

14   agreement of counsel, and stipulations hereinafter set

15   forth, at the offices of Beverly Storm, Esq., Arnzen &

16   Wentz, PSC, 600 Greenup Street, Covington, Kentucky, at

17   11:00 A.M., on the 9th day of May, 2002, before Kathy

18   Simpson, a Notary Public for the State of Ohio.

19

20

21

22        TRI-COUNTY COURT REPORTING AND VIDEOTAPE SERVICE

23              95 SOUTH FOURTH STREET
                BATAVIA, OHIO  45103
24                 (513) 732-1477

25


                TRI-COUNTY COURT REPORTING

2

1    APPEARANCES:

2            On behalf of Plaintiff:

3            BEVERLY R. STORM, ESQ.
             Arnzen & Wentz, PSC
4            600 Greenup Street
             P.O. Box 472
5            Covington, KY  41012-0472

6            On behalf of Defendant P&G:

7            SCOTT THOMAS, ESQ.
             JEANETTE DANNENFELSER, ESQ.
8            Furnier & Thomas, LLP
             One Financial Way, Suite 312
9            Cincinnati, Ohio  45242

10           On behalf of Defendant Mesa, Inc.:

11           JOHN C. SCOTT, ESQ.
             Faulkner & Tepe, LLP
12           Five West Fourth Street, Suite 2200
             Cincinnati, Ohio  45202
13                    S T I P U L A T I O N S

14           It is stipulated and agreed by and between

15   counsel for the respective parties that the deposition

16   of Roger Wabeke, a Witness herein, called as upon

17   direct examination by the Defendants, may be taken at

18   this time and place pursuant to the Federal Rules of

19   Civil Procedure, agreement of counsel; that the

20   deposition may be recorded in stenotype by the Notary

21   Public, Kathy Simpson, who is also the court reporter,

22   and transcribed out of the presence of the witness;

23   and that signature of the deponent was expressly waived.

24

25


                   TRI-COUNTY COURT REPORTING

```
                                                              3
1                          I N D E X

2    WITNESS                  DIRECT   REDIRECT

3    ROGER WABEKE

4      By Mr. Thomas:           4        187
       By Mr. Scott:          160
5
                                - - -
6

7    EXHIBITS                 MARKED/REFERRED

8    Exhibit No. PG-4             66

9    Exhibit No. PG-10           158

10   Exhibit No. PG-70            5

11   Exhibit No. PG-71            5

12   Exhibit No. PG-72            6

13   Exhibit No. PG-73           69

14   Exhibit No. PG-74          123

15   Exhibit No. PG-75          126

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                        ROGER LEE WABEKE
 2    a witness herein, being of lawful age, after having been
 3    duly cautioned and sworn, was examined and deposed as
 4    follows:
 5                       DIRECT EXAMINATION
 6    BY MR. THOMAS
 7            Q     Will you state your full name, sir.
 8            A     My full name is Roger Lee Wabeke, that's
 9    W-A-B-E-K-E.
10            Q     Sir, my name is Scott Thomas and I'm here on
11    behalf of the Procter & Gamble Company to ask you some
12    questions about a report and some prospective testimony in
13    this case.  I gather from looking at your curriculum vitae,
14    that you're no stranger to giving depositions, I take it?
15            A     I'm not.
16            Q     Well, my ground rules are probably the same
17    as everybody elses.  If you don't hear my question, let me
18    know that and I'll repeat it; that's generally not a
19    problem.  If you don't understand my question, let me know
20    that and I'll do my best to rephrase it in a way that's
21    clear.  It's my job to ask a question that makes sense.  And
22    you're not required to guess at what I'm trying to get at,
23    so if there's any doubt at all, let me know; otherwise,
24    we'll just assume that you heard and understood my question.
25    Fair enough?
```

5

1                A    Fair enough.

2                Q    Let me hand you two exhibits that have been

3     marked PG-70, which appears to be a report dated October 27,

4     2001, and PG-71, which appears to be your curriculum vitae.

5     First take a look at No. 70.  Is that, in fact, a report

6     that you issued in this case, with some attachments, dated

7     October 27, 2001?

8                A    It is.

9                Q    And is that a true and accurate copy of your

10    report?

11               A    I believe so, yes.

12               Q    And the opinions and conclusions that you

13    formed in this case, are they all included in that report?

14               A    They are.

15               Q    Now, Exhibit 71 is a curriculum vitae that we

16    got around the same time.  Is that a true and accurate copy

17    of your curriculum vitae -- and I apologize if I'm

18    mispronouncing that.  My Latin is terrible.

19               A    I think that's correct.  Yes, up until this

20    date.  I didn't bring a correct version.  It's essentially

21    not different.  It's essentially the same as this one.

22               Q    Sir, could I trouble you to provide Ms. Storm

23    with a current copy of your curriculum vitae at a later

24    date?  In fact, what I'll do is if you could forward that to

25    the court reporter and just make a note that we're going to

6

1    mark that PG-72; is that all right?

2             MS. STORM:  Yes, it is.  Off the record.

3                  (Off-the-record discussion.)

4         Q    All right.  So what we're going to do is mark

5    in advance Exhibit 72, which would be the new and updated CV

6    for Mr. Wabeke.

7                  Is there anything that you could tell me as

8    we sit here about what is different on your current CV from

9    what appears on the copy that we've got marked as Exhibit

10   71?

11        A    I would say, Mr. Thomas, in general not major

12   changes, perhaps a few internal publications through the

13   University and some additional speaking engagements.  But

14   other than that, nothing.  And I'll be happy to send a new

15   one to Ms. Storm.

16        Q    Okay.  And please be happy to call me --

17        A    Either tomorrow or the first part of the

18   week.

19        Q    Please be happy to call me Scott.  Nobody

20   calls me Mr. Thomas.  Let's start off with the CV, first

21   off.  And I'm going to -- I'm going to go through this more

22   quickly and just to confirm in my own head that I digested

23   it accurately.  You were born August 29, 1940, in Detroit,

24   Michigan?

25        A    Yes.

TRI-COUNTY COURT REPORTING

7

1           Q    And you graduated from high school in 1958 at

2   Redford High School?

3           A    Yes.

4           Q    That's also in Detroit?

5           A    Yes.

6           Q    From there, I take it, you did odd jobs,

7   carpentry and roofing until you joined the Navy in 1960?

8           A    That's right.

9           Q    And then in the Navy you served as a

10  Corpsman?

11          A    Yes.

12          Q    And you were honorably discharged from the

13  Navy in 1963?

14          A    Yes, my active duty ended in 1963.  I believe

15  I had two additional years that I was on inactive reserve.

16  So officially the discharge date would have been about 1964

17  or 5.

18          Q    From the reserves, but you were discharged

19  from active duty in 1963?

20          A    Yes, right.

21          Q    And in 1999, you got a Bachelor's of Science

22  Degree in Chemistry and Biology from Wayne State University

23  College of Science.

24          A    Yes.

25          Q    And when did you begin going back and taking

8

1    courses at Wayne State?

2            A    In graduate school, I'm not sure.

3            Q    Well, to start taking the courses that

4    culminated in the degree in 1998.

5            A    I started about 1964 or 65.

6            Q    All right.  Did you go -- was it part-time at

7    some point or was it night school or what was that?

8            A    It was part-time for, perhaps, the first two

9    years and then full-time for the last two or three years.

10           Q    And between 1963 when you got out of active

11   duty and when you started doing the part-time work, you were

12   -- you had gone back to the carpentry and roofing and doing

13   things of that nature until -- and, perhaps, while you were

14   attending college during those first two years?

15           A    That's exactly right.

16           Q    And you started at what was then Wyandotte

17   Chemicals Corporation in 1976?

18           A    Yes.

19           Q    So that would have been in your junior year,

20   perhaps?

21           A    Junior or senior, yes.

22           Q    And what did you do at BASF or Wyandotte,

23   excuse me?

24           A    I was hired as an industrial hygiene

25   technician and I operated industrial hygiene.


TRI-COUNTY COURT REPORTING

9

1              Q     What does an industrial hygiene technician
2      do?
3              A     Well, I was responsible for a variety of
4      issues at plants that BASF, or at the time Wyandotte
5      Chemicals Corporation, had throughout the United States and
6      Canada.   I primarily inspected plants, site visits with an
7      eye toward chemical exposure to workers in these sites.   I
8      evaluated the exposures, took ventilation measurements,
9      obtained the air samples, studied the work practices and
10     prepared reports with the findings with recommendations as
11     appropriate.
12             Q     And what kind of chemicals were you involved
13     with doing this work?
14             A     Wyandotte Chemicals manufactured perhaps
15     hundred of chemicals.   Many were inorganic in nature, others
16     were organic in nature.   The company manufactured basic
17     chemical such as chlorine, caustic soda, hydrogen, soda ash,
18     sodium bicarbonate.   It manufactured coal tar chemicals and
19     manufactured a variety organic chemicals used in polymer
20     formulations and paints, in disbursements and surfactants,
21     again a very broad mix of chemicals.
22             Q     Did they manufacture sulfur dioxide?
23             A     No, we purchased it, but did not manufacture
24     it.
25             Q     Was it used in the chemical processes that

TRI-COUNTY COURT REPORTING

10

1    were involved in making some of these other compounds?

2        A    It was used essentially in one process in the

3    manufacture of detergents and synthetic detergents.

4        Q    Now, in evaluating the ventilation and work

5    practices and doing air sampling, I take it you were

6    monitoring the air in the occupational workplace for the

7    presence of the kinds of chemicals that we're talking about?

8        A    Yes.

9        Q    And very often in these industrial practices

10   the very active manufacturing, whether it be equipment or

11   compounds at BASF, these chemicals are released into the

12   work atmosphere and an industrial hygienist or someone like

13   yourself will look at that environment to make sure that the

14   concentration, if you will, of the various chemicals are

15   within safe limits; is that fair?

16       A    That's one thing that's done.  That's not the

17   entire picture, but that is part of it, yes.

18       Q    And what were your hours like?  I noticed

19   from your CV that you worked from '67 to 1972 at Wyandotte.

20   That embraces probably the last two or three years of your

21   undergraduate work.  What kind of hours were you putting in

22   at Wyandotte?

23       A    Well, as it turns out, I needed one course to

24   get my Bachelor of Science Degree in Chemistry and Biology.

25   When I hired in at Wyandotte Chemicals, I had taken all but

TRI-COUNTY COURT REPORTING

11

1    that one course.  So I took that one course in night school

2    in about 1969.  So it's not a true reflection that I was

3    working full-time and going to school part-time for the

4    first two years of my employment at Wyandotte Chemicals.

5           Q    Okay.

6           A    My hours --

7           Q    Well, let me just say this.  I infer then

8    that it's fair to say that between '67 and '72 your work at

9    Wyandotte was what we would generally call full-time?

10          A    That's right.

11          Q    And you continued there after your

12   graduation?

13          A    Yes.

14          Q    And your title appeared to change from

15   industrial hygiene technician to assistant industrial

16   hygienist.  What if anything was changed in the duties that

17   you performed at that time?

18          A    I can't recall any change in my duties.

19          Q    A fancier title and perhaps better pay?

20          A    Yes.

21          Q    And then in 1975, you got a Master's of

22   Science in Industrial Hygiene and Occupational and

23   Environmental Health; is that correct?

24          A    Yes.

25          Q    And that was also at Wayne State?

TRI-COUNTY COURT REPORTING

12

1          A     Yes.

2          Q     And when did you begin working toward that

3     degree?

4          A     About 1971, 1970 perhaps.

5          Q     All right.  And so mindful that you also went

6     -- you worked at Wyandotte until '72, and then from '72 on

7     you began working at Ford?

8          A     Yes.

9          Q     And so tell me about how you juggled the

10     education and the work?

11          A     Much like any graduate student or any student

12     that is working and going to school.  You have very little

13     free time.  My classes were offered almost exclusively in

14     the evening, say, from 4:30 to perhaps as late as 10:00 at

15     night.

16          Q     So generally speaking you were in a night

17     program working full-time at Ford?

18          A     Yes.

19          Q     And were your duties at Ford between 1972 and

20     1977 roughly equivalent to the kinds of activities that you

21     described earlier that you did at Wyandotte?

22          A     Well, obviously the nature of the businesses

23     were different.  But as an industrial hygienist, we looked

24     at all the factors in the workplace that could have an

25     impact on Ford employees, including chemical exposures,

TRI-COUNTY COURT REPORTING

13

1    physical agents, biological factors and ergonomic issues.

2         Q    What is a study of Industrial Hygiene

3    Occupational and Environmental Health at the Master's level,

4    what does that entail?

5         A    Courses, a thesis.  I chose the thesis option

6    over the essay.  A variety of courses in the recognization,

7    evaluation and control of stress agents within the workplace

8    that can affect the comfort and indeed the health or even

9    the life of workers in those environments.

10        Q    Now, in 1977 I'm reading -- inferring from

11   this that your duties at Ford changed in the sense that you

12   became involved in the industrial hygiene and toxicology

13   laboratory; is that right?

14        A    Yes.

15        Q    Tell me what that involved.

16        A    Well, I was a supervising industrial

17   hygienist.  At the time, we developed a new laboratory, a

18   new testing facility for the environmental sampling that our

19   department collected throughout Ford workplaces.  I was the

20   director of the laboratory as well as the supervisor of

21   industrial hygiene.

22        Q    So I take it that half -- I don't mean this

23   quantitatively, but in one role you were in charge of the

24   laboratory work that involved the testing of samples that

25   were collected in Ford facilities?

TRI-COUNTY COURT REPORTING

14

1       A    I managed the entire department.  And I
2   believe that started about 1978, '79, '77.  I'm not sure of
3   the year.  And then I had two groups, the laboratory
4   function and the field staff.  The field industrial
5   hygienists who entered the various plants to conduct their
6   studies under my direction, and then the laboratory staff
7   that would analyze the samples that were collected by those
8   people.
9       Q    Okay.  You used a phrase "industrial hygiene
10  and toxicology program," what does mean?
11      A    Perhaps it should more be aptly phrased the
12  laboratory was the industrial hygiene and toxicology
13  laboratory at Ford Motor Company.  We focused on
14  occupational toxicology, not medical toxicology.  We were
15  looking at the effects of chemicals primarily on the health
16  of Ford employees.
17      Q    I'm not criticizing the label, just trying to
18  --
19      A    Well, looking back on it perhaps it would
20  have been more appropriately labeled, "The occupational
21  toxicology laboratory."  But essentially we were concerned
22  about the potential adverse health effects of chemicals, for
23  the most part, on Ford employees.  That involved testing,
24  not animal testing as traditional toxicologist do, but the
25  testing of environment samples collected by field industrial

15

1    hygienists.

2              Q    But the testing that was done was related to

3    samples on Ford premises?

4              A    For the most part, yes.

5              Q    At any time was there -- in your work at

6    Ford, was there a collection of samples or testing of

7    samples related to sulfur dioxide?

8              A    Yes.

9              Q    And in what process or activity of the Ford

10   Motor Company would sulfur dioxide be a potential compound

11   in the atmosphere, the work atmosphere?

12             A    There were two major processes that seized

13   our attention.  The manufacture of cores and grey iron

14   foundries.  And of the Ford foundries, I believe we had six

15   at the time.  Only three had the process.  One in Michigan;

16   one in Windsor, Ontario; and one in Cleveland.  And the

17   other major process where Ford employees could be exposed to

18   sulfur dioxide gas was in the steel mills in Dearborn,

19   Michigan.  There were two plants.  There was a basic oxygen

20   furnace and an electric re-mill furnace.  There were

21   occasional studies done on a sporadic basis for sulfer

22   dioxide at certain battery charging operations, but those

23   were essentially non-problematic.

24             Q    Now, these -- let me make sure I understand

25   that first expression you said.  Core in grey iron --


                    TRI-COUNTY COURT REPORTING

16

1           A     Foundries.

2           Q     -- foundries.  What does that mean?

3           A     Let's say that -- perhaps I can describe it.

4    Let's say we wanted to make a cast metal cup in which we

5    would pour molten metal in this case iron to make the cup.

6    We will have to have the box; a mold, a molded material; and

7    then a space.  The space would be the cup.  The core would

8    be that portion of this casting process that would be in the

9    -- it would form the interior volume of the cup.  And sulfur

10   dioxide in this process would actually cure the chemicals

11   that are used to make the core.  After the metal solidifies,

12   the core and the molds are broken away and we have a metal

13   cup.

14          Q     Where is the grey iron?

15          A     The grey iron would be the material to make

16   the cup.  Not that cups are made of grey iron, but I'm

17   trying to give an example.

18          Q     And how does the sulfer dioxide get used?

19          A     It was a binding agent in the core-making

20   process to bind the grains of sand together along with

21   polymers.

22          Q     Okay.

23          A     And instead of cores, these were engine

24   blocks, pistons, and crank shafts and things like that.

25          Q     Now, in these processes that you've described

17

1    in that foundry, that kind of core foundry and in the steel

2    mills, I take it that these processes necessarily release

3    sulfur dioxide into the working atmosphere of the folks who

4    are performing this work to one extent or another?

5              A    That's right.

6              Q    And part of the job of the industrial

7    hygienist is to keep tabs on that work atmosphere and ensure

8    that the sulfur dioxide in that work area does not approach

9    dangerous levels or levels that are injurious to health; is

10   that fair?

11             A    That's part of the job.  The air sampling in

12   and of itself is not the job, it's the overall chemical

13   safety of the entire process.

14             Q    I don't mean to oversimplify.

15             A    No, I understand.

16             Q    That is the general idea.  You figure out

17   what the air atmosphere in that work environment is and

18   analyse it, and then you take whatever steps are necessary

19   so that the work can be done safely by the workers in there.

20             A    Yes, but air samples are not done routinely

21   in all processes.  The overall objective is to have a system

22   in place to prevent exposures.  Air sampling on some

23   occasions might be part of that, but not as a matter of

24   routine.

25             Q    Okay.  That takes me back to my earlier

TRI-COUNTY COURT REPORTING

1    question.  I just got the impression that in these various

2    activities -- that's why I think I used the word

3    "necessarily" -- when you engage in these activities, some

4    sulfur dioxide is going to go into the work environment

5    merely because you're engaging in core foundries where this

6    sulfur dioxide is used as a binding agent or assistor or

7    it's used in some other -- to some other end in the oxygen

8    furnace or something like that; am I wrong?

9          A    Yes.  The objective isn't that sulfur dioxide

10   and gas and other air contaminates do not enter the work

11   environments.  They can be released in a process, but the

12   objective is to control that release such that the

13   contaminates don't reach the breathing zone of the workers.

14   So while there is a release in the process, ideally it's not

15   to expose the workers, it's to be exhausted in such a way

16   the workers are not exposed.

17         Q    Let me ask it this way.  In these processes

18   was the concentration of sulfur dioxide in the working

19   atmosphere where the operators were, was that concentration

20   zero?

21         A    No, it was -- well, at some processes with

22   some core-making machines it was non-detectable, it was at

23   ambient concentrations.  In other situations it was out of

24   control and required attention, so it was variable.

25         Q    And that was part of your job to control it?

19

1        A      That's right.

2        Q      In 1987 you joined Chemical Risk Management?

3        A      Yes.

4        Q      And what is Chemical Risk Management?

5        A      Well, it's my company, as small as it is.

6    It's not a Ford Motor Company.  We are an environmental

7    consulting firm.  We provide services in industrial hygiene

8    and chemical safety engineering and environmental pollution,

9    primarily to small companies in the mid-west.

10        Q      So what happened in 1987 when you left Ford?

11        A      I went into business for myself.  I excepted

12    a position at Wayne State University as an adjunct professor

13    in the Department of Occupational and Environmental Medicine

14    and I started consulting for companies on industrial hygiene

15    issues and safety engineering.

16        Q      Okay.  How many people were in Chemical Risk

17    Management when you opened your doors in 1987?

18        A      Initially it was me.  We had as many as

19    seven.  Right now it's just me.  Typically over the years

20    three people, consulting engineers.

21        Q      Sometimes when this -- when a person does

22    this, they merge with some other entity that already exists,

23    maybe it's a shell corporation, maybe it's a company that a

24    person's retiring and they take it over.  I guess my

25    question is did Chemical Risk Management perform any of

TRI-COUNTY COURT REPORTING

20

1    these kinds of services that it did while you were the
2    president prior to 1987?
3          A    No.  I should mention that I've been a
4    consulting industrial hygienist for 33 years, perhaps.  But
5    after 1987, I was doing business as Chemical Risk
6    Management.  Prior to that time, it was just under my name.
7          Q    All right.  What kind of work did you do
8    prior to 1987 as a consulting industrial hygienist in your
9    own name?
10         A    I consulted for companies in the Metropolitan
11   Detroit area.  I consulted for attorneys in pretty much the
12   Metropolitan Detroit area.  That was pretty much it.
13         Q    And what kind of work would be entailed in
14   the consulting on behalf of companies?
15         A    Conducting site visits where small companies
16   generally had a concern regarding occupational exposures of
17   their employees to whatever was of interest to them or of
18   concern to them, primarily in the area of chemical
19   exposures.  A variety of plants, small tool and die plants,
20   small potato chip plant, very diverse.  We've got in a
21   tremendously diverse segment.
22         Q    And on behalf of attorneys?
23         A    Those were primarily toxic tort issues.  Not
24   unfrequently an attorney would call to see if there was a
25   basis to a claim from an industrial hygiene perspective and

TRI-COUNTY COURT REPORTING

21
1   sometimes there were.

2          Q    Without knowing, I'm going to presume or
3   guess that the amount of work you did for attorneys prior to
4   1987 would be a small fraction of the work that you've done
5   since 1987; is that fair?

6          A    That's fair.

7          Q    Can you give us an estimate of how frequently
8   you might have given depositions or testified at trials
9   prior to 1987?

10         A    It's difficult to sort out because when I was
11  at Ford, I was deposed quite frequently on behalf of Ford
12  Motor Company and Wyandotte Chemicals Corporation.  But
13  other than that, on behalf of my employer I would say maybe
14  twice a year for 20 years.  I mean, it's a very rough
15  estimate where I was acting as an expert on behalf of an
16  attorney in an action.

17         Q    Well, with respect to your work -- your
18  testimony in connection with Ford and Wyandotte, I get the
19  impression that would mostly be in the context of worker's
20  compensation hearings?

21         A    It was at Wyandotte Chemicals, with the
22  exception of perhaps a few cases that had product liability
23  issues associated with them on warnings and adequate
24  disposers of the contents of a product.  And at Ford several
25  were worker's comp.  But as I look back on it, the lion's

TRI-COUNTY COURT REPORTING

22

1    share had to do with product liability issues regarding, for

2    example, carbon monoxide exposure of occupants inside Ford

3    Motor vehicles or exposure of certain chemicals that Ford

4    would sell to dealerships that would end up in, say, the

5    garage of homeowners.

6         Q    Prior to 1987, had any of your consulting

7    work, either on behalf of other companies or on behalf of

8    attorneys, involve sulfur dioxide?

9         A    I don't think so.  It's been a long, but

10   nothing comes to mind.  It's highly unlikely.

11        Q    Tell me about your post 1987 connection with

12   Wayne State University.

13        A    I've been on the faculty since.  I teach

14   three courses at Wayne State University.  I work in the

15   Department of Family Medicine, the Division of Occupational

16   Environmental Medicine.  I provide lectures to residents in

17   Family Medicine and to residents in Occupational and

18   Environmental residency programs.  I conduct site visits

19   with the physicians to various facilities primarily in the

20   Metropolitan Detroit area to familiarize the doctors with

21   types of exposures workers might encounter, people they will

22   see as patients in their clinics.  I'm involved in research

23   through the department.  I'm in the department on an

24   as-needed basis as a consultant to the department on issues

25   regarding causation of occupational diseases and injuries.


                     TRI-COUNTY COURT REPORTING

23

1    Should a physician, for example, have a concern that their
2    patient might have an occupational component in terms of the
3    pathology, they will contact me to see if there is any merit
4    to that.
5         Q    Tell me the names of the three courses that
6    you teach.
7         A    The first course is Occupational and
8    Environmental Medicine; the other course is Risk Management;
9    and the third, which I'm currently teaching, is Principles
10   of System and Process Safety Management.
11        Q    Principles --
12        A    Of System -- or Systems -- and Process Safety
13   Management.  And in addition to that, I give regular
14   lectures in the Chemistry of Industrial Processes, that is
15   to say I don't teach entire courses, just selected lectures,
16   and lectures of residents in Family Medicine and
17   Occupational and Environmental Medicine.
18        Q    What is the scope of that -- well, first let
19   me as you this.  You said "and now I'm teaching this."  Is
20   that merely a reflection that this is a course that's
21   currently in session?
22        A    Yes, that's right.  Each of those courses is
23   offered one a year and they are not coincident.
24        Q    So during one academic year you're always
25   teaching and it will be one of these three courses?

TRI-COUNTY COURT REPORTING

24

1          A    Yes, except for the summer.

2          Q    And tell me about the scope of risk

3    management.   What does that mean?

4          A    Well, some would say in the insurance

5    industry it's cost containment.   The course is part of a

6    Master of Science Degree in Industrial Hygiene.   And the

7    course is bifurcated into statistics and concepts of risk

8    management.   Risk management is attempts to introduce the

9    student to processes with injury and harm potential,

10   starting through hazard assessment, risk assessment, and

11   then finally the management of risk by a variety of

12   techniques.

13         Q    And students in this course are pursuing a

14   Master of Science Degree in Industrial Hygiene, correct?

15         A    Or in chemical engineering.   We get students

16   from engineering schools as well as -- well, actually three

17   schools:   The School of Medicine -- College of Medicine,

18   School of Engineering, and the College of Pharmacy and

19   Health Sciences.

20         Q    All right.   But fair to say, this is not a

21   course where you're teaching medical-doctors-to-be.

22         A    No, no, they are.   I just finished teaching

23   the course Occupational and Environmental Medicine.

24         Q    Sticking with risk management.

25         A    Risk management.   We will get two or three

TRI-COUNTY COURT REPORTING

25

1    out of maybe twelve students that take courses as an

2    elective for physicians, but they are not exclusively

3    medical doctors, no.

4         Q    Let me phrase it a different way.  You would

5    agree with me, I would assume, that the information you're

6    presenting to the students in this risk management course in

7    content is not teaching anyone the practice of medicine; is

8    that fair?

9         A    Not the clinical practice of medicine, that's

10   fair, that's right.  But there are concepts covered in the

11   course that address medical issues as might be encountered

12   by a physician specializing in Occupational Medicine.

13        Q    Certainly?

14        A    No, I'm not a physician.  I'm not teaching

15   clinical practice issues, but other issues regarding

16   occupational medicine, yes.

17        Q    Well, when we say "other issues regarding

18   occupational medicine," what other issues -- I guess my

19   impression from hearing you is that the issues that you're

20   talking about are helping the doctor become aware of risks

21   and hazards associated, for example, with some of the

22   chemicals that we've talked about in terms of their

23   toxicological effects on humans; is that fair?

24        A    That's part of it, yes.

25        Q    Now, Principles of Systems and Process Safety

TRI-COUNTY COURT REPORTING

26

1   Management, is that also a course that, to me, just not

2   knowing anything, sounds like it would also fall in that MS

3   Degree in Industrial Hygiene; is that right or no?

4           A     Partially.  It can be an elective course for

5   that degree.  It's not a core course for the degree, but it

6   is a core course for a graduate certificate in safety.

7           Q     And what is a graduate certificate?

8           A     A graduate certificate typically is -- it can

9   be considered, say, the first twelve to fifteen hours of a

10  Master of Science Degree.  And it's a growing trend

11  throughout the country, wherein a person might have an

12  interest in certain things.  If they do well grade-wise

13  during the graduate certificate, that might spur them on to

14  proceed for additional graduate training, perhaps a master's

15  degree or doctorate.

16          Q     And I noticed in your own CV you talked about

17  a post-graduate certificate in hazardous materials

18  engineering, that was -- a year later you got your Master's

19  of Science in Chemical Engineering in Hazardous Material and

20  Environmental Pollution and such.  When I read that, I kind

21  of got the same impression that you were just describing.

22  It's kind of like a milestone on the path to a Master's of

23  Science?

24          A     Exactly.

25          Q     Is that fair?

TRI-COUNTY COURT REPORTING

27

1          A     Exactly.

2          Q     And once you get a Master's of Science, you

3     really don't -- you don't dwell on the certificate, is that

4     fair?  Because the Master's of Science is a higher level of

5     achievement?

6          A     I don't know what you mean by "dwell" on it.

7          Q     It's not separate and apart.

8          A     It's part of it, right.

9          Q     You can't get a Master's of Science in

10    Chemical Engineering with Hazardous Materials without having

11    qualified for a post-graduate certificate; is that fair?

12         A     That's a good question.  I suppose you could,

13    I don't know that.

14         Q     How are you going to jump the first twelve to

15    fifteen hours?

16         A     Well, you take them.

17         Q     See what I'm saying?

18         A     That's right.  I guess you would have to.  I

19    never thought about it that way; that's right.

20         Q     Now, this Occupational Environmental Medicine

21    course, tell me about the scope of that.

22         A     This course has been offered for at least

23    eight years.  I was involved from the get-go, the past seven

24    to eight years at Wayne State University School of Medicine.

25    It's a course that introduces the students, or almost I

TRI-COUNTY COURT REPORTING

28

1    would say three-fourth physicians, to those environmental
2    factors in the workplace that can cause adverse effects in
3    workers and ostensibly their patients at one time or
4    another.  We introduce the concepts of recognition of
5    hazards and the nature of those stressors in the workplace
6    that can cause pathology and adverse effects in people.
7    It's a survey course addressing chemical factors such as
8    gases, vapors, dust, fumes, mist, smoke; physical factors,
9    which would include noise, ionizing and non-ionizing
10   radiation, hypothermia, hyperthermia, microwaves, lighting;
11   biological factors and ergonomic factors with an emphasis on
12   manual material handling operations.
13        Q     And I take it that this course might be of
14   interest to a student, perhaps a doctor who was either
15   intent on pursuing a career in addressing health issues
16   among industrial workers, or, perhaps, doing research on
17   this kind of toxicology; is that fair?
18        A     That's fair.  Most I would say are
19   practitioners with active practices or that's their
20   objective.  Very few are involved in research as such.
21        Q     And what I think I'm hearing is you share
22   with these students your perspective on things that are
23   going on in the industrial world much the same way that you
24   explained to me a few moments ago about the core processes
25   at that one foundry and the chemicals that are involved in

29

1    the various manufacturing processes, and essentially

2    highlight to them to increase their awareness of these

3    potential agents that can cause injury to industrial

4    workers.  So that when Joe Industrial Worker comes in their

5    office and when the doctor takes a history and they say what

6    do you do for a living and he says, "Well, I work in a steel

7    mill," a light goes off in the doctor's mind and it reminds

8    the doctor to check various things that might be existent to

9    see whether that occupational exposure may have a factor in

10   what's going on medically with the patient; is that fair?

11           A    That's fair.

12           Q    Now, the converse of that is -- and what I

13   want to understand is -- I take it that you're not teaching

14   the doctors medicine in terms of how to be a doctor in

15   diagnosing, treating, monitoring, prescribing, whatever the

16   care requires for the proper treatment of a patient that's

17   been exposed to a chemical that you might well discuss in

18   your class; that part of it is not part of your course; is

19   that fair?

20           A    That's fair.

21           Q    Okay.  How would you break down for me your

22   time with respect to the time you spend teaching your course

23   and -- I'll say that.  I know it might me three courses, but

24   at any one time you're teaching one course -- did I get that

25   right?

TRI-COUNTY COURT REPORTING

30

1          A    Yes.    Except for the summer months.

2          Q    When you're not teaching?

3          A    Right.

4          Q    But occasionally you're going to teach

5     workshops or fragments of these courses to smaller groups

6     that have a particular interest in that subject?

7          A    Yes.

8          Q    So let me just over generalize and say that

9     at any point in time you may have your academic hat on or

10    you might have your Critical Risk Management hat on.    What

11    would you tell me would be the breakdown of your time

12    between those?    Ten percent wearing this hat, ninety percent

13    wearing that hat?    How would that break out?

14         A    I would say over a year, fifteen percent of

15    my time -- maybe even 20 -- let's say fifteen percent of my

16    time is in the area of teaching and research, but that's

17    very broad.    That would include courses that I teach,

18    lectures to physicians in our department, that would be

19    research activities with my colleagues.    I would say fifteen

20    to twenty percent and that's been fairly steady over the

21    years.

22         Q    Now, tell me a little bit about this Wayne

23    State University School of Medicine.    Your area where you

24    teach is in a division of the Department of Family Medicine;

25    is that right?


                    TRI-COUNTY COURT REPORTING

31

1          A      That's right.

2          Q      Do you teach in any other divisions or

3    departments of the University?

4          A      Yes.

5          Q      What is that?

6          A      The course that we were discussing,

7    Occupational Environmental Medicine, is offered through the

8    Department of Community Medicine.  And it's jointly offered

9    through the School of Pharmacy and Health Professions -- or

10   Health Sciences, pardon me.  So I have an appointment in

11   both schools; that is to say that the School of Medicine and

12   the College of Pharmacy and Health Sciences.  The other two

13   courses are exclusively through the School of Pharmacy and

14   Health Sciences.  They are all through the graduate schools

15   of each of those departments.

16         Q      Let me see if I've processed what you said.

17   I take it, then, that we can say that all of these three

18   courses are offered through the College of Pharmacy and

19   Health Sciences of Wayne State University; however, the

20   Occupational and Environmental Medicine course is also

21   offered through the Division of Occupational and

22   Environmental Medicine, which is part of the Department of

23   Family Medicine?

24         A      That's right.

25         Q      Is that right?

TRI-COUNTY COURT REPORTING

32

```
 1              A     That's right.

 2              Q     Now --

 3              A     Sounds convoluted.

 4              Q     No, I understand.  Is your title -- it's

 5    listed here as "adjunct professor and resident lecturer."

 6    Is that the same in both the College and Pharmacy of Health

 7    Sciences as well as the Division of Occupational and

 8    Environmental Medicine of the Department of Family Medicine?

 9    Or is the title of those teaching posts different?

10              A     That's a good question.  I don't know.

11              Q     The reason I ask, I looked at -- I was

12    surfing on the internet and I found in this College of

13    Allied Sciences that they've got professors, associate

14    professors, adjunct associate professors, assistant

15    professors, adjunct assistant professors, clinical assistant

16    professors and they've got names under all of these.

17              A     Is this at Wayne State?

18              Q     Yes, sir.  And you're listed not under any of

19    those titles, but as what they call an adjunct instructor.

20    Now, I don't know if that makes any difference.  Is that --

21              A     It doesn't make any difference to me.  I

22    don't care.

23              Q     Okay.  But so I guess what I'm saying is your

24    title hasn't changed in any respect?

25              A     I really don't know.  I cannot be a clinical
```

TRI-COUNTY COURT REPORTING

33

1   professor because I'm not a physician.  I don't teach

2   clinical medicine.  Other than that, I don't know the

3   distinction between the various titles.

4           Q     Okay.

5           A     My students call me doctor, but I'm not.

6           Q     Well, with the complexity of the subject

7   matter that you're teaching, I'm not surprised.  Then you

8   went for a second Master's in Chemical Engineering and you

9   got that degree in 1992.  Was that also kind of working at

10  night or how was that?

11          A     Part-time at night, yes.

12          Q     And I guess I'm -- why was the interest there

13  in chemical engineering as opposed to -- can you go -- can

14  one pursue a doctorate in your first Master's?

15          A     At some universities I believe that's

16  possible.  A Doctorate in Industrial Hygiene is not

17  available in the Detroit area.  I believe the University of

18  Michigan offers a doctorate.  I had no desire to become a

19  PhD, if you will, in a very specialized area.  I chose this

20  program because I felt that I could provide more technical

21  services to my clients.  Quite simply, I didn't want to be

22  the world's expert in a very narrow area, that would be of

23  little benefit to my clients.

24          Q     And meanwhile, while you're doing this

25  additional coursework, you did an internship at -- between

TRI-COUNTY COURT REPORTING

34

1    1990 and 1992 in Hazardous Medical Biohazard Chemical Waste

2    Management.  Can you tell me about that?

3         A    That was part of the degree requirement.  I

4    arranged to do that internship with the Detroit Medical

5    Center.  Having an office within one of their major

6    buildings, I saw some issues that I was also being consulted

7    on by numerous people throughout the facility.  So I thought

8    it was natural to combine that internship through the course

9    requirements and my professional responsibilities.

10        Q    The curriculum vitae indicates at some point

11   also in your -- I guess in the signature block,

12   "professional engineer," what does that mean?

13        A    A person who has completed engineering

14   courses and practices engineering in the area of a

15   specialty.  I focus on chemical safety engineering and

16   hazardous materials.

17        Q    Are you licensed as a professional engineer

18   in the State of Ohio?

19        A    No, I'm registered as a safety engineer, but

20   I'm not a licensed professional engineer.

21        Q    And where is that registration?

22        A    It's in Illinois with the America Society of

23   Safety Engineers in the Professional Engineers Division.

24        Q    Are you licensed as a professional engineer

25   in any state?

TRI-COUNTY COURT REPORTING

35

1           A     No, I'm not.

2           Q     And you agree with me that that's a different

3    thing from the safety engineering licensing that exists in

4    Illinois?

5           A     As a CSP, you mean, a Certified Safety

6    Professional?

7           Q     Yes.

8           A     Yes, they're different, that's right.

9           Q     When I think of professional engineer, I

10   think of, generally speaking, first someone takes the

11   engineer in training exam.  Then after satisfying the work

12   experience requirement, they sit for professional engineer.

13   And certain your Master of Science in Chemical Engineering

14   would be one of those building blocks to that.  But I take

15   it I don't hear you saying you have sat for the exam in any

16   particular state?

17          A     No, I haven't.

18          Q     Too busy working?

19          A     If we could compare it to physicians, I

20   suppose I could say I'm board eligible, that would be the

21   most appropriate designation.

22          Q     Is there any other employment that is not

23   listed on your CV?

24          A     No, I think I was employed -- and, in fact,

25   still am -- at Karmanos Cancer Institute, a research on

36
1    prostate cancer.  That project is winding down.
2              Q     That is in there.
3              A     That is in there?  No, there is nothing else.
4              Q     Well, let me -- since you bring that up,
5    let's explore it just for a few moments.  I take it in that
6    event you were -- what's known in the business as the
7    principal investigator and you're supervising, as I
8    understand it, three other people who are investigating some
9    aspect of that?
10             A     Excuse me, I was one of four principal
11   investigators.  There are three other people as well.
12             Q     And your role in that was what?
13             A     My role was to supervise industrial
14   hygienists in establishing retrospectively exposures of
15   people with prostate cancer in controls.  Establish an
16   occupational history for these gentleman over their life.
17             Q     And was this the data that would then in turn
18   be reviewed by other investigators who were physicians?
19             A     That will be late in the process.  Now the
20   data are being evaluated by biostatisticians.
21             Q     Epidemiologists?
22             A     Well, then that would be phase three, the
23   epidemiologist.  And then the last phase would be joint
24   where we all get back together and look at it along with
25   physicians, the medical implications of occupations and

                    TRI-COUNTY COURT REPORTING

37

1     prostate cancer.

2          Q     I've reviewed the publication on your CV.  Is

3     this list complete or do you know -- well, let me let you

4     look at Exhibit 72, which we don't have before us today,

5     whether there are additional publications on that?

6          A     There might be, say, two or three additional

7     publications within the University.  But beyond that,

8     nothing.

9          Q     Now, again, as a layman, looking at this, I

10    didn't see anything in list of your publications that dealt

11    with sulfur dioxide in any respect.  Did I miss that?

12         A     Well, there wouldn't be anything in the

13    title.  I've written a book and there might be some problems

14    within that book.  As I sit here, I don't know if there are

15    problems in that book regarding SO2 or not.

16         Q     Which book are you talking about?

17         A     It's in my CV.  It's called "Air Contaminants

18    and Industrial Hygiene Ventilation."

19         Q     Could you take a look and point out which one

20    to me?

21         A     I'm going to have to go through each one, I'm

22    sorry.

23         Q     There is one here that talks about problems?

24         A     Page what?  I'm sorry.

25         Q     Page 8, one is "Problems with Technology and

TRI-COUNTY COURT REPORTING

38

1    Measurement?"

2         A    No, page eight, a little more than halfway

3    down, "Air Contaminants and Industrial Hygiene Ventilation,

4    CRC Press."

5         Q    Press and Lewis Publishers?

6         A    Yes.

7         Q    Okay.  And what is that book about?

8         A    It's a book that contains 450 problems,

9    solved problems on primarily air contaminants in the

10   workplace, but air pollution issues as well in the

11   community, primarily industrial hygiene issues, and problems

12   regarding ventilation as a control method for those air

13   contaminants.  The example problems are designed to help the

14   reader address these issues.  There are some introductory

15   chapters on concepts.  For the most part it's a workbook of

16   450 problems.

17        Q    And so that might have some sulfur dioxide --

18        A    It might.

19        Q    -- in it.  As we sit here, is that the only

20   one you could think of in terms of what might otherwise

21   discuss or focus on sulfur dioxide?

22        A    That is the only one.  And, of course, in my

23   reports to Wyandotte Chemicals and Ford Motor, but those

24   were internal documents.  There were several of those.  And

25   for the people I supervise.  But other than that, nothing.

TRI-COUNTY COURT REPORTING

39

1        Q      Okay.  And really I'm just trying to confirm

2    that I haven't missed something because of my inability to

3    decode some of this language.  But there is nothing related

4    or focuses on sulfur dioxide with the same type of -- say,

5    for example, you have written one of things here on

6    polychlorinated biphenyls, which that probably goes into

7    whole the PCB thing in great detail.  And what I think I'm

8    hearing is you haven't done a similar work or monograph -- I

9    love that word -- on sulfur dioxide?

10        A      That's right.

11        Q      Now not withstanding that, there is nothing

12    in there, other than that book of the problems, that

13    handbook, is there anything else that you have written that

14    you think is particularly pertinent to the opinions that you

15    have expressed in your report of this case?

16        A      No.

17        Q      Now, in your CV it talks about presentations

18    that you made to hospitals.  Based upon what we talked about

19    before, I'm guessing that that's kind of like what we

20    discussed earlier where you take a fragment of one of the

21    courses that you teach and present that narrow topic to

22    interested groups among these various institutions; is that

23    fair?

24        A      Well, perhaps for half of the presentations I

25    give to hospitals.  Sometimes they are very specific and the

TRI-COUNTY COURT REPORTING

40

1   subject is -- I won't say esoteric -- but it's beyond the
2   scope of the courses I teach because of the detail I get
3   into.   The fitting of respirators for nurses and physicians
4   that might have patients with tuberculosis, it's not
5   something I cover in the course, but it's so detailed I'd
6   have to cover it.
7          Q     Certainly, certainly.   Anything in those
8   presentations that's germane or otherwise relevant to the
9   opinions that are expressed in your report, just for
10  completeness?
11         A     No.
12         Q     Okay.   Before the deposition began, we were
13  talking about depositions that you have done and you were
14  kind enough to give us some information regarding the trials
15  in which you have testified in the last 13 years.   Before we
16  get that information, can you tell me what information you
17  have started to collect with respect to deposition
18  testimony?
19         A     I've started a file.   I believe it's sketchy
20  because I'm trying to build it on my recall and going
21  through records and there probably will be omissions.   I'm
22  doing it by at least part of the case caption, by the
23  attorney that retained me, the nature of the claim, and the
24  year and the location, generally by city.   I believe those
25  are the things I've started to record and will provide a

TRI-COUNTY COURT REPORTING

41

1   list.  I don't know if it's any more detailed than that.

2          Q     I guess that, generally speaking then, when

3   you do work for attorneys, you're generally in state courts

4   of some kind?

5          A     I have been in federal and state.

6          Q     Has this ever come up in the past?  Because

7   as long as I've been around, it's not terribly long, but as

8   long as I've been around the federal requirement is an

9   expert witness has to have this -- provide this information

10  about deposition testimony.  Has that ever -- I realize it's

11  incumbent upon the other side to ask you for it, but nobody

12  has ever asked you in the past?

13         A     No, I first learned about it about two years

14  ago.  Apparently this federal rule has been around for a

15  long time, but I wasn't aware.  I've been asked what percent

16  of your time and what type of cases, but I wasn't aware

17  until two years.

18         Q     We're going to get that, too.

19         A     There is no way I can go back thirty years.

20         Q     No one is asking you to.  I guess I want to

21  get a sense, in preview, with the hopes of dispensing of a

22  telephonic follow-up to this, to learn what I can about your

23  depositions.

24         A     Sure.

25         Q     Let me back up a step and just ask you with

42

1    respect to your work for -- can I call it CRM?

2         A    CRM is fine, sure.

3         Q    Your company, how would you breakdown the

4    percentage in terms of consulting that you do on behalf of a

5    company, say, that wants you to come in and do an audit or

6    some of type of service for them, as distinct from

7    consulting services that you perform on behalf of a company

8    or insurance outfit or a lawyer where you're providing

9    litigation services as -- you know, in this field?

10        A    That is a question that comes up now and

11   then.  I would say 20 to 25 percent of my consulting work is

12   in the area of serving as an expert on issues such as this.

13   And 15 to 20 percent would be in the area of teaching and

14   research.  And the balance, roughly 60 percent, would be in

15   the area of providing industrial hygiene consultation

16   services to industrial firms, insurance companies,

17   government agencies, things like that.

18        Q    Okay.  And I take it from one of the lines in

19   your report that you get -- you either give a deposition or

20   testify in a trial about once a month; is that --

21        A    I would say -- not at trial, I'm deposed on

22   average once a month.

23        Q    I meant either.

24        A    Right.  I would say once a month, yes.

25        Q    And so what kind of records do you think you

TRI-COUNTY COURT REPORTING

43

1    have with respect to -- let's talk about the volume first.
2    Maybe a list of going back two years of 20, 25 depositions
3    where you have given in the past?
4            A    That's about right, I would say.
5            Q    Do you have any transcripts of any
6    depositions that you have been given?
7            A    Not as a matter of course.  In fact, I'm
8    rarely given a transcript of my depositions.  I don't ask
9    for it and it's rarely provided to me and I really don't see
10   a need for it.  I'm assuming it's preserved somewhere.
11           Q    How about your trial testimony?  Do you have
12   any transcripts of areas where you've testified at trial?
13           A    Nothing comes to mind, I mean --
14           Q    How many cases would you believe you have
15   right now that are active?  And by that I mean you have
16   formed a consulting relationship:  Some may be in the early
17   phases where you're viewing material, others may be like
18   today you're preparing a deposition, others may be hopefully
19   toward the close of the relationship where you're testifying
20   at trial next month.  How many cases, using that definition
21   of active, would you consider you have?
22           A    I'm visualizing the second desk in my office
23   because that is where they sit.  And I have to go through
24   how many rows by rows.  I would say 15.  But having said
25   that, I might find out that the case settled a long time

TRI-COUNTY COURT REPORTING

44

1    ago.  So when I learn of that, then I pitch it.  But I would
2    say about 15.  As far as I can tell, they are active.
3         Q    And when you provide those kinds of
4    litigation consultation services, if I may use the phrase,
5    you're wearing your CRM hat at that time, correct?
6         A    I don't know if I'm wearing any hat.  I'm me.
7    I'm giving expert opinions.  Do I bill through CRM?  Is that
8    what you're getting at?
9         Q    That's one way to answer.
10        A    Yes, the checks are payable to Chemical Risk
11   Management.
12        Q    So conversely, you're not here on behalf of
13   or with the stamp of approval of Wayne State University, for
14   example, although you do a significant amount of work with
15   them, correct?
16        A    Right.
17        Q    And I can see, for example, at the top of
18   your letter there is a couple of logos, if you will.  The
19   one piece that says Wayne State University -- and I
20   understand you probably use that letterhead to send a wide
21   variety of different correspondence and some may be germane
22   to Wayne State and some to your CRM work, but in this
23   particular case one should not be confused into thinking
24   that Wayne State University has any interest or other role
25   in this case; is that fair?

                    TRI-COUNTY COURT REPORTING

45

1          A     That's fair.

2          Q     Do you ever testify in criminal matters?

3          A     There have been a few, nothing recent.

4          Q     What kinds of cases would you get involved in

5     in a criminal environment?

6          A     One was a murder case.  And there have been a

7     few other over the years that have been infractions of EPA

8     issues where the sanctions are more criminal than civil.

9          Q     And when you say EPA infractions, what are we

10    talking about?  Spills or --

11         A     That sort of thing, right.

12         Q     And in the murder case, what was that about?

13         A     Fascinating in that the convicted murderer

14    was fingered by his Nth wife in some island off Tahiti.  He

15    had be on the lamb for a long period of time.  He was

16    fleeing from all sorts of jurisdictions and he was

17    prosecuted for poisoning his first wife -- first or second

18    wife and found guilty.

19         Q     What was the agent?

20         A     Succinylcholine,

21    S-U-C-C-I-N-Y-L-C-H-O-L-I-N-E.

22         Q     And where does one find that?  I won't even

23    try to pronounce it.

24         A     It's not an over-the-counter drug.  It's a

25    muscle relaxant.  You could probably get it from a hospital

TRI-COUNTY COURT REPORTING

46

1    pharmacy, but not your corner drugstore.  It's used in
2    certain medical procedures.
3            Q    Is that a Ferrari-type agent?
4            A    Yes, it would be, interesting way of looking
5    at it.  The man who is turning big rocks into little rocks
6    right now was a pharmacologist and he understood that this
7    chemical broke down quite quickly in the human body and was
8    essentially non-detectable.
9            Q    And what was your role --
10           A    I was just trying to thing of the television
11   program, it's still on.  Some television show where they
12   posts criminals.
13           MS. STORM:   Unsolved Mysteries.
14           A    This guy was a pilot; he was a clown; he was
15   a carpenter.  He was also PhD pharmacologist.  He did all
16   sorts of things.  He was an airplane pilot, I believe.  Your
17   question?  I'm sorry.  Fascinating that, hey, I know that
18   man.
19           Q    Your role in the litigation?
20           A    It was a very minor technical role about the
21   use of a gas chromatograph and a mass spectrometer in
22   analyzing materials.
23           Q    I would imagine that those are staples of
24   your laboratory?
25           A    Not my present laboratory.


                    TRI-COUNTY COURT REPORTING

47

1          Q     But at Ford?

2          A     Yes.  There was some debate on the Fry Rule

3     and that's why I was called into it.

4          Q     I'm guessing that you would agree that the

5     criminals matters that you have been involved in as a

6     witness have no bearing on the opinions and conclusions that

7     you have in this case?

8          A     No, they don't.

9          Q     Now, with respect to the civil matters that

10    you have testified in -- have you testified in any -- in any

11    litigation or consulted in any case relating to litigation

12    that had to do with the inhalation of sulfur dioxide?

13         A     Before I get to that, I should back up.  I've

14    been involved now and then on Dram Shop issues where there

15    have been contests regarding how inebriated the person was

16    or was not.  I assume that would be criminal.

17         Q     Where a person is prosecuted for serving

18    someone who is intoxicated?

19         A     And I'm called in as an expert on the most

20    probable number of beverages consumed, blood alcohol as a

21    function of time and diet, type drink and when a person had

22    it -- I don't know if that is criminal or civil -- DUIs,

23    that sort of thing.

24         Q     And I appreciate your -- you have license, if

25    you remember something in the depo that relates to an

TRI-COUNTY COURT REPORTING

48

1    earlier question, feel free to supplement your answer.  I'm

2    grateful for that.  I'm taking that not withstanding

3    remembering about those cases, you still agree that none of

4    the criminal matters you appeared in as a witness are

5    relevant to your opinions in this case?

6            A    They are not.

7            Q    Let's go to the civil matter then.  And I was

8    asking you -- I think the question on the table dealt with

9    have you ever testified or consulted -- and I don't want to

10   make it -- limit it to testimony.  Have you ever consulted

11   with someone involving litigation where the facts involved

12   alleged inhalation of sulfer dioxide?

13           A    Nothing comes to mind.  I would like to think

14   I'd remember that, but nothing comes to mind.

15           Q    Looking at the list that you provided -- and

16   again, this is just -- the list you gave us to this point is

17   just trials, correct?  Trial testimony?

18           A    Yes.

19           Q    I didn't see anything on this list that stuck

20   out to me as sulfur dioxide related.  Am I right in that or

21   did I miss something?

22           A    No, you didn't.

23           Q    Let me ask you a couple of the abbreviations

24   on this list.  OBS, can you tell me what that is in the

25   reference to occupational asthma and OBS.

TRI-COUNTY COURT REPORTING

49

1          A      Organic Brain Syndrome.

2          Q      And solvent vapor induced RADS?

3          A      Reactive airways dysfunction syndrome.

4          Q      Okay.  Have you ever been retained by

5     Ms. Storm in the past?

6          A      No.

7          Q      Have you ever retained by a member of her

8     firm?

9          A      No.

10         Q      Have you ever been involved in litigation

11    where Ms. Storm or another member of her firm represented a

12    party other than one that called you, but you worked

13    together on the case?

14         A      No.

15         Q      When were you retained in this case?

16         A      I can't give you a specific date, I'm sorry,

17    I could check with Expert Resources.  As I sit here, I don't

18    know the date.  I'd be guessing.

19         Q      What is Expert Resources?

20         A      They are an agency in Illinois that provides

21    litigation assistance, experts I suppose, in any matter to

22    those who need expertise.

23         Q      And was that your first contact regarding

24    this case was an inquiry that reached you from Expert

25    Resources?

TRI-COUNTY COURT REPORTING

50

1          A     Yes.

2          Q     And is that an organization that you -- I may

3    not be using the right words -- you register with them for a

4    particular, say, I'm available in these particular fields.

5    And if they have someone that needs an expert in those

6    particular fields, they call you up and find out if you're

7    interested in looking at the case?

8          A     Yes.

9          Q     How long have you been affiliated with Expert

10   Resources?

11         A     Perhaps 10, 12 years, maybe more.

12         Q     Pretty much going back to the creation of

13   CRM?

14         A     Perhaps, I'm not -- I really can't give you a

15   specific date, but it's certainly ten years.

16         Q     Are you affiliated with any other agencies or

17   companies like Expert Resources, but perhaps in another

18   state or another discipline?

19         A     There are two.  Technical Advisory Service

20   for Attorneys in Pennsylvania and there is another one also

21   in the same city, Blue Bell, Pennsylvania, Technical Network

22   Services, I believe, is the name of the organization.

23         Q     Do you keep a record of the time spent on a

24   particular case?

25         A     Not -- well, yes, I do.  There are billing

51

1    statements in this case that go to Expert Resources, right.

2        Q    Let me make sure I understand.  You fill out

3    an invoice that says a date and an activity, looked at this

4    information, and you tell them how many hours, and then you

5    multiply that by whatever hourly rate you charge, and then

6    everything gets totalled up and that's your bill or invoice?

7        A    That's right.

8        Q    And those, in this case, you are sending to

9    Expert Resources?

10        A    Yes.

11        Q    Can you tell me what your rate is?

12        A    There are two rates.  Two hundred dollars per

13    hour for all work that I do on the case with the exception

14    of depositions and trial and that is $300 per hour and

15    expenses at cost.  Expert Resources, of course, adds their

16    administrative charge or markup or whatever that is.

17        Q    And what rates do you charge if say an

18    attorney down the street in Dearborn, Michigan, knocked on

19    your door and came in through the door and said, "I need

20    your help, I've got this case that involves some benzine and

21    I don't know what I'm doing and I need your help with the

22    science aspect," what rate does that person get charged?

23        A    The same rate.

24        Q    And --

25        A    I should say the way you describe that

TRI-COUNTY COURT REPORTING

52

1    scenario, I might invest two, three or four hours into

2    something for which there is no charge, sort of a pro bono

3    thing.  If it's a non-issue, I let it go at that.

4            Q    Essentially, you are doing that to see

5    whether the activity or whatever happened warrants further

6    inquiry?

7            A    Exactly.

8            Q    Do you know how much you have billed Expert

9    Resources to date?

10           A    Not offhand, no.

11           Q    Well, do you know how much you billed prior

12   to October 27, 2001, when you issued your report?

13           A    I'd be guessing.  They are in my records.  I

14   don't know as I sit here.

15           Q    Can you give me a ball park of the number of

16   hours you anticipated were spent prior -- from whatever time

17   you got retained until October 27, 2001, when you issued

18   this report, how many hours you spent on the -- on

19   formulating it?

20           A    It's an absolute guess, I want the record to

21   reflect that, 15 hours.  It could be 20, it could be ten.  I

22   don't know.

23           Q    And that helps me with that.  Really, what

24   I'm interested in is are we talking about -- and you'll

25   satisfy my interest at this point with an understanding of

TRI-COUNTY COURT REPORTING

53

1    the order of magnitude.  I don't know if we're talking about

2    tens or a hundred or 500.  But if I say it's between ten and

3    10 hours and you're comfortable with that range, not holding

4    you to a specific number?

5              A    Yes, that's right.

6              Q    Thank you.  And how much time -- again, you

7    give me the range.  I'm not here to put the numbers in your

8    mouth.  You give me a range for the number of hours that you

9    spent after this report was complete until the present.

10             A    Well, short of today and yesterday, I

11   reviewed the file for half of an hour about three nights

12   ago.

13             Q    And that's it?

14             A    That's it.

15             Q    All right.  And I take it that your activity

16   three nights ago was to brush up on this for the deposition?

17             A    That's right.

18             Q    And when you reviewed the file, as you say,

19   what did you review?

20             A    Pretty much everything in front of me.

21             Q    All right.

22             A    I have to admit, this is not my complete

23   file.  I'm in the process of consolidating three offices

24   into two and there are some records that I just didn't

25   retrieve for today's meeting.


                    TRI-COUNTY COURT REPORTING

54

1           MR. SCOTT:  Scott, are you going to mark the

2     file -- off the record.

3                   (Off-the-record discussion.)

4     BY MR. THOMAS

5           Q    Sir, if you would, tell me your understanding

6     of what happened on March 17, 1999, with respect to this

7     case.

8           A    I guess who, what, why, when and where,

9     right?  On March 17, 1999, Mr. Rick Newman, an employee of

10    Viox, was in Building 179 at the Procter & Gamble Ivorydale

11    Plant.  He was in the process of insulating a piece of

12    equipment, mechanical equipment.  It was later in the

13    afternoon, approximately 3:30 as I recall, thereabouts --

14    I'm not sure of the time, pardon me.  I'm not sure of the

15    time.  And the records reflect that there was a release of

16    liquid sulfur sulfer dioxide, which rapidly vaporized and

17    intruded into his workstation.  He was exposed to sulfer

18    dioxide gas for an undetermined amount of time.  And,

19    subsequently, he was diagnosed with chemical pneumonitis.

20    And I guess that's why we're here today.

21          Q    You used the word "rapidly" in terms of the

22    liquid sulfer dioxide, what are we talking about there?

23          A     Well, liquid SO2, the boiling point is about

24    14 degrees.  It's very low.  It has significant vapor

25    pressure on the order of about 2300 millimeters of mercury.

TRI-COUNTY COURT REPORTING

55

1    So liquified SO2 will flash rather quickly.  It can vaporize

2    rapidly at room temperature.

3            Q    So to a layman, me, what I hear you saying is

4    that when you have liquid SO2 and you allow it to expand in

5    a container, it will go to a gas at temperatures of, I

6    think -- normal temperatures about 14 degrees, we're talking

7    about Farenheit, I guess?

8            A    Well, even lower than that.  You'd have to

9    get down to absolute zero where it wouldn't vaporize at all.

10   As the temperature increases, the rate of vaporization

11   increases.

12           Q    So when you said 14 degrees, that is the

13   boiling point at which there is a quantity of sulfur

14   dioxide.  It's going to go to a gas (indicating) fairly

15   quickly -- I snapped my fingers.

16           A    In an open system where there are no pressure

17   constraints and temperature constraints, yes.  Within the

18   system that it's contained, there would be a two-phase, a

19   liquid and a gas phase.

20           Q    You also said there was an exposure for an

21   undetermined amount of time.  I thought I read in your

22   report that there was an exposure for one to two minutes?

23           A    That is my belief.  It's the most likely

24   exposure time of Mr. Newman.  I don't know that.  I suspect

25   nobody has an exact precise duration of exposure.


                    TRI-COUNTY COURT REPORTING

56

1          Q     Okay.  But if you would, tell me what facts

2     lead you to that belief that it was one to two minutes?

3          A     It really is a reflection of my experience

4     with studying dozens and dozens of work sites and hundreds

5     of workers exposed to SO2 under a variety of conditions.

6     I've found situations where workers are not exposed to

7     anything above the ambient concentration of SO2 and

8     situations where there has been a gross overexposure and a

9     variety of physiologic responses to those exposures.  And

10    they can be quite variable.  One thing about sulfer dioxide

11    is that the six people in this room exposed to the same

12    concentration more likely than not would have extreme,

13    depending on the dose of course and dose response or dose

14    rate, considerably different reactions.  Some might not be

15    so affected as others.  For whatever reason, it's a

16    peculiarity of sulfer dioxide that I have not seen with

17    other gasses with the exception of ammonia.  But based on my

18    review of the records that were provided to me and my

19    interview with Mr. Newman, I believe that he was exposed for

20    at least a minute and perhaps longer.

21          My review, I should say, of an interview of

22    Mr. Newman is that I believe there was a time he didn't

23    recognize he was being exposed and that is not at all

24    surprising with sulfer dioxide.  I would like to temper

25    those remarks and say, for example, this room was suddenly

57

1    inundated with one percent sulfur dioxide gas at ten
2    thousand parts per million.  All of us would respond the
3    same way.  But there are lower concentrations of the gas
4    where there is a variability in human response.
5           Q    It's my understanding that the gas sulfur
6    dioxide is detectable to the human nose at a concentration
7    of 0.33 parts per million, according to that organization
8    that I think is the American Industrial Hygiene Association;
9    is that right?
10          A    I'm a member of that organization and have
11   been for 35 years or so or -- I don't know, since '68.
12   There is a range of responses of the human nostril to sulfer
13   dioxide and they are sorted out into two categories.  One,
14   detection.  And, two, recognition.  The range for detection,
15   for example, is I notice something in the atmosphere, I have
16   no idea what it is, but I'm being affected by it.  Where
17   recognition is not only am I affected by it, but more likely
18   than not it's this or that.  It's a clear demarcation
19   between -- there is a thing between -- there is a link
20   between what the person perceives and what the agent is.  So
21   there are two sets of values given as a range by the
22   American Industrial Hygiene Association.
23          Q    And detection, that is that first experience
24   that you talked about, "I smell this odor, I'm not sure I
25   recognize it;" that is 0.33 parts per million, correct?

TRI-COUNTY COURT REPORTING

58

1          A     The range for sulfur dioxide for detection is

2     .33 per five parts per million and the range for recognition

3     is 3.8 to 5.0.   And there are geometric means, that is

4     50 percent above and below of 2.7 and 4.4 parts per million

5     respectively.   You could say with sulfer dioxide it -- well,

6     it has an odor.   I think it's probably more appropriate to

7     refer to it as an irritating quality with an odor that could

8     be different from one person to the next.   I've had workers

9     describe the odors in different terms.   Smells like -- well,

10    John smells like this and Bob smells it like that.

11         Q     And both John and Bob agree it smells very

12    bad, don't they?

13         A     It depends on the concentration.   It depends

14    on a lot of things.   If they are like me, I can't smell it

15    anymore since by surgery.   Sadly, I lost all my sense of

16    smell.

17         Q     With respect to these numbers, tell me what

18    you're reading from?

19         A     I'm reading from the American Industrial

20    Hygiene Association's publication entitled, "Odor Thresholds

21    for Chemicals with Established Occupational Health

22    Standards."

23         Q     And the date of that?

24         A     1989.   There might a more current edition,

25    but this is 1989.

TRI-COUNTY COURT REPORTING

59

```
 1            Q     Have you ever smelled sulfur dioxide?

 2            A     Many times, yes.

 3            Q     And at what concentration have you smelled

 4     it?

 5            A     It's difficult to do that in the field.  The

 6     studies that are reported here are controlled studies in

 7     laboratory settings.  The reason I say that, the research

 8     olfaction physiologists can prepare a known concentration in

 9     a controlled environment and can ask the people to sniff it

10     and detect certain things.  When I've been in the field

11     taking air samples and measuring ventilation for worker's

12     exposures, my air sampling device might run for anywhere

13     between five and 25 or 30 minutes, so I get an average

14     result during that period.  And during that time it wouldn't

15     at all be unusual for the gas concentration to fluctuate.

16     It's a long winded way of saying I get an average number and

17     during that time frame I might or might not smell it.  So I

18     can't give you a snapshot, a pinpoint time of concentration.

19     Having said that, I can detect and clearly recognize SO2 at

20     about eight to 12 parts per million.

21            Q     And please don't confuse my question.  I'm

22     not -- it's not your fault, it's my fault for not being

23     clear.  I'm not asking you at what concentration you were

24     able to detect the odor, the pungent odor of sulfer dioxide.

25     I asked you a question and you said that you smelled sulfer
```

TRI-COUNTY COURT REPORTING

60

1    dioxide on a variety of occasions.  Tell me about the

2    concentration levels at which you have smelled that gas?

3         A    Well, I don't know all of them.  There was a

4    release at a foundry, a Ford foundry in Windsor, a massive

5    release.  I didn't take an air sample.  I would expect the

6    concentration was several hundred parts per million.  I

7    don't know.  I was evacuating the area.  Had I taken an air

8    sample, I wouldn't be surprised if I was getting several

9    hundred ppm's of SO2 gas, but that is a guess.  I have

10   detected it as an average concentration over say a 15 minute

11   air sample period clearly at five parts per million, maybe

12   closer to eight, but it's quite variable.  I think I have a

13   higher threshold for detection and recognition than other

14   people do, that's been my experience.  And I find the same

15   with ammonia gas as well.

16        Q    Is it fair to say that the phenomena of

17   desensitization through chronic exposure to a particular

18   smell or to sulfer dioxide in particular, that say might be

19   common in workers at a foundry, that's not something that

20   would affect Mr. Newman's ability to smell this gas on

21   March 17, 1999?

22        A    Correct, that would be very speculative on my

23   part to speak to what he would or would not have responded

24   to.  Clearly, desensitization or olfactory fatigue, these

25   things do occur with many gasses, not all.


                    TRI-COUNTY COURT REPORTING

61

1          Q      What I'm saying is you're unaware of any
2    facts where Mr. Newman was exposed to sulfer dioxide over
3    the course of many days, months, weeks, which would result
4    in his being desensitized through chronic exposure?
5          A      I'm not, no.
6          Q      So you agree with me?
7          A      I agree.
8          Q      That's all I was asking.
9          A      Sure.
10         Q      All right.  Let's talk for a few minutes
11   about the materials that you reviewed.  And I'm looking on
12   the first page of your report.  You can look at that and
13   follow along with me.  There is a paragraph that begins, "I
14   studied numerous documents and records."  Is this a complete
15   list of the materials that you looked at prior to issuing
16   your October 27 letter?
17         A      I received additional records since then, not
18   many, but some.  That would be a complete list, yes.
19         Q      What would be the additional records?
20         A      The report of Mr. Kaminisk, I believe.  Dr.
21   Hirsh's deposition.  I mean.  I really have to go to the
22   transmittal letter from Mrs. Storm to specifically identify
23   them and I don't have that handy.  But there was a letter to
24   me from her in February, I believe maybe a couple of
25   letters, that had additional documents included with them.


                     TRI-COUNTY COURT REPORTING

62

1          Q     Just so your answer is complete, let me give
2     you that letter.
3          A     Yes, these would be the reports I mentioned.
4     Mr. Kaminiski, Mr. Kapichi, and Drs. Donovan, Goyle and
5     Brownstein.
6          Q     And did you review those?
7          A     Yes.
8          Q     And let me just -- I'll get to it in detail
9     if we need to.  Did your review of any of those materials
10    cause you to, as I think you say, you reserve the right in
11    your letter -- you "reserve the right to augment, modify
12    recant or buttress these opinions if additional evidence or
13    facts are shared with you."  Do you need to do any of those
14    things on the basis of the additional information that you
15    have received?
16         A     No.
17         Q     Tell me what -- well, before we get to that.
18    Let me -- have you reviewed any pleadings in this case,
19    legal papers that anyone has filed?
20         A     Well, there were responses to
21    interrogatories; that is not really a pleading.  No, I can't
22    say I have.
23         Q     You've already told us about those.  You told
24    us about those?
25              MS. STORM:  In the interest of making a correct

TRI-COUNTY COURT REPORTING

63

1    record, he was mailed a copy of the complaint.  I'm not sure

2    what pleadings.

3           Q    He's recorded that he looked at the

4    complaint, thank you.

5           MS. STORM:   Okay.

6           Q    Have you met Mr. Newman?

7           A    No.

8           Q    Have you talked to him on the telephone?

9           A    Yes.

10          Q    Or had correspondence with him?

11          A    Telephonically.

12          Q    And when did you talk to him on the

13   telephone?

14          A    Perhaps in March sometime and yesterday.

15          Q    March of?

16          A    This year.

17          Q    2002?

18          A    Again, I don't have the specific dates.

19          Q    That's fine.  But is it fair to say it's a

20   couple months ago and after your October 27, 2001, report?

21          A    Yes.

22          Q    And what did Mr. Newman tell you?

23          A    I wanted him to describe his working

24   conditions on March 17, 1999.  I had read the records, the

25   documents that have been provided and I wanted to hear in

64

1    his words what he was doing and how he was doing it.  I

2    didn't take notes.  I can't recall what he told me.  I could

3    say this, there was nothing that came from that telephone

4    conversation that flew in the face of my understanding.  And

5    I was looking for that, but I didn't encounter that.

6          Q    Okay.  So what I think I hear you saying is

7    you had a conversation on the telephone with Mr. Newman and

8    what he told you didn't cause you -- didn't disrupt the

9    facts that you thought you gleaned from the written

10    materials that you had reviewed prior to that point?

11          A    Right.  I had confusion about the

12    configuration of Building 179.  And I understand there is

13    some dispute about where he claims he was working and where

14    others claimed he was working.  But setting that aside, I

15    had some concern about the actual structural arrangements of

16    the building.  And I spoke to Mr. Newman about that

17    yesterday and then inspected the building this morning,

18    which clarified some issues for me.

19          Q    What was your understanding prior to the

20    telephone call with Mr. Newman?

21          A    Prior to all this, I had a difficult time

22    sorting out the various -- there was a photocopy of a

23    photograph of the building, exterior of the building.  There

24    was a floor plan and they didn't gel.  They didn't -- there

25    were some new structural elements included.  And I came to

TRI-COUNTY COURT REPORTING

65

1    learn that what was present when he was exposed to sulfer
2    dioxide was not the same as in the photograph that I had
3    been provided.  And I had a question about a wall that he
4    described as being approximately 10 feet long and 6 feet
5    high adjacent to where he was insulating the tank, I was
6    interested in that.  And it became clear what he was talking
7    about.
8            Q    Okay.  How long was your conversation with
9    Mr. Newman?
10           A    I really can't say.  Not very long, it was
11   very brief.
12           Q    First off, there are two conversation.  One
13   in March and one yesterday?
14           A    Right.
15           Q    Was the one in March, are we talking about an
16   hour?
17           A    No, no, nothing like that, very brief.
18           Q    Less than 15 minutes?
19           A    Yes.
20           Q    The conversation yesterday, an hour?
21           A    No, no, I would say less than 15 minutes.
22           Q    And tell me what the features were -- to use
23   the word that didn't "gel" between the architectural or
24   building features?
25           MS. STORM:  Can we have the file back?

TRI-COUNTY COURT REPORTING

66

1              MR. SCOTT:  The photograph is in there.

2              MS. STORM:  That may be all I need.  Excuse me for

3     interrupting, Scott.

4              Q    No, that is all right.  You can look at any

5     photographs you like to compare.

6              MS. STORM:  Thank you.

7              Q    But tell me what wasn't jiving.

8              A    There were several things.  I was trying to

9     really marry this floor plan with this photograph.

10             MS. STORM:  Identify them.

11             A    One is PG-4 Exhibit and other doesn't have an

12    exhibit.

13             Q    It is page 40 of the exhibit book, which that

14    will clarify which Exhibit No. it is from.

15             A    For one, on the side of the building there

16    appears to be an enclosure that I cannot, in as many plans

17    as I've looked at throughout my career, decipher on this

18    floor plan.  And I wanted some clarification on that.  There

19    was a description here, it states, a metal wall, which I

20    presume to be along at this point.  I wouldn't describe it

21    on PG-4, but essentially at the side of two roughly garage

22    size doors, utility doors on Building B.  And it appears

23    this wall is what is demarked as a metal wall here.  But

24    then there is Building A.  I don't see a Building A as such.

25    I see air compressors, mechanical equipment, but no Building

TRI-COUNTY COURT REPORTING

67

1    A.   I was confused about that.   But there is an additional

2    buildings, like a sub-building on top of Building A which

3    does not appear to be on this floor plan.

4           Q    When you're saying the additional building,

5    you're talking about the structure at the extreme left of

6    the photograph that is a copy on page two?

7           A    Yes.

8           Q    Do you have it clear in your head now what

9    the layout was and the photograph depicts after having

10   talked with Mr. Newman yesterday and visiting that site this

11   morning?

12          A    It appears that this is no longer there.   And

13   at the time Mr. Newman was working in Building B, Building A

14   was not present.   It was -- perhaps some of the equipment

15   was present that the Mesa employees were working on, but it

16   was enshrouded in a plastic three-sided envelope, for lack

17   of a better term, instead of a structural building such as

18   this.

19          Q    And to what extent, if any, does that require

20   you to augment, modify, recant or buttress the opinions in

21   your report?

22          A    It really doesn't.

23          Q    Okay.   So it was something that was nagging

24   at you because you didn't feel that you understood it fully.

25   But now having understood it fully, you don't feel it makes

TRI-COUNTY COURT REPORTING

68

1     any -- it doesn't really bear on any of the opinions that
2     you have?

3              A     No, the enclosure today is of more
4     substantial material than was present three years ago.

5              Q     Okay.  And what else did Mr. Newman tell you
6     in his telephone conversation with you yesterday?

7              A     Well, I should mention that it was also a
8     conference call where Mrs. Storm and I were present and she
9     had questions of Mr. Newman as well, so it wasn't just my
10    dialogue with him.  It was a three-way.

11             Q     Let me just ask you what questions that you
12    asked to Mr. Newman that he responded to you, or anything
13    that Mr. Newman said that you found germane to the opinions
14    and conclusions that you made in this case?

15             A     I asked him to describe the wall that was
16    adjacent to where he stated he was working that day.  And
17    you can see from the diagram, it's not clear if this is a
18    solid wall that goes to the ceiling or if it's a partial.
19    He explained to me it was approximately 10 feet long and
20    6 feet high.  He described it as cinder block, when in fact
21    it is not cinder block; that is neither here nor there as
22    far as I'm concerned, it is a solid wall.  I had some
23    questions about that.  I asked him to explain to me again
24    how long he believes that he was exposed to sulfer dioxide
25    and he couldn't be precise on that.  Because I, frankly,

TRI-COUNTY COURT REPORTING

69

```
 1   don't think he knew.  I think early on he was exposed, but
 2   didn't respond to it until the concentrations became
 3   oppressive.
 4            Q    Let me take a stop here and this has already
 5   been marked as an exhibit, but I'm going to mark it as
 6   another exhibit so that you can write on it and we can mark
 7   it and you can help me understand and record exactly what it
 8   is that you're describing by writing on the document.  If we
 9   need to, we can write on several copies of it.  This will be
10   Exhibit 73.
11            MS. STORM:  Do we know what 73 is?  Just tell me
12   what it is.  It's an exhibit that's been already marked, but
13   can you identify it.
14            MR. THOMAS:  I'll just say it's a floor plan.
15            MS. STORM:  Prepared by who and from what date.
16            MR. THOMAS:  Let me just use it.
17            MS. STORM:  You know, just tell me, if you don't
18   know, you don't know.  We'll use it preliminarily to finding
19   out what it is.  Do you know who prepared this?
20            MR. THOMAS:  I don't know when it was prepared.
21   It was provided to me and it represents the floor plan.  And
22   I'm not asking you to waive any rights to objecting to it
23   with respect to the accuracy, its scale, or its depictions,
24   but I want to simply use it as a means of recording the
25   witness' discussion of where things are and what --
```

TRI-COUNTY COURT REPORTING

1          Q    And I'll say this, Mr. Wabeke.  If at any

2    time, you have been there now, if you think there is

3    something that isn't here that you need to depict, that is

4    why we're here.  You have a pen and we'll put it right on

5    there and you can adjust it however you want.

6          MS. STORM:  If you want me to send him out of the

7    room, but the problem I have with this is -- like we were

8    out there today.  This is not what it looked like the day of

9    the accident.  I don't know what it is you're going to be

10   asking him.  If you will give me a standing --

11         MR. THOMAS:  You have --

12         MS. STORM:  Standing objection, motion to strike,

13   whatever.  Again, one of the things that was difficult about

14   this picture is it wasn't accurate in terms of what it was

15   when this happened.  And I don't believe this is either

16   unless you can tell me that this was the floor plan on the

17   date of the accident with the correct features.

18         MR. THOMAS:  Well, we'll leave that discussion to

19   another day.

20         MS. STORM:  Okay.

21         Q    Have you got Exhibit 73 there in front of

22   you, sir?

23         A    Yes.

24         Q    And do you have a pen you can write with?

25   Feel free to mark this up.  Before we started talking, let

71

1    me get this --

2         MS. STORM:   This is part of the file.  I'm going

3    to put it back in front of him.  These are his copies of

4    exhibits.   This is part of his file and this is part of his

5    file and this is part of his file and this one you marked

6    73.  Thank you.  Go ahead.

7         Q    A few minutes ago we were talking about a

8    wall.  And we were looking at a different layout.  And I'll

9    just represent to you that this diagram is styled as the

10   first floor at Building 179 and it's divided into section A

11   B and C or Buildings A, B and C?

12        MS. STORM:   Again, are you telling me that you do

13   not know what the date of this floor plan is?

14        MR. THOMAS:   I'm not testifying at this

15   deposition.  I'm just providing this with him --

16        MS. STORM:   But you have identified him, but you

17   have not identified it in an accurate manner.  That is the

18   problem I have.  Is this the floor plan of 11/21/01 the date

19   down at the bottom?

20        MR. THOMAS:   Let me do it this way.  You know, I'm

21   either going to examine him over this, which I think will go

22   a lot faster, or I'm going to give him a blank piece of

23   paper and he can draw whatever he wants.  But I think going

24   over this is fine.  I've allowed you the opportunity, you

25   can raise whatever objections you like, but I think this

TRI-COUNTY COURT REPORTING

72

1    helps clarify the examination and preserve his views.

2              MS. STORM:  I'm not telling you how to examine

3    him.  I'm asking a question.  If you don't know, you don't

4    know; that will help me.  Do you know what the date of this

5    is?

6              MR. THOMAS:  How about I say I don't know?

7              MS. STORM:  Then that is all we need to say.  So

8    you're not representing to this witness it is accurate as of

9    the date of the accident?  You're using it for demonstrative

10   purposes to ask questions?

11             MR. THOMAS:  That will work for me.

12             MS. STORM:  Thank you.

13             Q    Let me start this way.  You have been there

14   today.  Does this diagram, which we've marked as 73, without

15   commenting on the -- without asking you to comment on

16   whether the figures representing dimensions are precise,

17   does it reflect the layout that you observed at the site

18   today?

19             A    Generally, with one exception.

20             Q    All right.  Tell me what the exception is and

21   I'm going to ask you to take your pen and -- well, first,

22   tell me what it is, and then we will decide how to reflect

23   it.

24             A    I think it's an important exception because

25   today I observed the wall described to me by Mr. Newman.


                    TRI-COUNTY COURT REPORTING

73

1     His recollection was the wall was approximately 10 feet long

2     and 6 feet high.  And I believe he was referring to this

3     wall which was present today.

4              MS. STORM:  You need to identify that.

5              A     On Exhibit PG-4, which was present today in

6     that location.  It's not present here, but I believe that's

7     significant because Mr. Newman said he was working next to

8     that wall.  And I would find it hard to understand if others

9     claim he was working down here, how he could make a

10    connection between that wall and where he was working

11    because there is no wall there, apparently.

12             Q     Please take your pen and transpose the wall

13    that you've indicated on PG-4 on Exhibit PG-73?

14             A     Well, I'm going to transpose it

15    approximately.

16             Q     I'm not holding you to scale.

17             A     Approximately there.

18             Q     Now, if you would, at the bottom margin, just

19    so when we photocopy this, we will be able to see, draw an

20    arrow to that and put a "W" for wall or just spell it out.

21    All right.  And you have written the dimensions 6 feet by

22    10 feet; is that correct?

23             A     Yeah, approximately equal to, yes.

24             Q     And the ceiling in the area where that wall

25    is is about 16 feet high, right?


                    TRI-COUNTY COURT REPORTING

74

1           A     I would say 16 to 18 feet.  I didn't measure

2      it, but that is a standard height.

3           Q     And so is the -- which dimension is the

4      height of the wall?

5           A     Six feet.

6           Q     And it's 10 feet long?

7           A     Roughly.  I didn't measure it, but I would

8      approximate it like that.

9           Q     And Mr. Newman told you on the telephone

10     yesterday that he was near what?

11          A     Near a cement or cinder block wall of those

12     approximate dimensions at that location.

13          Q     And you're assuming that based upon what

14     Mr. Newman told you on the telephone and the visit that you

15     made to the site today -- we keep talking about today and

16     yesterday.  Let me just note that today is May 9, right?

17          A     Yes.

18          Q     May 9, 2002.  Please put in an "N" where

19     you're assuming Mr. Newman was during this event.

20          A     It would be approximately here.  I can't --

21     obviously, he's not going to be stationary, he's moving, but

22     it's approximately where that "N" is.

23          Q     And I take it you have -- have you been

24     provided with any examinations of Mr. Newman, any kind of

25     medical examinations other than the reports?

TRI-COUNTY COURT REPORTING

75

1          A    I read the reports.  I don't recall seeing
2    medical records, perhaps I did and don't have them with me:
3    The exposure reports, incident reports and EMS and that sort
4    of thing.
5          Q    Well, in your report you state, "I studied
6    numerous documents and records in connection with my review.
7    These included medical records and reports."  That is the
8    end of the quote.  Does that refresh your memory as to
9    whether you looked at actual medical records or whether you
10   reviewed, for example, Dr. Anderson's or Dr. Hirsh's report?
11         A    I clearly reviewed their narrative reports.
12   I don't recall, as I sit here today, pulmonary function
13   tests and graphs.  Perhaps I did, but nothing comes to mind
14   as I sit here.  It wouldn't surprise me.  On the other hand,
15   I can't state specifically whether I did or didn't.
16         Q    As we sit here today, you're not here to
17   offer medical opinions, correct?
18         A    No, of course not.
19         Q    Have any -- are there any other changes that
20   you feel are necessary to make -- to clarify what we talked
21   about before about things not jiving?
22         A    Well, one thing that doesn't jive that is on
23   this photograph, or this copy of a photograph, it shows
24   again this vestibule-like building attached to Building A,
25   which is not reflected on whatever this exhibit is.


                    TRI-COUNTY COURT REPORTING

76

1          MS. STORM:   73.

2          A    73.

3          Q    Do you think there is any relevance to the

4    existence of that vestibule to a full, comprehensive

5    analysis of what happened on March 17?

6          A    I don't mean to be evasive.  It might or

7    might not.  I don't know.  It strikes me as strange, I'm

8    looking at three documents and there are common things, but

9    there are so many uncommon issues it raises some questions.

10   If, for example, I found out what the purpose of this

11   structure was, what it housed, if anything, that might have

12   a bearing on this.  It's not going to change my fundamental

13   opinion.  It strikes me as odd at this point in these

14   deliberations we have this confusion about the documents and

15   what's purporting to be the truth and undated documents, not

16   nothing what existed at what time, at least to my way of

17   liking.

18         Q    All right.  So with respect to medical

19   records you don't remember if and what you reviewed in that

20   regard?

21         A    No, I don't; I'm sorry.

22         Q    How about material safety data sheets?

23         A    There was an MSDS -- in fact, it is in this

24   stack of documents for sulfer dioxide.

25         Q    Can you please show it to me?

TRI-COUNTY COURT REPORTING

77

1           A     Well, Murphy's Law, I have to go through them
2      one by one; I'm sorry.
3           Q     I'm going to mark that as something for me to
4      come back to and you can look for that in the break.
5           A     Maybe I can answer some questions as you're
6      speaking.  I can respond to your questions while I'm looking
7      for it.
8           Q     What treatises in your library did you look
9      at?
10          A     A NIOSH publication on the physical, chemical
11     and toxicological properties of air contaminants.  I have
12     the book with me, if you would like.  Another NIOSH
13     publication entitled, "A Guide to the Work-Relatedness of
14     Disease.  The American Industrial Hygiene Association Odor
15     Detection and Odor Recognition Values that I referred to
16     earlier.  Franck's, F-R-A-N-C-K-'-S Toxicological
17     Emergencies.
18          Q     Could I see the copy of the first one?
19          A     Sure.
20          Q     And what did you learn from these treatises
21     that contribute to the opinions and conclusions?
22          A     I didn't learn anything from this
23     publication.  I generally have that available because
24     questions might arise regarding physical and chemical
25     properties of various materials.  For example, you wanted

TRI-COUNTY COURT REPORTING

78

1   information regarding the vapor pressure of sulfer dioxide

2   and I would have an information source.

3           Q     How about the other treatises you mentioned,

4   Franck's and other work-relatedness of disease?

5           A     There was nothing enlightening in Franck's,

6   nothing enlightening in the Guide of Work-Relatedness

7   Disease.

8           Q     They were reference materials you consider

9   authoritative and you go to them from time to time to get

10  information that -- you don't keep vapor pressures figures

11  in your head, for example.  But in terms of -- there is

12  nothing in your report that hinges on a fact or opinion

13  expressed in one of those treatises; is that fair?

14          A     No, it's not entirely fair because I believe

15  an attachment of my report issues the NIOSH publication, A

16  Guide to the Work-Relatedness Disease.  I cite it in my

17  report.

18          Q     You're talking about the protocol?

19          A     Yes.

20          Q     We'll talk about that a little bit later.

21  But other than that, you will agree with me?

22          A     Yes.

23          Q     What about medical and industrial hygiene

24  articles from MEDLINE -- is that an internet resource?

25          A     Yes, it's an internet resource.  I don't

TRI-COUNTY COURT REPORTING

1 recall what I searched on it.  What I have in this stack of

2 documents are some OSHA publications regarding

3 multi-employer work sites.  And I believe I anticipated that

4 might be an area of contention, so I made photocopies of

5 those and brought them to today's meeting.  Mrs. Storm has

6 not seen them.  She saw them yesterday.  They weren't part

7 of my report.  I simply brought them should questions arise

8 regarding multi-employer work sites.

9    Q You don't intend to offer legal opinions as

10 to OSHA requirements of and impacts on liabilities in this

11 case, correct?

12    A No, I'm not a lawyer, but it's background

13 information I thought might be helpful.

14    Q Is that something you got off MEDLINE?

15    A No, no, not MEDLINE.  Google, one of the

16 search engines; I'm sorry.

17    Q As we sit here today, can you remember

18 anything from MEDLINE that impacts on --

19    A I have information on the toxicology of SO2

20 in terms of exposures, but -- I don't know if that was

21 through MEDLINE or not, I really can't say.

22    Q How about TOXLINE?

23    A Same thing, I can't --

24    Q GratefulMed?

25    A GratefulMed is -- it's not the Grateful Dead,

TRI-COUNTY COURT REPORTING

80

1     it's a subdivision of MEDLINE and TOXLINE.

2          Q    And the National Library of Medicine, I

3     presume that was also online?

4          A    Yes.

5          Q    I guess what I'm getting at or I guess the

6     impression I'm getting is that you've got a case, it

7     involves sulfer dioxide, and you've dealt with sulfer

8     dioxide in the past, but it's not something that one keeps

9     shelves in their study filled with books and treatises on,

10    so you refreshed your memories of this substance by going

11    online and using the internet as a resource and looking at

12    various -- and I guess we're talking about information that

13    was largely in the form of abstracts?

14         A    Right.

15         Q    Just to get the background and get the juices

16    flowing, if you will, about what was going on or what is

17    important in sulfer dioxide; is that fair?

18         A    That's fair.

19         Q    Now, the next thing you said in the list of

20    things that you looked at was diagrams of Mr. Newman's

21    workstation on the day of his exposure to sulfer dioxide

22    gas.  What diagrams are those?

23         A    It would have been PG-4.

24         Q    Now, PG-4 is a copy of a pleading that is not

25    the complaint.  Do you know whether you got the entire

TRI-COUNTY COURT REPORTING

81

1    pleading or whether you just got that page or whether you
2    got a piece masked out or whether you got it in some other
3    form?
4             A    I don't know.
5             Q    Is there any other diagram -- this PG-4 that
6    you have been referring to, that was something in your
7    files, correct?
8             A    Yes.
9             Q    And PG-4 was so marked at an earlier
10   deposition in this case earlier this year.  Do you know
11   whether you got it sometime in the last couple of months or
12   is there another diagram in your files that you might have
13   been able to refer to prior to October 27, 2001?
14            A    I received -- I'm almost certain I received
15   this after I prepared my report.  Having said that, I don't
16   think it was a new diagram.  I recall referring to diagrams
17   not in the stack of documents prior to preparing my report.
18            Q    And that's exactly my point.  You couldn't
19   have seen PG-4 in that form?
20            A    Not an as an exhibit, right.
21            Q    In those days because it wasn't marked prior
22   to October 27?
23            A    Yes.  Thank you.  In the Plaintiffs answers
24   to interrogatories is this very diagram.  Ms. Storm
25   refreshed my memory on that.

82

1          Q     So what you had is a copy of that diagram in

2    response to Mr. Newman's response to interrogatories; that

3    is the form you saw it in?

4          A     Yes.

5          Q     Now, the word diagrams plural is used.  Do

6    you know whether that is -- sometimes we speak and we just

7    put a plural on things heedlessly.  Do you know whether

8    there are any other diagrams, other than that one that you

9    looked at?

10         A     Well, usually I'm very careful in using the

11   plural, but nothing comes to mind.

12         Q     Are you aware --

13         A     Thank you.  There is a diagram here.  It's

14   essentially the same as -- well, not quite the same.

15         Q     May I see it, sir?

16         A     There are some notes on this that are not on

17   this one.  They purport to be the same physical plant.

18         Q     All right.  You've handed me a document that

19   is another diagram, which is the same as the diagram in PG-4

20   with the exception of some handwritten information on PG-4

21   that does not appear on the other diagram, correct?

22         A     Correct.

23         Q     But other than that, they are the same?

24         A     They are the same.

25         Q     And so just again in an abundance of caution,

TRI-COUNTY COURT REPORTING

83

1    are there any other diagrams that are different from that

2    diagram?

3         A    No.

4         Q    That paragraph that I quoted earlier said you

5    "reviewed personal statements," what are those?

6         A    There are some handwritten notes somewhere in

7    here that were prepared by a colleague of Mr. -- do you want

8    me to retrieve them or --

9         MS. STORM:  Let's go ahead and take a break.

10                   (Lunch break taken.)

11    (Continued deposition from lunch break.)

12         Q    Your report states, "The records reveal that

13    Mr. Newman inhaled sulfer dioxide gas on March 17, 1999."  I

14    need to know if that is an opinion or conclusion that you

15    have reached.

16         A    It's a conclusion I reached.  I'm not

17    distinguishing an opinion from a conclusion.  But whatever,

18    that is my belief.

19         Q    Tell me what facts that is based on.

20         A    That sulfer dioxide was present at building

21    179 and there was a release of that gas while he was working

22    there.

23         Q    And you would agree that that could occur and

24    Mr. Newman could not have inhaled any sulfer dioxide,

25    correct?

TRI-COUNTY COURT REPORTING

84

1          A     That's possible, sure.

2          Q     So I guess my question is what are we basing

3     it on?  What are you basing your conclusion on that he did,

4     in fact, inhale?

5          A     Mr. Newman, based on the review of everything

6     and talking to Mr. Newman, was healthy before March 17,

7     1999.  He was diagnosed with chemical pneumonitis.  He

8     described an exposure to a gas that would be consistent with

9     irritative properties of sulfer dioxide and that's primarily

10    the basis for my opinion.

11         Q     Now, this exposure Mr. Newman described, is

12    that something he described to you on the telephone?

13         A     Yes, I've not seen his deposition.  I talked

14    to him two times and that was his description.

15         Q     Tell me what he told you on the telephone --

16         A     Well --

17         Q     I'm sorry -- that you stated was relative to

18    the exposure?

19         A     He described an irritation.  I was trying to

20    get a handle on the duration of his exposure.  I knew that

21    might be dicey going in.  And it was.  I couldn't get a

22    precise -- and I suspect nobody can get a precise duration

23    of the exposure of the gas based on what I said earlier.

24    I'm also coupling my opinion to the incident report or

25    description by -- not only by Mr. Newman in the records, but

                    TRI-COUNTY COURT REPORTING

85

1    by a colleague, a coworker.  I don't know if I'm being

2    responsive to your question but --

3              Q    Well, let me put it this way.  Isn't it true

4    that there's no objective physical evidence that sulfer

5    dioxide molecules were in Mr. Newman's body?

6              A    I don't know that air samples were taken or

7    if his body was tested for sulphate, urinary sulphate.

8              Q    And stated another way, there is no test that

9    shows any type of objective evidence of an injury that's

10   traceable to sulfer dioxide; is that fair?

11             A    No, that's in the medical realm.  If you want

12   me to respond am I aware of any tests that were taken either

13   on him as a person or in his workstation that day, I'm not

14   aware of anything.  Nothing has been present brought to my

15   attention or shared with me.

16             Q    Or later?

17             A    Well, taking an air sample now is

18   meaningless.

19             Q    You mentioned treatment after that day.

20             A    Measuring urinary sulphate today is

21   meaningless.

22             Q    So, sir, are you agreeing with me that there

23   is no objective evidence of his having inhaled sulfer

24   dioxide on March 17, 1999?

25             A    In other words, are there any tests showing

TRI-COUNTY COURT REPORTING

86

1    that sulfer dioxide molecules entered his nostrils and/or

2    mouth?

3              Q    Yes.

4              A    No, there aren't.

5              Q    And there is no objective, say, x-ray -- I

6    don't know how this is done -- but there are not the tests

7    that say, okay, here's a test that shows lung scarring;

8    here's a test that shows some type of abnormality in the

9    nostrils, or this, that and the other, correct?

10             A    That's really in the realm of medicine.  I'm

11   not here to speak to how subjective or less objective.  On

12   the other hand, a diagnosis of chemical pneumonitis can be

13   made when there is a history of exposure in the absence of

14   x-ray findings, pulmonary function tests or even osculation

15   of the chest.

16             Q    Let me just stop you right there.  Because

17   you can have it one way or the other way, but we can't have

18   it both ways.  Are you agreeing with me that your area of

19   expertise does not permit you to render medical opinions?

20             A    That's right.

21             Q    Tell me what Mr. Newman told you that you

22   felt was consistent with an exposure to sulfer dioxide gas?

23             A    Irritating properties, the choking sensation.

24             Q    First, what do you mean by "irritating

25   properties"?


                    TRI-COUNTY COURT REPORTING

87

1          A     I don't know what he meant by that.  I have a

2    sense of what he meant by that, but assuming he was inhaling

3    something that was irritating his mucous membranes.

4          Q     Those were his words "irritating properties"?

5          A     No, he didn't say irritating properties.

6    Something was irritating him.  I didn't take notes on that.

7    I listened to what he had to say.

8          Q     When you said you didn't know what he meant

9    by that, I inferred you were hearing his words and you were

10   relaying them to me without an understanding of what he

11   meant?

12         A     I'm almost certain he said "irritation",

13   something is irritating me.  It could have been burning, I

14   don't have specifics.

15         Q     I'm sorry?

16         A     I don't have a specific wording.  I didn't

17   take notes of exactly what he said.  I didn't think that was

18   important.

19         Q     Well, what about that word choking?

20         A     He used the word choking, yes.

21         Q     That is something you remember specifically,

22   he said choking?

23         A     Right.

24         Q     Any other words that he used that you

25   specifically remember as we sit here today?

TRI-COUNTY COURT REPORTING

88

```
 1              A    I don't remember.
 2              Q    Was this the conversation yesterday or the
 3    conversation back earlier?
 4              A    The earlier one.
 5              Q    In April?
 6              A    The earlier one.
 7              Q    And no other words beside choking?
 8              A    I don't remember.
 9              Q    And when did this choking occur?
10              A    I don't know.
11              Q    You don't know?
12              A    No, as I said earlier, he couldn't give me a
13    time when he was symptomatic until the time that he
14    evacuated himself from the building.  He didn't know when T
15    subzero started, the original exposure time started.  It
16    wasn't clear to him.
17              Q    All right.  Well, let me put it to you this
18    way.  Did you get a sense from your conversation with
19    Mr. Newman about the duration of time on the opposite side?
20    That is, at one moment he started having this experience of
21    this choking, and then he evacuated the building; is that
22    fair?
23              A    Yes.
24              Q    Do you have a sense of the duration of that
25    time?
```

TRI-COUNTY COURT REPORTING

89

1           A    I can't be specific.  I believe it's
2    somewhere between -- up to two minutes, but I don't have a
3    handle on that.  I really can't.  I don't think he can.
4           Q    All right.  So what I think I hear you saying
5    is you have no idea because you think Mr. Newman himself has
6    no idea?
7           A    No, I believe that he had substantial
8    exposure for up to two minutes; it could have been less, it
9    could have been a little bit more, but I believe it was one
10   to two minutes.
11          Q    Why is that?  Why do you have that belief if
12   Mr. Newman doesn't even know?
13          A    I believe it's a reflection of my
14   understanding of the physiology, the pathic physiology of
15   sulfer dioxide gas when people have been exposed before that
16   I've had experience with: the nature of the gas, it's toxic
17   properties.
18          Q    Are you saying that sulfer dioxide affects
19   different people -- I mean, I think when I was talking with
20   somebody else in a deposition, I asked the question if my
21   wife and I go for a walk in the woods and we stroll through
22   poison ivy.  It will effect her not at all, but it will ruin
23   me because I will react to it.  Is that what sulfer dioxide
24   is in terms of some people are adversely affected by
25   exposure to it and others are not?


                    TRI-COUNTY COURT REPORTING

90

1          A    Well, there is a point in which everybody
2    would be affected.   There is a point in which everybody
3    would die if the exposure is sufficiently concentrated and
4    sufficiently protracted.   If you're suggesting is it an
5    allergic sensitizer?  No, it's not.  As chemicals go, it's
6    not -- it's more of a primary irritant in a dose-response
7    relationship.   It does have sensitizing properties in a very
8    small percentage of people, but certainly not as potent as
9    poison ivy, a variety of formaldehydes, and several others.
10          Q    Well, the way sulfer dioxide hurts the body
11    is it touches on a part of the body that is moist, mouth or
12    nose, and it reacts with the moisture to create sulfurous
13    acid, right?
14          A    That is one mechanism, yes.
15          Q    And that's what causes the choking sensation,
16    for example, or irritation of the eyes or tearing or some of
17    those symptoms, correct?
18          A    That's partially true, yes.  It's not a
19    complete picture of the toxicology of the gas, but it's part
20    of it.
21          Q    Well, it's certainly part of the toxicology
22    insofar as it describes irritation of coughing and choking
23    and sneezing and whatever, tearing, correct?
24          A    No, not entirely correct.
25          Q    Well, what am I missing?

TRI-COUNTY COURT REPORTING

1          A    Well, sulfer dioxide is a gas that provokes a

2    greater bronchial constriction than one would anticipate

3    just on sulfurous acid alone.   There is something there that

4    is not explained and I don't know.   I haven't seen anything

5    in literature to fully explain it.   But sulfer dioxide is a

6    potent broncho constrictor, and, again, more so than a

7    strict irritation phenomena would explain.   There is

8    something on a deeper cellar level; that's clear.   It's not

9    just the formation of the acid causes one to choke up.   It

10   is deeper than that.

11         Q    Where is that written?

12         A    I don't know, in the literature.   I can't

13   cite things chapter and verse as I sit here.   I would refer

14   you to the NIOSH criteria document for occupational health

15   standards for sulfer dioxide gas.

16         Q    You think it's in there?

17         A    Some of it's there.   It's an ancient document

18   today, but some of it's there, yes.   The major author of

19   Sulfer Dioxide Inhalation Toxicity was actually from

20   Cincinnati, too, Drs. Kettering and Keho years ago.

21         Q    Well, let me put it this way, broncho

22   constriction aside, sulfer dioxide doesn't pick and choose

23   among the moist membranes of different people's bodies and

24   say, all right, with this water I will form sulfurous acid

25   and with this water in this person's mouth I will not,

TRI-COUNTY COURT REPORTING

92

1   correct?

2            A    No, that's correct.

3            Q    It's indiscriminate?

4            A    It's indiscriminate.

5            Q    What is broncho constriction?

6            A    It's a narrowing of the airways up to the

7   bronchial level, up to the alveolar level.

8            Q    All right.  So we're talking about the

9   smaller airways as we get closer to the lung itself?

10           A    Yes.

11           Q    And those openings get narrower because of

12  some reaction with the sulfer dioxide?

13           A    Yes.

14           Q    And do we have any idea whether this happened

15  to Mr. Newman?

16           A    I don't know.  I suspect not.  I mean, there

17  could be broncho constriction from an exposure to an

18  irritant gas or vapor or even a particulate for that matter.

19  I'm not suggesting -- and I don't think any of the medical

20  records suggest that he developed an immediate asthmatic

21  response.  He had no prior history of asthma.

22           Q    Nor am I suggesting.  I'm just asking did he

23  have it and you're saying probably not.

24           A    He -- it's unlike he had the type of broncho

25  constriction that can occur in an asthmatic that is

TRI-COUNTY COURT REPORTING

93

1    responsive to SO2.

2         Q    So broncho constriction doesn't apply to this

3    unless a person has asthma?

4         A    No, not at all.  One can have restriction of

5    the bronchioles from exposure to irritant gasses, such as

6    sulfer dioxide.  The asthmatic has a much greater response,

7    which becomes incredibly profound even ambient pollution air

8    situations for those people, especially children.

9         Q    And my question is simply do you believe that

10   Mr. Newman suffered from -- I'm not sure if I'm pronouncing

11   it right -- bronchio or broncho constriction?

12        A    I don't know.  Again, we're getting into the

13   medical field.  I mean, it's certainly plausible, but I

14   don't know if he did or not.  Choking, I mean, is one of the

15   overt signs of that sort of thing.  There are other causes

16   of choking, of course.

17        Q    And, again, sir, my job in this is to ask you

18   questions and find out more about your opinions.  My mere

19   asking a question does not mean to imply that you do know or

20   should know or I expect you to know the answer to any

21   particular question.  A lot of this is finding the

22   boundaries of where your trial testimony will take us.

23        A    Sure.

24        Q    Okay.  So I don't -- bear with me.  What is

25   respiratory morbidity?

TRI-COUNTY COURT REPORTING

94

1          A     Lung disease.

2          Q     And what are the risk factors for pulmonary

3    irritant lung disease?

4          A     Risk factors?  The nature of the inhaled

5    agent, in other words, its chemical and/or biological and/or

6    physical nature; it's physical and chemical properties; the

7    concentration that one is inhaling; the duration of

8    exposure; individual biological factors, human factors that

9    might predispose one to adverse effects.

10          Q     Let me ask you this.  Take a look at your

11    report because I think we're on the wrong -- on page two of

12    your report it says, "Mr. Newman did not have any precedent

13    respiratory morbidity and no apparent risk factors for

14    pulmonary irritant lung disease."

15          A     I see where you're going.

16          Q     I'm trying to figure out what the risk

17    factors are for pulmonary irritant lung disease.

18          A     He didn't have a preexisting lung disease.

19    Nothing suggested obstructive or restrictive lung disease,

20    asthma, emphysema, fibrosis.

21          Q     I take that as your answer with respect to

22    not having respiratory morbidity.  What are the risk factors

23    for pulmonary irritant lung disease?

24          A     I mentioned them.

25          Q     Well, to me -- and again this is just me, a

TRI-COUNTY COURT REPORTING

95

1    lay person -- but I would think of a risk factor -- when I

2    think of risk factors, I think of say a risk factor for

3    heart disease is a diet high in cholesterol.  And the -- so

4    I'm thinking of pulmonary irritant lung disease, we ought to

5    talk about what that means, that ought to have risk factors

6    too that if a person has this particular factor in their --

7    whether it may be their history, their diet, daily living

8    activities, occupational exposures, that those are risk

9    factors for that condition; do you agree with me?

10          A    Well, I think I gave you risk factors.  You

11   used diet as a risk factor.  Ingestion of fatty foods is a

12   risk factor; inhalation of sulfer dioxide is a risk factor.

13   It's not ingestion, it's inhalation, but it's a function of

14   dose, dose duration.

15          Q    Well, the risk factors that you gave me were

16   concentration, right?

17          A    How much fat in your food that you eat.  It's

18   no exception, it's no different.

19          Q    How is the concentration -- the concentration

20   of what?

21          A    In this case sulfer dioxide gas.

22          Q    When you say there is no apparent risk

23   factor?

24          A    What number are you referring to?

25          Q    Page two of your report.

TRI-COUNTY COURT REPORTING

96

1          A     Where?

2          Q     There is a paragraph that reads, "The records

3     reveal" -- the third sentence in that paragraph is the one

4     I'm quoting.

5          A     There was nothing in the records that

6     indicated he had preexisting lung disease.

7          Q     All right.  And then my question is -- I've

8     understood that.  What I want to know is your understanding

9     of the risk factors for pulmonary irritant lung disease.

10         A     Risk factors -- I'm repeating myself, but the

11    risk factor are several, and in no particular order, but two

12    in the top would be what is the agent or agents, what is the

13    concentration that is inhaled that reaches the target

14    tissues and cell sites, what is the duration of exposure to

15    that provocative agent or injurious agent.  There are other

16    risk factors, but those are the big three.  There can be

17    unique individual biologic factors, there can medication

18    factors, there can be metabolic uptake factors, biochemical

19    factors, it goes on and on and on.  But the big three are

20    what is the chemical, how much is inhaled and how long did

21    one inhale it.  Those are clearly risk factors, as I

22    understand risk factors.

23              The hazard is the agent, but the risk is the

24    function of exposure and exposure is defined by how much and

25    how long and what is it.  We use an equation, but a very

TRI-COUNTY COURT REPORTING

97

1    simple equation in our business that Hazard plus exposure

2    equals risk.  In this case sulfer dioxide is the hazard.  If

3    it is in a contained system, it's always hazardous.  But if

4    there is no exposure, there is no risk.

5           Q    What is your basis for concluding that

6    Mr. Newman had pulmonary irritant lung disease?

7           A    He was diagnosed with chemical pneumonitis.

8    His lungs were burnt.

9           Q    What does "his lungs were burnt" mean?

10          A    Chemical pneumonitis, inflammation of the

11   respiratory tract tissues.

12          Q    So he had inflammation of the pleural

13   membrane secondary to exposure to sulfer dioxide gas; is

14   that what you're saying?

15          A    The pleural membrane?

16          Q    Well --

17          A    Well, perhaps he did.  I don't recall any

18   pleural effects.  It's certainly conceivable.

19          Q    Well, what does --

20          A    But I believe chemical pneumonitis is not so

21   much one of chemical pleurisy as it is chemical alveolitis.

22          Q    And you're getting that on the basis of the

23   medical records that you reviewed.  You're not qualified to

24   make a diagnosis --

25          A    No, I'm not.


                    TRI-COUNTY COURT REPORTING

98

1          Q     -- of that, correct?

2          A     That's right.

3          Q     And with respect to those factors that you

4     listed earlier:  Concentration, duration -- were those the

5     two big ones?  Was there a third?

6          A     Well, it has to be what the agent is, that

7     goes hand-in-hand.

8          Q     Sulfer dioxide.  What assumptions have you

9     made regarding those factors in this case?

10         A     I believe that Mr. Newman, based on my review

11    of the records, that he had an exposure up to two minutes,

12    somewhere between one and two minutes; that coupled with his

13    medical findings tell me that he had an exposure above 100

14    parts per million of sulfer dioxide gas.

15         Q     And what is his precise -- is the precise

16    condition that we're talking about chemical pneumonitis?  Is

17    that the condition that we're talking about?

18         A     I don't know what it is today.

19         Q     Well --

20         A     There several medical records and I read

21    them, but I didn't -- I'm not here to second guess those.

22         Q     If I understand you right -- if I understand

23    you right, you're saying that you understand that there is a

24    release of sulfer dioxide, and that at some later point a

25    doctor evaluated Mr. Newman and concludes that he had


                    TRI-COUNTY COURT REPORTING

99

1  chemical pneumonitis, and that you're taking that fact and

2  perhaps Mr. Newman's irritation on that day and you're

3  trying to correlate if he has this resultant condition, what

4  must have been his exposure; have I got that right?

5          A    Pretty much.

6          Q    What has been your background and experience

7  in doing that in the past with others, wherein you have

8  correlated a person's condition to -- and there is probably

9  a word for the certain kind of reasoning, maybe --

10         A    Forensics.

11         Q    Well, I was thinking in terms of inductive --

12  I never got those words straight in my head a long time ago.

13  You have taken the condition, and knowing the agent, that

14  there was this potential that was in the environment, what

15  must the exposure have been to cause that result.  And I

16  want to know what have you done -- how many occasions have

17  you reviewed or have you done this in the past where you

18  have had a person who was exposed to a known dosage of X

19  amount concentration of sulfer dioxide and they had these

20  symptoms or these medical sequela?

21         A    With sulfer dioxide I can probably count on

22  the fingers of one hand the times that I have done it, but

23  have never attempted to extrapolate retrospectively a dose.

24  It really wasn't important.  There was no question a person

25  was excessively exposed to sulfer dioxide and a plan had to

TRI-COUNTY COURT REPORTING

100

1    be put into place to prevent future.  In a more general
2    sense I have done that very thing you have talked about
3    perhaps tens of thousands of times.  And, in fact, I am the
4    principle investigator in investigating 6,000 cases of
5    prostate cancer looking back through the lifetime of
6    exposures of men to whatever they did in their occupation to
7    see if there is a link between their cancer, their disease
8    and what they did for a living, where they worked and how
9    much their exposures might have been in the absence of air
10   sampling and ventilation measurements.  It is an established
11   scientific protocol to follow to do just that.
12          Q     Just so we're here, you're not here to make
13   any link between exposure to sulfer dioxide and prostate
14   cancer?
15          A     No, I'm not.
16          Q     Someone reading the transcript many months
17   from now would --
18          A     Let's hope not.
19          Q     Tell me about the cases that you can count on
20   one hand in which you looked at someone with sulfer dioxide
21   exposure and the symptoms that they've suffered as a result.
22          A     All four occurred in two foundries wherein
23   Ford Motor Company was considering the use of sulfer dioxide
24   to produce cores in core-making operations, which we were
25   discussing earlier this morning.  In fact, as a result of

TRI-COUNTY COURT REPORTING

101

1    that, one of the decision factors in not using sulfer
2    dioxide was a lack of good control that we could achieve
3    with that gas.  There were other economic factors, but there
4    were certainly the industrial hygiene that argued against
5    using that process.  These were men who had exposures to --
6    for lack of a better term -- puffs of sulfer dioxide as a
7    burp from the core-making machines so much so that they had
8    medical problems and had to be admitted to hospitals and
9    treated accordingly.  There was no attempt to work back to
10   find out what their exposure was, it really wasn't
11   necessary.  They were healthy before.  Their only exposure
12   was sulfer dioxide.  Their signs and symptoms were
13   consistent with exposure.  End of story.
14            Q    And what symptoms did they have?
15            A    Coughing, choking, eye irritation, in some
16   cases labored breathing, dyspnea.
17            Q    What does dyspnea mean?
18            A    Labored breathing, difficulty breathing.
19            Q    And these puffs -- is this when the core is
20   made itself that's used later in the mold-making process?
21            A    No, it's in the manufacture of the cores
22   themselves wherein sulfer dioxide is injected under high
23   pressure into the sand grains and the polymer that binds the
24   sand.
25            Q    Then you have something you can use to make

TRI-COUNTY COURT REPORTING

102

1    the cup to use our example before?

2         A    Right.

3         Q    Did the workers -- these four men, I take it

4    this was a non-fatal exposure; is that correct?

5         A    That's right.

6         Q    These four men, when they were -- did they

7    suffer these results immediately upon when the first core

8    was made or is this something that was as a result of

9    chronic exposure that could only be -- the only attributable

10   causal factor that you determined was their working in

11   proximity to this particular manufacturing process?

12        A    Nothing suggested it was a chronic exposure.

13   They probably had day-in and day-out exposure.  In fact, my

14   air sampling demonstrated that.  But what caused their

15   problems was this single burst, this release of gas in an

16   uncontrolled situation.

17        Q    But that would happen every time they made a

18   mold, right?

19        A    No, it could be function of many things,

20   improper addition rate, withdrawn pressure, adding too much,

21   adding too much at the wrong time, or on top of all that the

22   ventilation isn't work.  But for the ventilation system not

23   performing the way it was designed, the person wouldn't have

24   been exposed.  There are many factors that led to their

25   exposures.  It wasn't one -- it was a systematic issue in

TRI-COUNTY COURT REPORTING

103
1  terms of things went wrong.

2          Q    Were all of these men injured at the same

3  time?

4          A    No, two were.  Two in Windsor were.  Two or

5  three or four, whatever it was, in the Michigan Casting

6  Center were over a several week period.

7          Q    But all of these men, prior to suffering

8  injuries that led to their hospitalization, they had been

9  subjected to sulfer dioxide in their workplace in the past

10 and that's all I mean by chronic.  It wasn't the first time

11 the mold was made and they had that experience, correct?

12         A    When I was called -- in fact, I went on two

13 site of the visits.  And somebody that worked for me went on

14 another one.  We don't know what their exposures were

15 before, there is no way.  We had no indication on

16 interviewing the people or their supervisors or their

17 colleague if the exposures were massive daily.  It's

18 unlikely.  People wouldn't tolerate that sort of thing.

19 These were equipment breakdowns, frankly.

20         Q    Okay.  At the same time, they were involved

21 in a manufacturing process on a daily basis that used sulfer

22 dioxide, correct?

23         A    Yes.

24         Q    And so there may have been exposure to sulfer

25 dioxide over a long period of time within permissible

104

1    limits, less than two parts per million or less than five

2    parts per million on a daily basis over a time, correct?

3         A    No, not correct.  I don't believe that.

4    Because the prior process -- and the subsequent process, the

5    company went back to use formaldehyde as the curing agent.

6    And we had that controlled very well.  The permissible

7    exposure levels at the time were roughly equal to two

8    gasses.  Either it worked beautifully and perfectly or it

9    didn't work at all.  And when it didn't work at all, it was

10   dramatic, in the case of these four or six people.

11        Q    Okay.

12        A    So I believe since the formaldehyde was

13   controlled for which we had mountains of data, it is

14   reasonable to conclude that the sulfer dioxide was

15   controlled day-in and day-out.  Not to say that now and then

16   there couldn't be a little bit here and there, of course,

17   but manageable.

18        Q    How did you come to investigate -- or did you

19   come in after the fact, after these men had left and gotten

20   whatever medical treatment they needed?

21        A    Well, actually we came in before the fact.

22   We did some preemptive industrial hygiene monitoring on the

23   research facility and forwarned the plants that if they go

24   with this process, this is what they could be faced with.

25   At that research process, no issues.  Things were controlled

TRI-COUNTY COURT REPORTING

105

1     fairly well.  But in response to your question, we were

2     called in after the people reported to the plant medical

3     department with health problems from the gas.

4              Q     And what did you do?  Did you interview them?

5     What did you do?

6              A     I interviewed one man.  Somebody else

7     interviewed one or two of the others.  We didn't interview

8     all of them, I know that.  What did we do?  We went to the

9     plant.  We measured ventilation, took air samples, we

10     studied the work practices.  We worked with the engineers on

11     the injection rate of sulfer dioxide into the core-making

12     materials.  Our objective then was to make sure the process

13     was operating in a way that it wouldn't cause further harm

14     to people.

15             Q     All right.  And, I guess, you said earlier

16     that in these situations, in these four cases it was

17     unnecessary to determine what their exposure to sulfer

18     dioxide had been during that puff event, correct?

19             A     It served no useful purpose.

20             Q     So you agree with me that it was not done?

21             A     It was not done.  It was massive.  We knew it

22     was massive.  Whether it was 192 parts per million or 217.5

23     is neither here nor there.

24             Q     Say that again.

25             A     It was not important to have a precise

TRI-COUNTY COURT REPORTING

106

1    estimation of whether it was 119 or 217 parts per million of

2    sulfer dioxide gas was not important.  It was a situation

3    that was out of control that required engineering

4    intervention and personal protective equipment.

5              Q     And from your report, there was something in

6    terms of this sulfer dioxide, one of the features of it is

7    that you can be exposed to several hundred parts per million

8    and as long as you get out of there, get out of that area,

9    it will not cause you permanent harm, correct?

10             A     That would be generally true for most people.

11   If they didn't have any antecedent medical conditions such

12   as asthma, that would be a generally true statement.  If you

13   can evacuate yourself from the area, there should not be --

14   given biological variabilities.

15             Q     So I guess then going back to this situation

16   with these four gentlemen.

17             A     There might have been six.  It's been many,

18   many years.

19             Q     You said one hand.

20             A     Okay, sorry.

21             Q     Those people were able to return to normal.

22   I mean, after their medical treatment, they didn't have

23   any --

24             A     I don't know.

25             Q     Well, you certainly would have been made

TRI-COUNTY COURT REPORTING

107

1    aware of it if there were continuing problems?

2            A    In a perfect world, yes.  I managed a

3    department of 22 people for half a million people.  We were

4    run ragged.  In an idea world we would want that

5    follow-through and coordinate with medical, maybe even visit

6    the people at home.  We didn't do that.  We didn't have the

7    luxury of doing that, frankly.

8            Q    Let me put it another way.  You're unaware of

9    any ongoing problem or permanent damage caused to the

10   gentleman that were involved in those events at Ford?

11           A    Maybe they didn't have it, maybe they did.  I

12   have no idea.

13           Q    You agree with me, you're unaware of their

14   having permanent damage?

15           A    That's right.

16           Q    So consequently, my question is on the basis

17   of that experience, how are you able to correlate

18   Mr. Newman's symptoms, his diagnosis of chemical pneumonitis

19   to a concentration and a duration of exposure with the

20   precision that you have been able to?  Mindful that there

21   has been -- no air sampling was done, correct?

22           A    Right.

23           Q    You have made no calculations as to the

24   concentration of the sulfer dioxide in the area where

25   Mr. Newman was, right?

TRI-COUNTY COURT REPORTING

108

```
 1              A    I gave you my best belief of what his
 2    exposure was.  It's not precisely time-bounded.  It's not
 3    precisely concentration-bounded.  I cannot do that.  Nobody
 4    can do that.  What I have done in former cases where people
 5    have been exposed to sulfer dioxide, after the fact I or
 6    people I supervise would go in and take direct reading
 7    concentration of gas clouds or puffs of SO2 during not a
 8    singling, but the breakdown situation.  We have had results
 9    quite frankly all over the place, but all of them were
10    excessively high.  They were so high, in fact, that we felt
11    this process was unreasonably dangerous and we didn't
12    authorize from our perspective continued use of it because
13    Ford engineers couldn't guarantee better control and that
14    was too much, so we abandoned the process.
15              Q    And my question, sir, is how can you look at
16    Mr. Newman and say, okay, and he had choking sensation,
17    irritation, and he had a diagnosis of chemical pneumonitis,
18    and then say all right, that translates to -- given that the
19    agent is sulfer dioxide, that translates to this
20    concentration and this duration of exposure?
21              A    Well --
22              MS. STORM:  I'm going to object.  I don't think
23    we've gotten to concentration.
24              Q    Let me -- while we're on the subject, I
25    thought you said between 100 and 200 parts per million over
```

TRI-COUNTY COURT REPORTING

109

1    between one and two minutes?

2         A    That's my belief.

3         MS. STORM:  Okay.  I apologize.

4         Q    No problem.

5         A    I'm telling you it's based on my experience,

6    it's my best --

7         Q    And you agree with me that with your

8    experience -- the experience that you've had, when you've

9    dealt with these four or five or six gentleman who were

10   exposed during this foundry operation to a puffing event,

11   that no one went back and measured the exposure that these

12   gentleman had?

13        A    You can't do that.  There is no way that can

14   be done.

15        Q    All right.  So you agree with me that you

16   don't know what they were exposed to?

17        A    No, I can tell you it was excessive, but I

18   can't tell you how much.

19        Q    Tell me what excessive means.

20        A    One bullet through the chest or ten?  It

21   really doesn't matter.

22        Q    Give me a range.

23        A    I did.  I said I believe 100 to 200 parts per

24   million, it could have been higher, for up to two minutes.

25   That's about as precise as I can get.


                    TRI-COUNTY COURT REPORTING

110

1          Q      Forget about Mr. Newman for a moment.  Tell

2     me -- do you agree with me that no one measured the SO2,

3     sulfer dioxide exposure that was experienced by the men, the

4     four to six men that you were involved with at Ford?

5          A      As they were inhaling the gas, that's

6     correct.  Nobody took air samples as they were exposed.

7          Q      And that's the basis for your comparison in

8     Mr. Newman's case, is it not?

9          A      No, it's not.  You're trying to narrow my

10    opinions down to a handful of people a long time ago.  I

11    personally have taken air samples, hundreds of air samples

12    for sulfer dioxide on hundreds of workers or hundreds of

13    workplaces with hundreds of workers.  And that's part of my

14    collective experience.  What is a problematic dose of this

15    gas.  And I'm pleased to report that the lion's share of

16    them are not problematic.  They're well controlled.  There

17    were a few that were not and this is what we're talking

18    about.  That is part of my experience too.  I have a sense

19    of what a threshold dose is.  And as a matter of fact, so

20    does NIOSH, so does OSHA, so does the American Industrial

21    Hygiene Association, and so does the American Conference of

22    Young Industrial Hygienists.  They have not that absolute

23    figure above which everybody is poisoned below which

24    everybody is safe, but the most plausible threshold limit

25    value that will protect the health of most people exposed to

111

1    it.  It's not just four people out of many, many years ago.

2    There's a collective data base out there.  We have a pretty

3    good understanding of how much SO2 would be injurious at

4    what concentrations and for how long.

5            Q    If someone were exposed to ten parts per

6    million, that's likely to induce coughing, won't it?

7            A    For how long?

8            Q    You tell me.

9            A    One breath, no.  Half an hour, most people

10    would say I prefer not to be around.  Would it be lethal?

11    No.  Would it cause lung disease?  Probably not, unless a

12    person is hyper-susceptible and they're not asthmatic going

13    in.

14            Q    Are you telling me that one minute in a

15    concentration of ten parts per million of sulfer dioxide a

16    person is ambivalent to the existence of the sulfer dioxide?

17            A    Some people might experience profound

18    irritation, others are more stoic, much more stoic.

19            Q    And so if that's the case is the

20    concentration of parts per million of the sulfer dioxide

21    together with its duration so resulting in experiences that

22    are so variable among different people?

23            A    There are variable to a point.  Like I said

24    earlier, if we were all exposed to 1 percent -- 10,000 parts

25    per million -- for five or ten minutes, we're going to die.

TRI-COUNTY COURT REPORTING

1    Maybe not right away, but we'll all die.  Everybody in this
2    room sooner or later will die from that exposure.  As the
3    exposure goes down and the duration of exposure perhaps goes
4    down as well, then it becomes more variable between you and
5    me and these ladies.  It would be a tremendous biological
6    variability between one person to the next.  The higher the
7    dose the closer we all come to the same response.  At the
8    lower doses, there is tremendous biological variability.
9    I've seen that in workers.  I personally, for whatever
10   reason, seem to tolerate more SO2 than some people who find
11   it profoundly irritating.  That is one of the reasons why
12   the threshold limit value has been established where it is,
13   to prevent irritation in most people, but not everyone.
14         Q     When you say low doses, tell me what you mean
15   by that.
16         A     Well, it's a relative term.  And the reason I
17   say it's relative, sulfer dioxide as an ambient air
18   pollutant is really high of EPA's hit list because the
19   six percent of us who have asthma are profoundly affected by
20   increased elevations of SO2 that comes primarily from our
21   power plants.  The rest of us don't have a problem.
22         Q     Sir, let me stop you there.  And I'll let you
23   explain whatever you want.  Really, all I want to know is in
24   the last sentence you said, you said in low doses of sulfer
25   dioxide there's tremendous biological variability in the

TRI-COUNTY COURT REPORTING

113

1    responses that are experienced by the people who are
2    exposed.  And all I want to know is when you said low doses,
3    what does that mean?  Is a thousand parts per million, is
4    that ten parts per million, 50 parts per million?  Give me
5    some understanding.
6              A    A low dose is relative to the recipient.  An
7    asthmatic can be profoundly affected by a dose that you and
8    I might consider low and are they're broncho constricted to
9    the point they are turning blue and they're calling 911 to
10   save their life.  So it's a relative term.  If a person
11   doesn't have antecedent asthma and they're occupationally
12   exposed, they are adults, they can gainfully acquire a job
13   and hold a job, dose low dose would be below the action
14   level, that is below one part per million as an eight hour
15   time waited average.  But even there, there are no
16   guarantees that that would be protective of the health of
17   all people.
18             Q    What is your understanding of the -- you
19   referred to him working under a process tank?
20             A    This is a conical tank.  I think we have a
21   diagram.  He was on his back working underneath it
22   installing insulation.  This was a device, it appeared to be
23   a mixing device.  I saw one this morning.  And presumably it
24   has blades inside for mixing chemical products, an insulated
25   conical-shaped vessel.

TRI-COUNTY COURT REPORTING

114

1           Q     Where was the release?  Where was the sulfer

2     dioxide, the source of release?

3           A     I don't know.

4           Q     Take a look at --

5           A     I understand there is a debate about that.

6           Q     Take a look at the diagram that we marked as

7     73.  Does that help you answer my question about the

8     location of the sulfer dioxide that was released?

9           A     Since I just received this today, I'll have

10    to look at it carefully.  I don't see anything on here where

11    it indicates a release point.

12          Q     What's your understanding on which you base

13    the report?

14          A     I don't know where the gas was released from;

15    I really don't know.

16          Q     Is it not relevant to your opinions to know

17    that?

18          A     Well, I believe it was released somewhere in

19    Building A, but I can't tell you -- give you a valve.

20    Somewhere in Building A, I can't be specific.

21          Q     How does the gas -- assuming it is released

22    in Building A, how does it get into the area where you've

23    drawn the N inside a circle to where Mr. Newman is?

24          A     There are several ways it can get in.  First

25    of all, there's not a contiguous wall.  It had breeches, had

TRI-COUNTY COURT REPORTING

115

1    holes in it.  There were holes in the back wall on the back

2    side of this building.  One of the two doors, I understand,

3    was open about three to four feet on the day of the

4    occurrence.

5            Q    How do you know that?

6            A    Well, I was told that by Mr. Newman.

7            Q    Did he tell you which door was open?

8            A    In one of the sketches it was this door,

9    would have been the door closer to the taller part of the

10   building.  This door.

11           Q    Why don't you mark that with a circle, if you

12   would, the door that Mr. Newman told you was open.  It was

13   open what?  You have written --

14           A    He said it was open three to four feet, not

15   fully.  It's a ten-foot wide door, eight feet high.

16           Q    Is that what you have written, three to

17   four feet?

18           A    Yes.

19           Q    How does the gas go to -- from Building A to

20   Building B?

21           A    As I said, there were numerous breaches in

22   this wall.  There were breaches in the back wall.  There was

23   an exhaust fan that I understand was not operating at the

24   time Mr. Newman was there.  This door was open.

25           Q    And what's the basis for your understanding

TRI-COUNTY COURT REPORTING

116

```
 1    that that exhaust fan was not operating at the time?
 2            A    I asked Mr. Newman initially if there was
 3    ventilation equipment in the area.  He said no.  And
 4    yesterday when I talked to him specifically about this fan,
 5    he said it was not running.
 6            Q    So how would the gas get into the area where
 7    Mr. Newman was?
 8            A    Well, there are several openings, as I
 9    mentioned.
10            Q    I believe that you have identified several
11    paths.
12            A    Several paths.  There was another one, there
13    was a floor drain where he was working.  It's possible that
14    it could have come through a floor drain.  I don't know
15    that.  It's certainly an avenue.
16            Q    How does it get in the floor drain?
17            A    It was a liquid.  It could enter the floor
18    drain and if somebody doesn't pour a bucket of water down
19    the floor drain every month or so, it acts like a gas
20    entrance.
21            Q    What was the temperature that day?
22            A    I don't know.
23            Q    Let's -- it was March 17.
24            A    Uh-huh.
25            Q    Let me ask you to assume it's well above
```

117

1    14 degrees Farenheit.  Is there going to be any liquid to go

2    into any drain?

3           A     Not for a second.  It's going to flash very

4    quickly.

5           Q     Within a second -- we're talking less than a

6    second, it's gaseous?

7           A     It depends on the volume.  A large volume,

8    it's going to take longer.  A small volume, it's getting

9    colder as it's evaporating.

10          Q     What's your understanding of the mass of the

11   gas that was released?

12          A     There was a report by a P&G engineer of .38

13   points.

14          Q     Are you aware of any fact that would

15   contradict that report?

16          A     No.

17          Q     Do you have any professional dispute with the

18   calculations or the conclusions of that report?

19          A     I didn't study it with that respect because I

20   didn't have the equipment and I didn't have the plumbing,

21   the valves and the containment.

22          Q     How about the methodology?  Assuming the

23   measurements were accurate; the methodology, right?

24          A     Well, there were measurements made of the

25   physical equipment, not measurements of the gas

TRI-COUNTY COURT REPORTING

118

1    concentration, of course.  The chemical engineering concepts

2    that the P&G engineer took down, I have no problem with

3    that.  Conceptually, it's --

4             Q    All right.  Based upon that, would you be

5    able to calculate the volume of the gas in Room A, Building

6    A?

7             A    If I have the dimensions of Room A,

8    length/width/height, minus the equipment in the room, some

9    net volume, ones that equipment is accounted for, and if I

10   knew .38 pounds in so many cubic feet or cubic meters or

11   whatever, I could calculate the concentration.  That would

12   be an average concentration.  I could also calculate an

13   average concentration as a function of ventilation in that

14   room.  I can calculate decay concentrations as a function of

15   the peek concentration and what that concentration would be

16   as the ventilation goes through.  I can make a lot of

17   calculations.

18            Q    Tell me how you would make those calculations

19   from -- let's start with how do we calculate the

20   concentration in parts per million of the sulfer dioxide in

21   Room A?

22            A    Well, I'll go through the drill with you.  So

23   many pounds in a certain volume of air; that is mass volume.

24   Then one would make a conversion into volume-volume, that

25   would be parts per million.  In other words, .38 pounds in

TRI-COUNTY COURT REPORTING

119

1    let's say how many thousand cubic feet in that room minus

2    the net; that would give you milligrams of sulfer dioxide on

3    average per cubic feet in that room.   That would say the

4    concentration one foot below the ceiling in this corner

5    would be no different than one foot off the floor in that

6    corner; that is the average concentration.   Then one would

7    convert pounds per cubic feet into milligrams per cubic

8    meter by convention.   Then one would one take milligrams per

9    cubic meter and for ballpark purposes, given the temperature

10   pressure that day -- Cincinnati being probably not much

11   different than Detroit, maybe 700 feet above see level --

12   times 24.45, divided by the molecular weight of sulfer

13   dioxide, which is about 64.1.   That would give you the

14   average sulfer dioxide gas concentration throughout that

15   room.   It wouldn't say anything about high concentrations in

16   one area and lower concentrations somewhere else.

17        Q    Now, let's talk about that.   First off, 24.45

18   is the volume of gas at those temperatures and pressure; is

19   that right?

20        A    That is the gram molecular volume of gas;

21   25 degrees centigrade and 761 degrees of pressure.

22        Q    Which is the standard?

23        A    Pretty much standard for an ideal gas.   And

24   sulfer dioxide would be pretty close to that.

25        Q    When the gas is released, how long does it --

TRI-COUNTY COURT REPORTING

120

1    I mean, maybe this is -- I'm using the wrong jargon, but

2    what is its dispersion rate, if you will?  How quickly does

3    the gas try to achieve equilibrium?

4              A    Clearly molecules move around.  And with

5    sufficient time, there will be -- short of the gas molecule

6    reacting with surfaces and being removed from the

7    environment that way, there would be an homogeneous

8    atmosphere.  The concentration at any one point would be the

9    same.  Now, to answer your question, it's not a simple --

10   cannot be done by simply.  It's a function of primarily the

11   mixing factor, the turbulence and the ventilation within a

12   facility.  There are other factors, thermal gradients, maybe

13   even pressure gradients.  But primarily it's the movement of

14   air within that facility that causes the mixing, like hot

15   water going into a bathtub of cold water.  If you don't stir

16   it, it's going to be hot at one end and cold at the other.

17   But as you're stirring, it very quickly will become -- the

18   stirring is analogous to a ventilation system.

19             Q    What would be -- I guess people just pick

20   mixing factors based upon their experience and judgment?

21             A    Yes.

22             Q    And having been there today, what mixing

23   factor would you chose in terms of when the gas enters --

24   when it goes from Building A to Building B, the quickness at

25   which it achieves equilibrium?

TRI-COUNTY COURT REPORTING

121

1          A    I have never seen mixing factors applied
2     between two buildings who are ostensibly separate.    Granted
3     there are breaches in that wall.    But in a practical sense,
4     those breaches do not allow for mass movements of tremendous
5     volumes of air.    They allow for movements of small volumes
6     of air.    I have never seen a mixing factor applied from one
7     building to another building and vice-a-versa.    If I found,
8     for example, very poor ventilation in Building B or Building
9     A, you could apply a mixing factor from anywhere from one to
10    ten.    I've never seen it from one building to the next; that
11    is bizarre.
12         Q    Well, if we take it, as I think we've said,
13    if the gas -- if the sulfer dioxide release occurs in
14    Building A and Mr. Newman is in Building B and you have
15    identified certain paths sulfer dioxide could that to go
16    from Building A to Building B, how do we determine how
17    quickly it would -- how long would it take to get to
18    Mr. Newman?
19         MS. STORM:    I object to the use of the words
20    "Building A."
21         Q    And you can --
22         MS. STORM:    Since it's not a building.
23         A    It was a tent as far as I'm concerned.
24         Q    I'm using that term solely as it is described
25    on the diagram.

TRI-COUNTY COURT REPORTING

122

1          MS. STORM:  Which we're also objecting to.

2          A     I can't tell you how quickly because there

3     are numerous factors.  A very important consideration in all

4     this is if we assume this wind direction, setting aside

5     velocity for a moment, was steady state.  Having said that,

6     it's rare that wind or God given ventilation is steady

7     state.  It's constantly changing in direction.  It might be

8     steady state for a minute or two minutes.  But it's shifting

9     in direction and in velocity, short of a gale.  When the air

10    was coming in this direction, as it was this morning, coming

11    by the building that way, it creates a ram effect on this

12    side of the building, positive pressure.  On the leeward

13    side of the building, the back side there is a negative

14    pressure.  As the building -- as the wind passes over the

15    building, it creates a negative pressure and an envelope

16    around the back side of that building.  That negative

17    pressure promotes intrusion of contaminants back into the

18    building.  And I believe that's the major way that the

19    sulfer dioxide got from tent A, if you will, into Building

20    B.

21         Q     And so take me through it with a pen, if you

22    will -- or first, tell me the gas goes out of Building A,

23    out that door, and turns right, goes around the building and

24    through the lower pressure comes down, comes back in through

25    some other source?

123

1              A    It could be that way since we're talking

2    about a non-rigid structure, it's certainly feasible or

3    plausible that there are breaches in that structure at

4    ground level.

5              Q    So, like, underneath the plastic, is that

6    what you're saying?

7              A    Exactly.

8              Q    So anyway -- but am I right that it goes --

9    and I don't want to write on your diagram, but you write on

10    your diagram.  But -- I'll tell you what, I'll write on

11    this -- my scrap copy here.  I get the impression you're

12    saying that whatever -- wherever the source is, the gas

13    comes and goes back through the low pressure side of the

14    building?

15              A    Yes.

16              Q    And finds a way into the building in that

17    manner?

18              A    Yes.

19              Q    All right.  Can you tell me -- if that's --

20              A    Well, perhaps I can show you with a side

21    view, if I may.

22              Q    I'll tell you what.  I'm going to give you

23    another piece of paper, that way we'll mark this as 74.  And

24    this way you'll have -- I'm sorry, I always get leary when

25    we have got double-sided copies.  Okay.


                    TRI-COUNTY COURT REPORTING

124

1              A      I'm going to draw -- give you a ground level
2       building.  Let's say there is a stack and let's say there is
3       another stack in that building for some process.  And the
4       prevailing wind is in this direction, whatever velocity.
5       What you will get is, of course, when the wind hits that
6       building, it's not going anywhere.  Since it has momentum,
7       there will be equal contours of air passing around the
8       building.  And say we had a make-up air inlet on the
9       building on this side.
10             MS. STORM:  A what?
11             A      A make-up air inlet, an exhaust fan -- let's
12      just put a hole in the building.  This is going to be a
13      positive pressure on this side.  As the air sweeps over the
14      building, it's going to continue its momentum.  It's going
15      to keep going in this direction.  It's not going to
16      magically come back in the building as your first drawing
17      suggests.  This is going to be a negative pressure side of
18      the building on the leeward side.  If this was a process
19      that was giving off a contaminant, there will be turbulence
20      around the back side of the building like this -- it's not
21      exactly like that -- to which to air pollution engineers and
22      ventilation engineers and people like myself, industrial
23      hygienists, it's very important to have a source contaminant
24      above this eddy zone, such that a stack like this, the smoke
25      is entrailed and it has little opportunity to get sucked

                        TRI-COUNTY COURT REPORTING

1    back in the building.

2              The point being made is that a contaminant

3    released let's say close to ground leve back in this eddy

4    zone is going to be caught and brought back in the building.

5    Stack heights are important, release points are important,

6    but you have some meteorology, for lack of a better word,

7    negative pressure on the leeward side of the building, every

8    industrial hygienist, as it's been a bugaboo from the

9    get-go, we see this all the time, we see it not only in

10   industrial plants, but at schools, hospitals, shipping

11   docks, where air contaminants aren train and brought back

12   into the building, not in as high a concentration as the

13   release point, there is considerable dilution in many cases.

14   But there are situations there are rich concentrations --

15   not in rich concentrations, but high concentrations are

16   simply taken out and brought right back in through the

17   turbulence.   This is not the best diagram.

18        Q    That is terrific.  Please though take the

19   original of Exhibit 73 and now with a bird's eye view

20   looking down, suggest to me the eddy effect that you

21   portrayed on Exhibit 74.

22        A    What I'm doing now is not -- is something

23   that in many cases to give you all the eddy currents at any

24   one point in time we need many factors:  Time of day, solar

25   load, barometric conditions, temperatures, wind velocity,

TRI-COUNTY COURT REPORTING

126

1     changing wind velocity.  But in general you have a positive
2     pressure effect coming this way and it's going to create the
3     greatest negative pressure in an envelope that surrounds --
4               Q     I'm going to give you another diagram.  We'll
5     mark this as 75.
6               A     I mean, literally, everything -- if this
7     building stood alone or by itself, the situation would be
8     very simple.  But when you have intervening terrain,
9     intervening structures as we did over there, the turbulence
10    and the eddy currents and what we call diffusivity currents
11    become extremely complicated.  And frankly I'm not going to
12    put educated arrows on a piece of paper.  I'll tell you that
13    the back side of this building is under a negative pressure
14    but the turbulence of the other buildings can have a
15    profound effect on the degrees of negative pressure behind
16    that building.  And, frankly, I think you're trying to pin
17    me down into something that will come back to haunt me.
18              Q     I'm trying to understand your testimony.
19              A     I think you understand it.  I think you
20    understand what I'm getting at.  I think you understand that
21    when you have a prevailing wind this way, you have negative
22    pressure behind the building that can be affected by
23    velocity, direction, solar loading, geographic features, if
24    there were hills, and certainly tall structures around that
25    building, all have a bearing on air flow.

TRI-COUNTY COURT REPORTING

127

1          Q     I marked Exhibit 75.  Are you unwilling to
2     tell me where this negative pressure is?
3          A     You want me to take something that's a very
4     sophisticated process that probably should be done in many
5     cases to give you all the little educated arrows by a
6     computer modeling program.
7          Q     So I take it you are declining to indicate on
8     this diagram where you think the negative pressure area is
9     with the proviso --
10          A     Be happy to.
11          Q     -- that's it's something that is complex.
12          A     The negative pressure area literally is in
13     this envelope from -- this was not a building then, assuming
14     the tent structure took that geometry like this.  And, of
15     course, that could extend out.  It's not a magic line.  From
16     that point to this point, we're in a negative pressure in
17     building eddy currents based on prevailing winds sweeping
18     over the building this way.  Positive pressure here,
19     negative pressure there.
20          Q     Let me ask you to assume that this door is
21     open when -- and I'm pointing to the door that is at the top
22     of Building A on Exhibit 75.  Assuming that's open at the
23     time of the sulfer dioxide release within Building A and
24     assuming the wind direction is in the prevailing method --
25     or in the prevailing direction as described and discussed

TRI-COUNTY COURT REPORTING

128

1    here in the last several minutes.  Will sulfer dioxide that

2    vents through this building through this door have any way

3    of entering the garage door that Mr. Newman says is open as

4    indicated on Exhibit 73 by the circle that you have drawn or

5    rather will it go through to that negative area?

6          A    It's not either/or.  There is tremendous

7    diffusivity, there's boiling air, moving of air.  As long as

8    air is coming this way, you're going to have negative

9    pressure.  As there is negative pressure here, there will be

10   a negative pressure shadow along -- probably pretty much

11   following that axis.  Within that shadow, for lack of a

12   better term, there is going to be an invisible maelstrom of

13   air moving around.  Sometimes we have observed that pieces

14   of paper will float up a wall.  You are standing there in

15   two corners of a building and a piece of paper -- or dust

16   devil dance, going up and down, not going much of anywhere,

17   sometimes slamming into a wall, sometimes settling down,

18   sometimes being picked up and swept away.  But in that

19   shadow you have that turbulence, absolutely.  There's no

20   question in my mind that there can't be entry through an

21   open door in that direction.  There is nothing mysterious

22   about it.

23          Q    How about gas coming over around this corner

24   and into a vent on this side of the building?

25          A    It's unlikely.  As long as you have got the

TRI-COUNTY COURT REPORTING

129

1   ram effect here, assuming -- there were buildings there, but
2   you still have air moving in this direction.  It's unlikely
3   that SO2 gas molecules will get out of this and go this way.
4   They will mostly be swept this way once they're in that
5   negative air pocket in that corner.
6           Q    Given the pressure that you've described on
7   the side of the building here, would there be any reason for
8   the sulfer dioxide to go through any of the holes in the
9   wall that you described, the breaches in that wall between
10  Building A and Building B, given the negative pressure
11  system on the side of this plastic sheet or tent, as you
12  call it?
13          A    Well, I don't know about the rigidity of the
14  plastic sheet.  But if it's a billows effect, if it's a
15  fairly windy day and you're getting a pulsating billows
16  action, sure that could be squeezing past it through the
17  hoes.  It's plausible.  I don't know if it's --
18          Q    Let me ask you to assume what we've got
19  here -- if you assume this, that this wall that is marked
20  17 feet and this wall that is marked 31 feet were comprised
21  of a chain link fence to which was affixed that plastic
22  sheeting, would that give you a rigidity that would preclude
23  that billows action you were talking about?  What does that
24  do?
25          A     I want to know how the plastic was attached

TRI-COUNTY COURT REPORTING

130

1      to the chain link fence.  You have either side, it can puff
2      one way or the other.  I'm just saying it's a possibility.
3      I don't know how probable it is.  It's something that should
4      be considered.
5              Q      What do you think is more likely?
6              A      I don't know.  You're trying to paint a
7      picture and I'm not getting it.  You can have a chain link
8      fence and you can have plastic sheeting on one side or the
9      other, and if it's not secured very well, it's on the top or
10     the bottom, it can billow out and billow in.
11             Q      Based upon what you know and your view of the
12     records, do you think the sulfer dioxide is going to go out
13     the door and into the Building B area via either the
14     negative pressure envelope that you've drawn or do you think
15     it's going to go through the holes in the wall?  Which do
16     you think is the more likely path?
17             A      Well, you're asking me for either/or.  It has
18     to be one or the other.  I don't think it's that simple.  It
19     could be all.
20             Q      Which do you think would be the predominant
21     one?
22             A      I believe the predominant one would be
23     through the back, the negative pressure on the back of the
24     building.  I should mention during my inspection that I saw
25     three covers on the back of Building B that were not part of

131

1    the original construction.  These were scab plates maybe
2    two feet long by a foot high fastened to the wall.  So at
3    one time there was a breach.  Arguably, it could have been
4    done last week, I don't know.  But there were openings into
5    that building.  Who knows when and for what.
6              There are three -- assuming that the SO2
7    release was from Building A, at some point in Building A
8    unknown or over which there's dispute, there are three
9    avenues of entry, all plausible in my view and it's not
10   either/or.  If I were to rank them, I guess you'd ask me
11   that, I shouldn't be volunteering anything.
12             MS. STORM:  No, you shouldn't.  Shut up.
13        A    Shut up.  I will not do that.
14        Q    Let me ask you this.  How would you rank
15   them?
16        A    What do you mean by ranking?  Sorry.  The
17   back of the building, one; two in through the door; three,
18   through the breaches of the wall.
19             MS. STORM:  Doesn't that depend on where in tent
20   A?
21        A    Absolutely.  To me, it's a black box.
22   Somewhere in this black box it came out, and where it went
23   from there.
24                       (Break taken.)
25   BY MR. THOMAS:


                    TRI-COUNTY COURT REPORTING

132

```
1              Q    Sir, on page two of your report it says, "In
2     summary, a reasonable degree of scientific certainty
3     Mr. Newman's chronic lung disease is more likely than not
4     attributed to his acute inhalation."  What I want to know is
5     are we talking scientific certainty or are we talking more
6     likely than not?
7              A    I'm not sure.
8              MS. STORM:  Object to the foundation of the
9     question.
10             A    I don't understand the question.
11             Q    Would you describe that you hold your
12    opinions to a certainty or, as you use the phrase here, more
13    likely than not?
14             A    They are really synonymous.  Certainty is a
15    percentage, if you will.  Somewhere between zero and a
16    hundred.
17             Q    What percentage would you say that is?
18             A    More likely than not is 51 percent.  I can't
19    give you a specific percentage.  Nobody can.
20             Q    You can't define it more precisely than 51
21    percent.  But those terms, you intend them to be read
22    synonymous?
23             A    If you want me to guess, I would say it's
24    closer to a hundred than 50, I will tell you that.
25             Q    Are you saying it's a hundred?  I'm asking
```

TRI-COUNTY COURT REPORTING

133

1    you the question.

2             A    No, in this business there is no hundred

3    percent in anything.  Some things are:  Gravity, taxes,

4    death.  But there is always some uncertainty, of course.

5             Q    In your report you indicate that Mr. Newman

6    was chronically ill afterwards.  What is your understanding

7    of what his condition is or was after March 1999?

8             A    I understand he still has breathing

9    difficulty.  I don't know to what magnitude.

10            Q    How do you have that understanding?

11            A    I read Dr. Hirsh's report.  Apparently he has

12   atrial or ventricular fibrillation on a spasmodic basis.  I

13   don't know the degree.  I'm not a cardiologist, of course,

14   or physician.  But it's my understanding he has medical

15   problems attributed to his exposure.

16            Q    Is it fair to say that you hadn't read that

17   when you made your report on October 27, 2001, right?

18            A    No, but Ms. Storm said that to me and I had

19   no reason not to accept that on her word.

20            Q    So Ms. Storm told you he was chronically ill?

21            A    Yes, maybe not in those words, but that is

22   the sense I got.

23            Q    Ms. Storm's comments to you were the basis

24   for your writing that particular point in your report?

25            A    No, you're trying to mischaracterize.

TRI-COUNTY COURT REPORTING

134

1        Q     I'm trying to understand, sir.

2        A     She mentioned to me initially at the

3   inception of this case that her client had health problems

4   that weren't there.   And I believe I probably asked her how

5   is his health -- how is Mr. Newman's health prior to

6   exposure -- and she gave me her opinion -- and how is it

7   now.   His health problems are ongoing.   And down the road,

8   more likely than not, she said she would be sending records

9   to me for review in connection with that.

10       Q     So would agree with me then that her

11  information was the source of your statement on October 27

12  that Mr. Newman was chronically ill afterwards?

13       A     I believe it was at that time.   I had records

14  to review, of course.   I can't sort out easily all the

15  records I had up to pre-report and post-report.   But I have

16  a caveat in my report, should I be presented with things

17  that fly-in-the-face of my opinions, I reserve my right to

18  resurrect those opinions and modify them as appropriate.

19       Q     Well, a couple hours ago we couldn't remember

20  whether you had reviewed medical records or not.   Has

21  something happened since you made that statement?

22       A     No, I really don't recall.   I read medical

23  reports.   I guess in a way that is a medical record,

24  specifically it probably is not a medical record, more

25  likely than not would be laboratory test results, but it is

TRI-COUNTY COURT REPORTING

135
1   a matter of semantics.

2          Q    You didn't read any medical reports prior to
3   October 27, did you?

4          A    I don't think so.

5          Q    Now, you used the word "massive" a couple
6   times in your report.  I take it that that's just intended
7   to mean 100 to 200 parts per million, right?

8          A    Anything above that.  Anything above an ideal
9   H concentration is immediately dangerous to life and health.
10  Is a thousand more massive than a hundred?  Of course it is.
11  It's an imprecise word, but I have a sense of what it means.

12         Q    No, I just want to understand it.  In
13  paragraph five, page two, you talk about a collection of
14  conditions:  Irritations in the nostrils, pharynx, trachea,
15  upper bronchi, rhinitis, dryness of the fluid, broncho spasm
16  and coughing, broncho constriction, chemical broncho
17  pneumonia, bronchiolitis obliterans, reactive pathways,
18  reactive airways disease, high pitched rales?

19         MS. STORM:  Could I just again correct the record?
20  My March 28 letter to Mr. Wabeke in the file that you all
21  reviewed indicated that I sent him copies of the medical
22  records.  And I also sent him copies of Rick's answers to
23  interrogatories, which included some indication as to what
24  his injuries were.

25         MR. SCOTT:  I think one thing for the record, once

TRI-COUNTY COURT REPORTING

136

1    Mr. Wabeke has a chance to take a look at his file here and

2    back in Michigan, I would like a copy of the entire file and

3    I think we shall mark it as exhibit to the deposition so

4    there is no misunderstanding as to what the witness did

5    review.

6            MR. THOMAS:  Let's go ahead and do that.

7                (Off-the-record discussion.)

8    BY MR. THOMAS:

9        Q    Your report indicates that Mr. Newman was

10   trapped under the tank and unable to immediately escape.

11       A    He was on his back.  He was lying on his

12   back, that to me indicates -- he's not physically trapped,

13   he's not ensnared in something.

14       Q    Is it fair to say from your looking at that

15   tank today, being on your back underneath that tank, if

16   indeed that is where he was, one can get off their back and

17   get up and leave the area if one needs to?

18       A    Well, he did that.

19       Q    So being under there working, you wouldn't

20   call that being trapped, correct?

21       A    It protracts the exposure, absolutely.

22       Q    Protracts the exposure in what sense?

23       A    Duration.

24       Q    By how long, how many --

25       A    I don't know how many seconds.  It's going to

TRI-COUNTY COURT REPORTING

137

1    protract it a little bit.

2          Q    I guess that comes down to what we mean by

3    immediately.

4          A    I can't give you definition of immediately.

5    We're talking microseconds.

6          Q    Well, I guess my -- again, let me rephrase

7    it.  I guess I haven't made it clear.  Mr. Newman's on his

8    back by this tank.  How much longer does it take him, how

9    much time does it add to his exposure because he's lying on

10    his back?

11          MS. STORM:  Can I interject an objection?  I don't

12    think that that accurately describes Mr. Newman's testimony.

13    This is one of the problems with not having the transcript

14    done.  There are some other factors -- and again if you want

15    me to send him out of the room, we can talk about it -- that

16    you're not putting in the question.

17          Q    Well, you have preserved your objection.

18          MS. STORM:  Then go ahead and answer if you can.

19          Q    It's not -- he's had two conversations with

20    Mr. Newman.  Tell you what, you just explain to me paragraph

21    seven, which is on -- the portion that I want is on page

22    three of your report where it says, "Please note Mr. Newman

23    was underneath the tank he was insulating and escape was not

24    immediately possible."  I, mean are you trying to suggest he

25    was stuck there like in a confined space or anything like

TRI-COUNTY COURT REPORTING

138

1    that?

2          A    No, no, I'm saying he can't bolt for the

3    door.  He's on his back and he has to get up.  To get up,

4    institutes a delay.

5          Q    Okay.

6          A    I don't know how long the delay is, a second.

7    There is an exertional component to doing that.  That means

8    a second or a deeper breath.  That is all part of the human

9    factor elements in this situation.

10         Q    We're not talking --

11         A    He's not pinned to the wall.

12         Q    Okay.  Are you familiar with the Anderson

13   study that looked at human response to controlled levels of

14   sulfer dioxide in 1974?

15         A    No.

16         Q    Would you take --

17         A    What was the journal?

18         Q    If you were to -- if I were to suggest to you

19   that they concluded that 25 parts per million of sulfer

20   dioxide was what they described as intolerable on first

21   contact, would you agree with that?

22         A    With some people, perhaps most people, yes.

23         Q    What is bronchiolitis obliterans?  I

24   apologize if I'm mispronouncing it.

25         A    You said the Latin correctly.  It's a medical

TRI-COUNTY COURT REPORTING

139

1    condition in that the bronchioles, the internal airways that

2    connect to the alveolar portion of the lung have been

3    destroyed to the point that their elasticity is deeply

4    affected and it tends to be a progressive condition that can

5    lead to fibrosis in some cases.  It is often terminal and

6    fatal.

7         Q    Are you supposing -- are you suggesting that

8    Mr. Newman has that?

9         A    No, I can't do that.  I'm not a

10   pulmonologist.  I'm not a physician.  Based upon my

11   understanding of the inhalation toxicology of sulfer

12   dioxide, I don't believe his dose was sufficiently high to

13   induce that condition.

14        Q    Likewise, he doesn't have chemical bronchial

15   pneumonia?

16        A    No, not today.

17        Q    Did he ever?

18        A    Well, it's unlikely.  I don't know.

19        Q    There is -- in paragraph nine of your report,

20   there is a parenthetical reference Tab Bio Per 1933.  Can

21   you tell me what that is?

22        A    That's the author of a 1933 study that showed

23   that for some reason they were able to measure or reasonably

24   reconstruct an exposure to a human being to 3,000 parts per

25   million of sulfer dioxide for five minutes that resulted in

140

1    that person or person's death.

2         Q    All right.  I understand that about the

3    Shupe, but what is Tab Bio Per?

4         A    That is the name of a person, probably

5    Norwegian or sounds like a Scandinavian name.  I don't know,

6    that is the author.

7         Q    That is the guy's name?

8         A    Uh-huh.

9         Q    Okay.  It almost looked like a footnote.

10        A    It does really, Bio Per, that is a person's

11   name as in Shupe or Shupe Tab Bio Per.  No, it's a person's

12   name.

13        Q    All right.  In the report in your testimony

14   here, you correct me if I'm wrong, but I think we've been

15   talking about your opinion that he was exposed between 100

16   and 200.  And in some parts of your report it talks about

17   between 100 and 300.  Is there any basis for the 200 to 300?

18        A    No.

19        Q    Okay.  So what I should be focusing on in

20   your opinion is -- or your conclusion is the concentration

21   is between 100 and 200 parts per million of sulfer dioxide

22   for a duration of between one and two minutes?

23        A    That's right.

24        Q    Now, with respect to the requirements, the

25   OSHA requirements that you cited in your report, is it fair

TRI-COUNTY COURT REPORTING

141

1    to say that the threshold quantity for sulfer dioxide that

2    triggers these requirements is a thousand pounds?

3         A    No.

4         Q    It's not true?

5         A    No, those threshold quantities are based on

6    protection of the community and not workers.

7         Q    So it has no application whatsoever to

8    workers?

9         A    Well, it does in the sense that if you have

10   sulfer dioxide on your premises and if you have a pound of

11   it and if it's foreseeable that one pound of sulfer dioxide

12   could put workers in harm's way, then there is a duty upon

13   the employer and others.   But if it's a thousand pounds that

14   also implies the duty upon the employer for their employees

15   and business invitees, but as well to the community.

16        Q    If I have a tank of sulfer dioxide at a work

17   site and all it is it's just being stored there, do the

18   workers in the vicinity of that have to do the kinds of

19   things that you've described in your report?  Have

20   self-contained breathing apparatus and pagers and police

21   whistles and things of that nature if it is merely a tank

22   there being used for storage?

23        A    The tank of SO2 would be a hazard: closed,

24   opened or otherwise.   It becomes a risk when there is an

25   exposure.   The employer has a duty to estimate the risk and

TRI-COUNTY COURT REPORTING

142

1    to project the exposures, and then implement a plan

2    accordingly.

3           Q    And I guess my question is if there is a tank

4    there, it's in a tank, and there is no reason to suspect

5    that the tank is flawed in any way that a leak might occur,

6    do the employees have to -- that have to work in that

7    vicinity or in adjacent buildings or rooms have to wear

8    self-contained breathing apparati?

9           A    I think I know what you're getting at, Scott.

10   The issue here is a what-if analysis.  There are various

11   types of analyses that have to be done.  If it is

12   foreseeable there could be a release -- and the duty is upon

13   those who create the hazard.  And this would be those who

14   purchased or procured the sulfer dioxide.  They have to go

15   through a risk assessment and risk consequence and a risk

16   management program to ensure that if there is a risk, if

17   it's foreseeable that there is going to be a release, then

18   they have to have a plan in place to protect.  Now, that

19   plan might include self-contained breathing apparatus, it

20   might not; it depends.

21          Q    With respect to the prospect that if there is

22   a tank that is used for the storage and it's just -- it has

23   got say 10 pounds of liquid sulfer dioxide in a tank, what

24   are the risks of that causing a danger to workers in that

25   environment when the tank is not used for any process?

TRI-COUNTY COURT REPORTING

143

1          A     Well, you are using terms that I use when I

2     teach safety engineering, I want to make sure we're on the

3     same wave length.  Risk, danger, hazard do not equate.

4     Sulfer dioxide is a hazard regardless of if it's in an open

5     system, a closed tank.  If it is on the moon it is a hazard

6     because of its very natures.  The risk comes as a result of

7     exposure.  The exposure can be one-third of an inhalation or

8     it could be a room engulfed with clouds of sulfer dioxide

9     that would be lethal to all of us.  The risk is a function

10    of the exposure to a hazard.

11         Q     Freon is a hazard, right?

12         A     That's right.

13         Q     I have got freon in my refrigerator?  Should

14    I be wearing a self-contained breathing apparatus when I go

15    get a glass of milk?

16         A     If in your analysis as a safety engineer

17    there could be an exposure, yes, or something.  You need

18    something to protect.

19         Q     Okay.

20         A     That requires the rigor and a robust analysis

21    on those who create the hazard.  It is that simple.

22         Q     Does the fact that -- my understanding is

23    sulfer dioxide is heavier than air?

24         A     In its pure form it's a little over two times

25    heavier than air, yes.

                    TRI-COUNTY COURT REPORTING

144

1          Q     2.25?

2          A     That sounds right.  29 into 64.

3          Q     Sorry?

4          A     Divide 29 into 64 will give you a ball park

5    idea.

6          Q     Twenty-nine would be the atomic weight of

7    atmospheric air?

8          A     It's the apparent molecular weight of air.

9    Air is a mixture of gases.

10         Q     A bunch of stuff?

11         A     It would be based on that combination of

12   gasses of an apparent molecular weight of about 29.

13         Q     And 64 is sulfer dioxide?

14         A     Yes.

15         Q     So the fact it is heavier than air, does that

16   have any role whatsoever in the subject that we've been

17   discussing here?

18         A     Well, pure sulfer dioxide gas released say

19   closed to the ground or floor level at a wall, for example,

20   that has a breach in it, that can easily migrate through

21   that breach.  There would be mixing with air, then it

22   becomes diluted.  As it becomes more diluted, the effective

23   specific gravity of the mixture becomes more air-like and

24   less sulfer dioxide-like.  In other words, you mix one part

25   of sulfer dioxide gas, which is over two times heavier than

TRI-COUNTY COURT REPORTING

145

1    air with 99 parts air, the average, if you will, the

2    specific gravity of the mixture is going to be more like air

3    than sulfer dioxide.  But it takes time for that to happen.

4    So if we were to throw a cupful of sulfer dioxide on the

5    floor it this room, it would evaporate very quickly, but it

6    would hover at the floor a long period of time unless there

7    was mixing and ventilation in this room, ventilation systems

8    and people walking about moving their arms and legs.  It

9    takes time, but eventually those SO2 molecules would mix

10   throughout the entire air in this room and we would have an

11   average concentration.  That would take time.

12        Q    So they are not like liquids in the sense

13   that if I have water and kerosene and I put them in a jar

14   and shake it up and put it on the desk and wait,

15   eventually -- maybe it won't take that long, but the

16   kerosene will be on the top?

17        A    Very quickly.

18        Q    And the water will be underneath because the

19   kerosene is lighter than the water or less dense?

20        A    That is right because those are incompatible

21   materials.  It's an organic material and an aqueous

22   material, but gas molecules don't behave like that.

23        Q    So they would mix and achieve equilibrium

24   over some period of time?

25        A    Right.  But once mixed, the sulfer dioxide

TRI-COUNTY COURT REPORTING

146

1    molecules aren't going to settle out of the air.  The air

2    molecules rise, but to get to that point takes time.  There

3    literally can be -- perhaps you have driven down the highway

4    sometime and you see a layer of fog on the highway.  Cars

5    drive through and they start mixing it, but then it just

6    sort of comes back in and stays there.

7              Q    That's been known to happen in this area.

8              A    That's right, but that is not uncommon.  Then

9    you get solar heating, you get more turbulence from

10   vehicles, and 18-wheelers start to mix it up, but it takes

11   time to get there.  Once mixed, those water vapor molecules

12   that are condensed in the fog become vapor molecules in the

13   atmosphere.  Until they come out as rain or snow, they will

14   stay there.

15             Q    And the factors that go into that are so

16   complex that you're unable to articulate what -- how long it

17   would take for that mixing to occur if the gas in room A or

18   Building A got into room B or Building B as we're describing

19   it?

20             A    There might be some programs that one could

21   use, but I've yet to see them applied to buildings.  There

22   are diffusion equations and mixing -- complex equations that

23   can be used for predicting atmospheric concentrations

24   outside of buildings, air pollution dispersion estimates.

25   You can buy ten different sets of software and get ten types

                    TRI-COUNTY COURT REPORTING

147

1    of answers, but they don't apply to buildings.

2            Q    Let me ask you this.  When this sulfer

3    dioxide gets released, and if it gets to Mr. Newman, it had

4    to get there somehow, right?

5            A    Yes.

6            Q    You've given us a couple different paths that

7    it could take.  How long does it take to get there?

8            A    You have asked that.  I said I don't know, it

9    depends on many variables, physical variables.

10           Q    Is it something like -- is it do these

11   molecules travel at the speed of light, at the speed of

12   sound, at the speed of molasses in January to coin a phrase?

13           A    The mixing of the SO2 molecules or any

14   molecules throughout air, such as the air in this room, is

15   not based on their molecular speed.  The predominant factor

16   is one of turbulence of the air.  That can be caused by

17   biomechanical means, a fan, people walking by, plus thermal

18   gradients from floor to ceiling.  Those are the two major

19   mixing forces, not their intermolecular speed, that has

20   essentially no bearing on the migration.  In other words, a

21   sulfer dioxide molecule in this corner is not going to get

22   to that corner by its speed as a molecule.  It's going to

23   get there because the air is starting to mix.  And randomly,

24   it could be anywhere for that matter.  It doesn't have to go

25   there.  But if we have a cubic foot of sulfer dioxide gas in

148

1    that corner and 99,999 cubic feet of pure air everywhere

2    else, eventually that will mix in.  It's like a cup of tea,

3    you have got the concentrated tea in a bag and then it mixes

4    and it's homogenous.  It never settles out after that point.

5            Q    You're unable to offer any prediction on how

6    long that would take on this case?

7            A    I can't do it on the back of an envelope.  I

8    wasn't asked to do that, nor do I think it's important

9    personally.

10           Q    And you're unable to gives a ball park

11   estimate?

12           A    Because the variables that are necessary are

13   wind velocity, wind direction, mechanical air handling

14   system velocity and direction, pedestrian traffic, thermal

15   gradients, and a whole host of other factors, turbulence

16   factors within a building.

17               (Off-the-record discussion.)

18           A    Which introduces, you know, if it is a valve

19   and gas releases and there's a pressure, there is a momentum

20   effect and a buoyancy effect of the gas that is released.

21           MR. SCOTT:  How much of that was on the record?

22           THE COURT REPORTER:  Only his answer was on the

23   record.

24           MR. SCOTT:  Can you read the question back to me?

25               (Off-the-record discussion.)


                    TRI-COUNTY COURT REPORTING

149

1      MR. SCOTT:  There's no question on the table so I
2  move to strike any reference to a valve being open.
3  BY MR. THOMAS
4      Q    Tell me what a time-waited average is as it
5  bears on the information in your report about OSHA
6  requirements.
7      A    I refer to time-waited averages just to give
8  Mrs. Storm a notion of what an eight-hour average exposure
9  would be to a chemical or should be for a chemical.  And I
10  think I cite several of them:  The NIOSH recommended
11  time-waited average limit, the American Industrial Hygiene,
12  the American Conference of Governmental Industrial
13  Hygienists recommended time-waited average, and the OSHA
14  regulated statutory time-waited average.  Very simply, the
15  time-waited average is traditionally based on an eight-hour
16  work exposure.  There are provisions for overtime, but to
17  keep it simple, if all of us worked in an environment for
18  four hours and our exposure to a gas was ten parts per
19  million, and then for the next four hours we worked at an
20  exposure to say 20 parts per million, our eight-hour
21  time-waited average exposure would be 15 parts per million.
22  We had a lower exposure before lunch and a higher one after
23  lunch, but on an eight-hour basis it averaged out to 15.
24      Q    Let me ask you this.  What's the eight
25  hour -- say a person works for seven hours and 45 minutes

TRI-COUNTY COURT REPORTING

150

1      and has no exposure to sulfer dioxide.  And for 15 minutes

2      they have an exposure of X, what's their --

3              A     One would have to calculate it.

4              Q     And how would that calculation be made?

5              A     Well, essentially, eight hours is 480

6      minutes.  Seven hours and 45 minutes is four hundred what 30

7      minutes, 420 minutes, right?

8              Q     Seven hours is 420.

9              A     450 minutes.  So you would take 450 minutes

10     times zero in brackets plus 15 minutes times that exposure,

11     X, add those two groups together and divide by 480 and that

12     would give --

13             Q     That would give you the time-waited average?

14             A     Yes.  But having said that, I think it's

15     important to understand with brief exposures to very high

16     concentrations that simple formula is often not used.

17     Arguably, one could have a time-waited average exposure of

18     carbon monoxide of 35 parts per million, which would be

19     neither here nor there, say over a ten-hour work shift, but

20     have a three-minute exposure to 10,000 parts per million

21     which would kill the person.  They would be dead in five

22     minutes.  So one has to consider the dose and dose response,

23     so the numbers game can be quite misleading.

24             Q     And that's why you presumably refer to the

25     National Research Counsel's Emergency Exposure guidance

TRI-COUNTY COURT REPORTING

151

1    levels for different time frames?  That kind of addresses

2    the things you were talking about?

3            A      Not exactly, but it addresses that issue.

4            Q      Same concept?

5            A      Same concept.  We can run our finger through

6    a flame and never burn it, but if we hold it there long

7    enough the same temperature will burn our skin.

8            Q      These levels are chosen with a view toward

9    selecting a level of exposure such that they can prevent

10   injury to workers, correct?

11           A      Well, some of those limits are for the

12   general public.  Some are for workplace exposure.  I should

13   mention there is no one limit that is protected for

14   everyone, based on individual responses -- reaction to

15   chemicals.  But these levels are selected to be, one,

16   reasonably achievable and, two, would provide a great deal

17   of protection for almost everybody.  Not everybody, there

18   would be a few who would be at risk.

19           Q      All right.  Let me -- I know some of these

20   documents are -- I understand we're going to mark the entire

21   file and mark that as Exhibit A to the deposition?

22           MR. SCOTT:  Yes.

23           Q      All right.  I think it's safe that I'm going

24   to refer to some documents from that soon-to-be-marked

25   Deposition Exhibit A and I'll refer to them by date.  If

TRI-COUNTY COURT REPORTING

152

1     there is any question, it should be taken care of.  There is
2     a letter in the file that is dated March 28, 2000, from
3     Ms. Storm to you thanking you for agreeing to assist
4     Mr. Newman in this case.  One of the things that it encloses
5     is item number four which reads, "A memo, which is work
6     product and confidential, setting forth our admittedly
7     sketchy knowledge of the facts at this time."  Please tell
8     me what was in that memo.
9               A     I don't remember.
10              Q     Do you have a copy of that memo?
11              A     Not here.  Its in -- well, now two offices,
12    yes, most likely.  It's unlikely it is gone, destroyed or
13    missing.  It's in one of two offices, yes.
14              Q     And do you recall how long that memo was?
15              A     I'm sorry, I don't.
16              Q     Do you recall anything about it that would
17    help us?
18              A     No, I mean, I'm just speaking in very general
19    terms.  The memo pretty much outlines my understanding of
20    the issues.  It might have raised some questions on my part,
21    I don't know that it did.
22              MR. THOMAS:  Off the record.
23                   (Off-the-record discussion.)
24              Q     There is a letter dated October 23, 2001,
25    from Ms. Storm.  Let me hand this to you and if you have

TRI-COUNTY COURT REPORTING

153

1    any --

2              A    What would you like me to do with it?

3              Q    Well, I'm going to ask you some questions

4    about it, but I wanted to refresh your recollection before I

5    did so.  Can I take that back when you're ready?

6              A    Sure.

7              Q    All set?  This letter as I said is dated

8    October 23, 2001, which is four days before your report.

9    Had you written anything prior to receiving this?

10             A    No.  I wrote my report that day or perhaps

11   started the day before.  Typically, the date that I mail the

12   report is the date I complete it.  And a report such as that

13   is not a long -- it started that day.

14             Q    Had you had any contact between March 28,

15   2000, and October 23, 2001?

16             A    With?

17             Q    With Ms. Storm or as indicated in this letter

18   Mr. Mark Arnzen?

19             A    Mrs. Storm tried to contact me several times.

20   I was out of the country and I was also traveling a lot on

21   business and we had telephone problems, I mean, in both

22   offices; it was horrid.  So there was a hiatus for quite

23   awhile in terms of contact.  I can't say exactly what and

24   when.

25             Q    It appears just shortly before this letter

TRI-COUNTY COURT REPORTING

154

1    there was a telephone conference?

2         A    Yes.

3         Q    Probably that day or the day before or

4    something of that nature?

5         A    Yes.

6         Q    Now, this appears to be some handwritten

7    notes written on a report that was authored by John Kaminski

8    on January 18, 2002.  On the cover page of that there is

9    some handwriting in blue ink and capital letters, generally

10   speaking.  Is that your handwriting, sir?

11        A    Yes.

12        Q    And can you tell us what -- can you read for

13   us what this says?

14        A    Sure.  Certainly.  I had some questions about

15   his approach and his method and technique, I guess.  The

16   table in his report, table one was unclear to me.  In a

17   general sense, I could see where he was trying to go, but it

18   raised more questions than it answered.  My understanding is

19   that Mr. Kaminski was calculating the average concentration

20   of sulfer dioxide gas in room B based on various

21   assumptions.  I take considerable exception to that because

22   an average concentration isn't the issue at hand here.  It

23   should be the concentration most likely present in the

24   breathing zone of Mr. Newman.

25             My second comment is the TLV preface, the

TRI-COUNTY COURT REPORTING

155

1    introductory comments to the threshold limit values, which

2    is rather lengthy in fine print.  But every practicing

3    industrial hygienist should understand that compliance with

4    those threshold limit values must not be used as proof or

5    disproof of an existing physical condition.  It appears that

6    Mr. Kaminski is attempting to demonstrate that or at least

7    say because the exposures are less than the OSHA standard

8    for sulfer dioxide, ergo -- admittedly I'm reading between

9    the lines -- Mr. Newman should not be ill.  I don't

10   understand his calculations.  They are bizarre.  There's no

11   method given on how he did it, so I'm really -- my hands are

12   tied in that sense.  Mr. Newman made no comment regarding --

13   I'm sorry.  Mr. Kaminiski made no comment regarding the

14   diagnosis of chemical pneumonitis.  There might be a debate

15   on that, but I'm surprised he made no mention of that.

16        Q    Well, you're aware that just -- he's not a

17   medical doctor either.  But are you aware in the medical

18   records that were sent to you there are opinions from

19   pulmonary specialists who were unable to find any indication

20   of pulmonary or respiratory problems?

21        A    Oh, absolutely.  No question.

22        Q    You're aware of that?

23        A    Absolutely, sure.  And sure there could be a

24   dispute on the medical.

25        Q    But you're -- is there a reason why you

TRI-COUNTY COURT REPORTING

156

1  discount those kinds of statements?

2          A    Well, the default position in this business

3  is you assume the conditions are valid.

4          Q    Professionally, you feel obliged to take

5  everything that Mr. Newman says at face value?

6          A    No, I don't, not at all.  I take that in

7  consideration of the information that I've been provided, my

8  understanding of the toxicology and inhalation hazards

9  associated with the chemical and the lack of an industrial

10  hygiene program, the physical characteristics of the

11  building, his premorbid condition, everything, all of those

12  factors enter into it.

13          Q    Well, you would agree with me that the

14  absence of an industrial hygiene program has no bearing on

15  the question of whether Mr. Newman for a fact inhaled sulfer

16  dioxide on that day, correct?

17          A    No, incorrect.  The lack of an industrial

18  hygiene program is why we're here.

19          Q    Let me ask it to you this way.  If I were at

20  that location on March 17, 1999, and I later claimed to you

21  that I had smelled sulfur dioxide and it made me cough and I

22  told that to a doctor that I had smelled sulfer dioxide at

23  work and I've had a bad cough since and as a result was

24  diagnosed with chemical pneumonitis, is there any way you

25  could discredit me or tell me that I did not inhale sulfer

TRI-COUNTY COURT REPORTING

157

1  dioxide?

2          MS. STORM:  Objection to the form of the question.

3  Go ahead.

4          A    Without knowing what the physician or

5  physicians did with Mr. Newman or anybody else for that

6  matter, I can't.  That's all part of it.  I don't think it's

7  just based on hearsay.  There has to be some suggestion of

8  an exposure coupled with medical findings.

9          Q    And I guess that's an alternate way of saying

10  what I've asked you.  What medical findings are you aware of

11  that are not based upon Mr. Newman saying, "I inhaled sulfer

12  dioxide?"

13          A    I don't know what factors led to the

14  diagnosis of chemical pneumonitis.

15          Q    If you don't know, you don't know.

16          A    I don't know, exactly.

17          Q    Anything else you need to tell me about your

18  notes there, there are some notes on some additional pages?

19          A    I find it interesting that Mr. Kaminiski just

20  cites the OSHA standards and doesn't go to the standards of

21  care as promulgated by the National Institute for

22  Occupational Safety and Health and the American Conference

23  of Governmental Industrial Hygienists, which really would be

24  under the vanguard of knowledge about inhalation toxicity of

25  sulfer dioxide, not OSHA.


                    TRI-COUNTY COURT REPORTING

158

1            Q     Would you agree with me that the NIOSH is a
2     recommended standard?
3            A     Yes.
4            Q     All right.   And as such, it does not have the
5     force and effect that the OSHA requirement does?
6            A     No, no.   It's just the standard of care, that
7     is all.   It's the best evidence we have in my view going.
8     It's the collective wisdom of toxicologists.
9            Q     When you expressed your comments on the
10    standard of care, would you agree with me that you're
11    expressing a legal opinion?
12           A     I don't know.   My sense of a standard of care
13    of industrial hygiene practices.
14           Q     Let me see if I have any additional questions
15    based on this.   Let me hand you a letter dated February 26,
16    2002, from Judy Stephano, who is listed here as secretary to
17    Ms. Storm.   Do you recall receiving this letter?
18           A     Yes.
19           Q     Would you read the first sentence of the
20    second paragraph, please?
21           A     "With regard to the picture that depicts
22    Building A and Building B, Rick was working inside the right
23    garage door.   Exhibit PG-10 shows the soap holding tank
24    which Rick was working on."
25           Q     Thank you.   Just the first sentence.


                         TRI-COUNTY COURT REPORTING

159

1          A     Sorry.

2          Q     Do you believe that the statement that you

3    just read is consistent with what you talked about earlier

4    when you related Mr. Newman's conversation about where he

5    was located next to some wall?

6          A     Well, my understanding is he was working at

7    or about point N, and the right door -- as you're standing

8    outside looking inside the building -- obviously the left

9    inside the building, this door, the right door.  The

10   photograph was taken from outside looking at the building

11   and that is the right door and that is the one he told me

12   was open three to four feet across from his workstation.

13         Q     And you confirmed this assumption on your

14   part with Mr. Newman in your telephone conversation?

15         A     He said so, yes.

16         Q     You asked him specifically about working

17   inside the right garage door?

18         A     Well, as we talked yesterday, my recall is

19   that one door was fully closed, one was partially open.  It

20   was the right -- in fact, he had to retrieve a sketch from

21   his records.

22         Q     All right.  Would you agree with me, from the

23   garage door to the back of the building is 50 feet?

24         A     The dimensions are on one of these.

25   Fifty feet sounds reasonably close.


                    TRI-COUNTY COURT REPORTING

160

1          MR. THOMAS:  All right.  If I may be permitted to

2     do so, I will turn the floor to my colleague while I review

3     my notes if I can come back and ask questions.

4          MS. STORM:  It depends on the time.

5          MR. THOMAS:  Mindful that we're going to suspend

6     if necessary to look at the deposition.

7          MS. STORM:  Suspend to question him about the

8     deposition, but that's it.

9                         DIRECT EXAMINATION

10    BY MR. SCOTT

11         Q    Mr. Wabeke, my name is Jack Scott.  I

12    represent Mesa, Inc.  I'm going to jump around a little bit.

13    I won't be as long, but my notes are a little bit

14    disoriented after three or four hours, so you will bear with

15    me I hope.  Your organization, Chemical Risk Management, is

16    that a dba of yours or is that a separate entity?

17         A    Dba.

18         Q    You have three forensic professionals with

19    Chemical Risk including yourself; is that correct?

20         A    They are -- well, it was through that project

21    with Karmanos Cancer Institute, the industrial hygienists.

22    That project is winding down; it's really one person

23    part-time now and they focus entirely on prostate cancer.

24         Q    Are you the only person with Chemical Risk

25    that provides forensic services?


                    TRI-COUNTY COURT REPORTING

161

1          A     Yes.

2          Q     Have you ever consulted previously either for

3     or against Procter & Gamble?

4          A     No.

5          Q     Ever been involved in a litigation as an

6     expert witness for or against Procter & Gamble?

7          A     No.

8          Q     You talked about the different titles that

9     Mr. Thomas was reading off as far as Wayne State.  You are

10    in which department again?

11         A     The Department of Family Medicine in the

12    School of Medicine.

13         Q     So there are physicians, I would take it, in

14    your department?

15         A     Yes.

16         Q     Okay.  Is yours a tenured position with the

17    University?

18         A     No, I'm adjunct, which means part-time.

19         Q     Okay.  Are there any other industrial

20    hygienists in that department at Wayne State?

21         A     No, there are industrial hygienists for the

22    University, but not in the department, not in our department

23    I'm in.

24         Q     We talked earlier -- or you talked earlier

25    about it seemed like chemical exposure issues with respect

TRI-COUNTY COURT REPORTING

162

1    to Mr. Newman.  What is your understanding as to his basic

2    or core, if there is one, diagnosis from a pulmonary aspect?

3          A    I don't know.  There is a restrictive

4    component and apparently an obstructive component to his

5    pulmonary capacity.  I don't know how much of which or where

6    the crossover becomes.

7          Q    The primary diagnosis to your knowledge

8    though is chemical pneumonitis; is that correct?

9          A    That is what prompted him to seek medical

10   care initially.

11         Q    Does chemical pneumonitis -- if this is

12   outside of your bailiwick and experience, let me know -- is

13   that only a product of some type of an exposure -- of

14   exposure to a toxic substance or can it be caused by other

15   causes besides exposure?

16         A    No, strictly the definition is inflammation

17   of the lungs due to chemical inhalation or arguably an

18   aspiration, vomiting where chemicals are entering the

19   respiratory tract.

20         Q    But it entails necessarily some type of

21   exposure; is that correct?

22         A    Yes.

23         Q    There was some discussion -- and if you have

24   your report in front of you, on top of page two if you

25   would.  If you recall, Mr. Thomas was asking you for what

TRI-COUNTY COURT REPORTING

163

1    I'll call the layman's terms for the words "precedent

2    respiratory morbidity," which I think you equate to lung

3    disease; is that correct?

4              A    Yes.

5              Q    There was discussion about no apparent risk

6    factors for pulmonary irritant lung disease.  And at one

7    time I heard you answering in terms of those factors being

8    related to the agent, the concentration, and the duration.

9    At an earlier point I thought you said that those type of

10   risk factors might be emphysema, fibrosis, asthma; do you

11   remember?

12             A    Yes, and I can see where there is confusion.

13             Q    What do you consider risk factors for

14   pulmonary irritant lung disease as you mentioned in your

15   report?

16             A    Well, they can be combinations of two major

17   categories and that is where I think there is some

18   misunderstanding.  Risk factors clearly can be the chemical

19   agent or arguably biological agent or agents.  Two, the

20   concentration in the inhaled air.  Three, the duration of

21   the exposure.  Four, the respiratory rate.  Those are some

22   of the major ones.  Then there is another group that would

23   be the unique biological setting that that person brings to

24   the table.

25             Q    Emphysema, fibrosis, asthma?

164

1        A     It might be an enzyme deficiency, it might be

2    whatever.  It might be superimposed upon a cold, influenza,

3    whatever.  So there are really two sets of risk factors.

4    What I was referring to here, nothing in the record

5    suggested that he had some biological risk factors that

6    predisposed him to a chemical pneumonitis.  I can see where

7    there is confusion on that.

8        Q     In your opinion, are the biological risk

9    factors limited to his medical profile or do they also

10   include any genetic disposition that may or may not exist?

11       A     It could be both, absolutely.  There has been

12   research on sulfer dioxide just that very thing, but it's --

13   it's a difficult thing to deal with, quite frankly.  There's

14   more questions than answers.  There is enough in eyes of

15   certain investigator that SO2 can be a -- SO2 injuries can

16   be precipitated based on certain enzymatic and biochemical

17   deviations from perhaps other people.

18       Q     What is your understanding of fibrosis?

19       A     That is a general term for scar tissue

20   formation in living tissue.

21       Q     Do you have any understanding as an

22   industrial hygienist as to causes from an occupational point

23   of view of any of fibrosis?

24       A     There can be several.  Mineral dust, such as

25   silica, asbestos; metals such as beryllium; and irritants,

165

1      irritant gasses and vapors.  So in some people there is some

2      agents such as crystalline quartz in silica that are

3      notorious for causing pulmonary fibrosis in exposed workers

4      with a sufficient dose, generally years of high dust

5      concentrations.  There are other agents that induce

6      pulmonary fibrosis that the mechanisms are not clearly

7      understood, occur in some people not in others for whatever

8      reasons.  We don't know.

9              Q    In your practice and experience as an

10     industrial hygienist, can exposure to fiberglass have an

11     impact or be correlated to fibrosis?

12             A    I'll answer that.  It wouldn't surprise me

13     down the road if we find that.  I haven't seen compelling

14     evidence to this point to support that notion.  It's like

15     asbestos.  We're learning as we go along; that's pretty

16     clear.

17             MS. STORM:  Let's not open up that litigation.

18             A    But I think the jury is still out on man-made

19     mineral fibers such as fiberglass.

20             Q    If I'm hearing you correct, you're suggesting

21     that the jury is out, but that there is possibly some

22     literature or thought in the scientific arena that there may

23     be or is a correlation; is that a fair statement?

24             A    There is some thought in that regard, yes.

25             Q    Do you have any understanding as to

TRI-COUNTY COURT REPORTING

166

1    Mr. Newman's work history in terms of whether he was
2    involved in the use fiberglass products?
3            A    No, as an insulator it wouldn't surprise me.
4            Q    Are you aware he was insulating at the time
5    of this incident?
6            A    Yes, and using fiberglass, right.
7            Q    Do you have any understanding as to the type
8    of adhesives that Mr. Newman used as part of his insulating
9    responsibility?
10           A    Not at this particular site.  I know the
11   types of adhesives that are used to adhere fiberglass batts
12   to various pieces of equipment.
13           Q    What is your understanding of those types of
14   adhesives?
15           A    There's acrylic resins, epoxy resins, thermal
16   stable resins with what we call a poly-added base,
17   especially in hot processes that might cause delamination of
18   material.
19           Q    Have you ever heard of a product called
20   Armstrong 520?
21           A    I know of Armstrong adhesive, the 520 doesn't
22   mean anything to me.
23           Q    Do you know if any of the products he used
24   had a specific material safety data sheets assigned to those
25   products.

TRI-COUNTY COURT REPORTING

167

1          A     It wouldn't surprise me.  I don't know that.

2          Q     I saw in your CV -- bear with me one second.

3          A     Sure.

4          Q     You were involved in a case in Escanaba,

5    Michigan, involving epoxy in TDI occupational asthma.  Do

6    you remember that case at all?

7          A     Very well.

8          Q     What is TDI occupational asthma?

9          A     TDI is an abbreviation for Toluene

10   Diisocyanate, it's one of the two ingredients that is used

11   in polyurethane products, foams.  The cushions -- the seat

12   cushions we're sitting on most likely are polyurethane.

13         Q     That case apparently involved some type of

14   epoxy; is that correct?

15         A     Epoxy paints, yes.

16         Q     They were paints?  While I have your CV out,

17   what is MDI hypersensitivity pneumonitis?

18         A     MDI is an abbreviation for another

19   isocyanate -- don't throw anything at me reporter --

20   methylene phenyl diisocyanate.

21         Q     Does your practice as an industrial hygienist

22   include consulting with any fiberglass companies concerning

23   either the risk of inhalation of fiberglass products or

24   epoxy adhesives?

25         A     I personally and through those I supervise

TRI-COUNTY COURT REPORTING

168

1    have done a lot -- I say a lot, probably 20 industrial

2    hygiene studies of workers' exposure to fiberglass, almost

3    exclusively at Ford Motor Company.  And in the process there

4    would have been occasions to contact Owen's Corning, various

5    material suppliers for their input on the hazards of their

6    product, to get their advise to help us solve some problems.

7    The big problem we had was fiberglass itch, it's a rather

8    disabling dermatitis the first week of exposure.

9         Q    To anyone who's ever insulated their attic,

10   correct?

11        A    You got it.

12        Q    Are there any pulmonary deficits or irritants

13   or conditions that can result in your professional

14   experience from the use of fiberglass products first?

15        A    Well, the fiberglass products -- and this go

16   goes back several years, it's not a recent issue with me.

17   We were looking at particles that were a little too large.

18   They could do a number on the skin.  But they really weren't

19   of an aerodynamic diameter that couldn't penetrate deep into

20   the lungs.

21        Q    These were studies that you were doing

22   yourself?

23        A    Yes.

24        Q    Was that at Wayne State?

25        A    No, Ford Motor Company.  Workers in car and

TRI-COUNTY COURT REPORTING

169

1    truck assembly plants installing insulation, perhaps
2    underneath the floor mat or in the trunk or in the trunk
3    engine compartment as sound deadeners.
4         Q    Do you have any understanding as to any
5    pulmonary risks associated with the adhesives that are used
6    in the fiberglass insulation business?
7         A    There are many, many types of adhesive.  I
8    really have to know the specific kinds.
9         Q    Armstrong 520?
10        A    I don't know what is in 520.  The adhesives
11   as a class are not volatile.  Even if they are sprayed, they
12   are not going to come out as a respirable mist, but the
13   solvents that are present in some adhesives can be
14   problematic.
15        Q    Did you discuss the use of the adhesives with
16   Mr. Newman at any time?
17        A    No.
18        Q    Do you consider them significant in
19   formulating your opinions to have any understanding as to
20   the type of adhesives that he was using day-to-day in terms
21   of his insulating requirements?
22        A    No.
23        Q    Why is that?
24        A    I don't think -- there was nothing really
25   dramatic in his work environment that even suggested that he

TRI-COUNTY COURT REPORTING

170

1   had significant exposure to adhesives or solvent vapors

2   coming from adhesives.

3          Q     Are you aware that he used any type of

4   protective breathing gear?

5          A     No.

6          Q     Did you ask him that by chance?

7          A     I did not.

8          Q     In your report, page two, the final sentence

9   of paragraph one reads "Other workers present at the site

10  also inhaled SO2."  First, can you tell me the source of

11  that statement, sir?

12         A     There is a statement somewhere in my

13  documents, somewhere in that stack -- I don't recall the

14  gentleman's name, but he described it.

15         Q     Do you have any understanding as to whether

16  there were any other workers present that you referred to

17  that had any long-term or chronic sequela?

18         A     It's my understanding no one else has, other

19  than Mr. Newman, to the extent that anybody knows.

20         Q     Do you have any understanding as to where

21  those other workers were physically located in the

22  structures, that's what we'll call it today.

23         A     No, I don't.

24         Q     I note that a lot of your opinions talk about

25  what appear to me to be pulmonary conditions.  Is that a

TRI-COUNTY COURT REPORTING

171

1    kind of a fair and obvious statement?

2          A    Yes.

3          Q    For instance, number two of your findings or

4    opinions at page two reads, "His pulmonary injuries are

5    consistent with a massive acute exposure of SO2 gas."  I did

6    not see any reference in the report to any of Mr. Newman's

7    alleged cardiac conditions.  Am I correct that that aspect

8    of the case is not addressed in your report?

9          A    It is not, that's right.

10          Q    Before you received Dr. Hirsh's deposition

11    transcript, did you have any understanding as to whether

12    Mr. Newman had any cardiac symptoms that were allegedly as a

13    result of this incident?

14          A    Nothing comes to mind.

15          Q    Whether as an industrial hygienist or

16    whatever other discipline that you've engaged in, do you

17    have any particular expertise in regard to cardiac sequela

18    from inhalation of SO2, as opposed to pulmonary conditions

19    that you have outlined in this report?

20          A    Well, I'm not aware personally of any

21    firsthand evidence that exposure to SO2 causes cardiac

22    problems.  But having said that, the heart and lungs are

23    really a cohesive network of machinery and, obviously,

24    independently intertwined in their function.  Myocardium is

25    the most oxygen-demanding muscle we have and it gets it from

TRI-COUNTY COURT REPORTING

172

1     the lungs.  They work very closely together.  It wouldn't
2     surprised me in an impaired pulmonary system --
3              MR. THOMAS:  I'm going to object to continued
4     medical opinions.  Go ahead.
5              MR. SCOTT:  Keep going.
6          A    There are medical conditions that effect the
7     heart -- that effect the lungs that can effect the heart.
8     You alluded to one earlier, fibrosis can produce right heart
9     failure to the point of death and congestive failure.  There
10    are numerous conditions, but I'm not here to render an
11    opinion regarding atrial or ventricular fibrillation as a
12    sequela from SO2, that is not my area of expertise.
13         Q    And I recognize that you're not offering
14    medical opinions, but I noted, for instance, opinion five
15    where you talked about conditions that may develop and they
16    all appear to me, to me anyway, of a pulmonary nature:
17    Chemical broncho pneumonia, bronchiolitis obliterans,
18    reactive airways disease.  Those appear to be classic
19    pulmonary conditions?
20         A    That's a fair statement.
21         Q    I gather, even though you're not offering
22    medical opinions, you're aware of these conditions as being
23    part of the literature or the understanding that things can
24    emanate from SO2 exposure; is that a fair statement?
25         A    That's right.  As an occupational

TRI-COUNTY COURT REPORTING

173

1    toxicologist I teach doctors, not the clinical aspects, but

2    what chemical can cause what types of health problems in

3    what types of workers under what conditions.  That is part

4    of my function as a faculty member at the University.

5              Q    And I'm intrigued by what is not listed in

6    number five as much as what's in there; namely, the fact

7    that I don't see any mention of arrhythmia, atrial

8    fibrillation.  The fact that you've mention pulmonary

9    conditions, is that significant in terms of what is out

10   there in the literature or in the general knowledge of what

11   SO2 exposure can do?

12             A    Those are the generally recognized effects of

13   excessive exposure to SO2.  A physician trained not even in

14   cardiology, just in primary care medicine should be able to

15   make a leap from impaired pulmonary function can lead to

16   impaired cardiac function.

17             Q    You would recognize and agree that despite

18   the fact, or other than the fact you're not offering medical

19   opinions, you agree with me that certainly there is a

20   separate medical discipline for pulmonologists versus

21   cardiologists, correct?

22             A    Well, there are cross-overs too like

23   interventional cardiologists.  But, yes, in general that is

24   correct.

25             Q    Can you point me to any treatises or

TRI-COUNTY COURT REPORTING

174

1  literature that you are aware of that correlate SO2 exposure

2  to subsequent cardiac sequela?

3          A    No, I haven't researched that.

4          Q    You've spent a considerable amount of time

5  talking about the words massive acute exposure and

6  Mr. Thomas was asking you specific questions about parts per

7  million.  And I remember at one time I think you said what

8  do you want, one bullet or ten bullets.  Do you remember

9  when you said that?

10          A    Yes.

11          Q    It's fair to say that your figure of 100 to

12  200 parts per million is not based upon any scientific

13  quantitative study.  It's your best estimate based upon what

14  you have gleaned from the subsequent condition or conditions

15  that Mr. Newman has presented with; is that a fair

16  statement?

17          A    Well, it's based on a lot of experience, sir.

18  I've been around the block a few times on sulfer dioxide in

19  a variety of occupational environmental settings.  I know

20  the dynamics of the gas; that is all part of my

21  understanding, that is what I bring to this table.

22          Q    And I don't doubt that.  I don't want you to

23  think for a minute that I'm denigrating your ability at all.

24  But it seems important to me anyway that if NIOSH or OSHA or

25  whomever lists threshold levels as five parts per million,

1    one part per million or a 1,000 or 3,000 being fatal, that

2    there would be some recognized quantitative numbers out

3    there that say at this level you're looking at this type of

4    damage and so forth.  That is how I'm seeing this.  Is that

5    not accurate?

6            A    It's accurate to a point.  These numbers are

7    obtained from a variety of sources.  One, in the case of two

8    that I cited here, people died and for whatever reason air

9    samples were taken at the same time or there was a

10   replication in a laboratory controlled setting.  Two, animal

11   evidence.  Rats and mice for the most part, we exposed them

12   and we can project somewhat.  And then air samples taken at

13   the time people are exposed.  Are eyes watering?  Are people

14   coughing?  Are they choking?  Can you smell?  Can you

15   detect?  At the same time air samples are being taken.  All

16   that is part of the corpus of knowledge that arise at these

17   limits.

18           Q    And you mentioned Ford situations where you

19   knew you were looking at a massive exposure and there was no

20   point in calculating the parts per million released,

21   correct?

22           A    Correct.

23           Q    But when you have a situation like this case

24   where you admittedly relied heavily on what I'll call the

25   correlating conditions in terms of his physical symptoms,

176

1    isn't that all the more important that we obtain some

2    understanding as to what the level of the parts per million

3    discharged that day?

4          A     If that can be done it would be helpful, yes.

5          Q     Mr. Thomas also asked you about opinion

6    number seven at the top of page three and the use of the

7    word "trap" and you clarified quickly that you're not

8    stating that Mr. Newman was quote/unquote trapped.  I

9    recognize what you're saying there.  Similarly, if you look

10   at opinion number ten it reads, "I believe that Mr. Newman

11   was exposed to an SO2 gas concentration exceeding 100 parts

12   per million and most likely to about 100 to 300 parts per

13   million for one to two minutes until he could extricate

14   himself."  First of all, the 300 should be 200, correct?

15         A     It could be 300.  Frankly, I don't have a

16   number.  Nobody does.  If anybody does, they are a fool,

17   frankly.  We'll take it from there.

18         Q     When you wrote for one to two minutes until

19   he could extricate himself.  The word "until" does not mean

20   to suggest in your opinion that it took him one to two

21   minutes to extricate him from being underneath the tank; is

22   that accurate statement?

23         A     That's right.

24         Q     The phrase one to two minutes is your opinion

25   as to the length of time that he was exposed to the SO2 at

TRI-COUNTY COURT REPORTING

177

1  whatever level, correct?

2          A    Well, yes, the time that he said is it

3  something that we should abandoned the building, should I

4  get out of here, to get up off the floor gather himself and

5  leave the building, yes.  There was dispute whether it was a

6  situation that would require evacuation, at least that is my

7  understanding.

8          Q    Do you have an opinion as to how long it took

9  Mr. Newman to first detect the presence of SO2?  And,

10  secondly, how long it took him to recognize the SO2?

11          A    I don't think Mr. Newman knew what SO2 was.

12  I don't think he had a clue.  I don't think he ever

13  recognized SO2 -- this clearly is sulfer dioxide.  He had no

14  idea.

15          Q    Well, you mentioned that with your own

16  personal surgery that you have a limited olfactory sense.

17  Do you have any understanding that Mr. Newman's olfactory

18  sense is impaired?

19          A    No.

20          Q    Does not SO2 for the majority of the populous

21  have a pungent egg-like odor immediately or --

22          A    I wouldn't call it an egg-like.  It's not so

23  much of an odor as an irritation as the formation of

24  sulfurous acids in the mucous membranes.  There's an odor

25  element to it, but not like hydrogen sulfide or rotten eggs.

TRI-COUNTY COURT REPORTING

178

1          Q    Let me ask it a different way.  Perhaps

2    Mr. Newman didn't know this was SO2, I will accept your

3    premise and go from there for a second.  Do you have an

4    opinion of how long before he recognized that there was some

5    type of chemical substance in the air that is not typical

6    for him to be experiencing at P&G?

7          A    I asked him that several times and it wasn't

8    clear.  There was no suddenly there's an awakening.  He

9    wasn't certain.

10         Q    So I take it from your answer that you didn't

11   glean from talking to him his point of detection nor his

12   point of recognition; is that a fair statement?

13         A    The stop watch wasn't started.

14         Q    Mr. Thomas asked you about the Anderson study

15   from 1974 and I think you said you weren't familiar with

16   that; is that correct?

17         A    What journal is it in?  Perhaps I read it

18   years ago.  I read a lot of journals.

19         Q    It's referred to in Mr. Kaminiski's report.

20         A    If it's in a journal that crossed my desk at

21   the time, I read it.

22         Q    The human response to controlled levels of

23   sulfur dioxide, ARCH. Environmental help by Linquist and

24   Jensen?

25         A    No, I have to know the journal; that tells me

TRI-COUNTY COURT REPORTING

179

1    more than anything.

2            Q    Well, Mr. Kaminski is apparently quoting in a

3    footnote that, as Mr. Thomas asked earlier, detection odor

4    threshold for sulfer dioxide is .33 parts per million.  And

5    I think your response for that was it depends on the

6    individual; is that an accurate recitation of your answer?

7            A    It does.  Mr. Kaminksi is citing one study.

8    The book I pulled out of my briefcase is a review of all the

9    studies.  And most likely, since that is the lowest reported

10   concentration of .33, I would be surprised if that .33 isn't

11   the same reference point as in this book that I have, but it

12   is the lowest one.

13           Q    Even if it's the lowest, it strikes me when I

14   look at that .33 detection and the other citations to the

15   same study indicating a distinct odor of sulfer dioxide is

16   detected by humans at one part per million, the figures that

17   you're talking about as far as the most likely extent or

18   level of the release are a hundred to 300 times the minimal

19   detection levels; is that accurate?

20           A    That's accurate, that is my call on it, yes.

21   Mr. Kaminski just cites the lowest standards he ever came

22   across.  I would like to suggest that I shared with you the

23   collective knowledge regarding this and it's quite a range,

24   not the lowest end.

25           Q    It's been a long day, I apologize.  What were

TRI-COUNTY COURT REPORTING

180

1    the numbers you were quoting as far as the -- what you

2    consider to be a recognized range, first, for detection and,

3    secondly, for the distinct odor being?

4              MS. STORM:  Do you want to just mark the table?

5              A    Do you want just the page?

6              MS. STORM:  Is the page all right?

7              Q    Absolutely.

8              MS. STORM:  Do you want to read it to him and then

9    I'll make a copy?

10             A    Sure.  The range for detection -- by the way,

11   this group of industrial hygienists who researched the

12   literature came across a lot of articles, some they said

13   essentially were so scientifically poor they didn't cite

14   them.  They took best which they felt had scientific merit

15   and cited those.  For sulfer dioxide, for detection .33 to

16   5.0 parts per million.  For recognition, 3.8 to 5.0 parts

17   per million.  And for each of those detections -- the

18   geometric mean was 2.7 parts per million.  And the geometric

19   mean for recognition was 4.4, which means on a geometric log

20   scale 50 percent of the people detected it below 2.7 and

21   50 percent above.  And there can be tremendous extremes,

22   especially since there is a log normal distribution.  You

23   can have some people who say why are all these people

24   coughing and choking and saying it smells.  I see these

25   people in my business all the time.


                    TRI-COUNTY COURT REPORTING

181

```
 1            Q     Mr. Wabeke, I wanted to take highest number
 2     and I want to assume they're correct, let's go with five
 3     parts per million.  The level that -- to your best belief
 4     that Mr. Newman was exposed, if we go a hundred parts per
 5     million, we're at 20 times that number.  If we go to 300,
 6     we're 60 times that number.  My question, not as an
 7     industrial hygienist, but as a lay person who struggled
 8     through chemistry in high school, isn't this an overpowering
 9     smell at the levels that you're quoting when Mr. Newman
10     detects it, if in fact that is the numbers that were
11     present?
12            A     Absolutely, that is why he was injured.  He
13     got out of the building.
14            Q     But it took him a minute to two minutes to
15     get to that appreciation at those levels and get out of the
16     building?
17            A     Based on everything, yes.
18            Q     Did you go through with him in detail what he
19     did for that minute to two minutes; namely, at what point
20     was he looking around trying to figure out what was going on
21     and at what point was he actually trying to get out from the
22     tank and get out?
23            A     I asked him to describe what he was doing, it
24     was over -- telephonic at best.  I didn't have a movie of it
25     or a video of it, but that is what he said and I had no
```

TRI-COUNTY COURT REPORTING

182

1    reason to dispute it.  He was consistent.

2             Q    Did you have any general understanding as to

3    whether he spent more time of that one to two minutes

4    getting out from underneath the tank or more time once out

5    of the tank heading out of the building?

6             A    I don't know.  The sense I had was there was

7    a lot of debate on whether we should evacuate or not, but I

8    don't have a clear understanding.

9             Q    Mr. Thomas may have asked this and I may have

10   missed it earlier.  Did you have a discussion at any time

11   with Mr. Newman about any buzzers or alarms or anything

12   going off unusual at or about the time of the SO2 incident?

13            A    Initially, it was my erroneous belief that

14   there was a gas alarm system, when, in fact, the enunciator

15   of the alarm or whatever it was was a paging system.

16            Q    First, how did you get misapprehension?

17   Where did that come from?

18            A    I don't know.  It's not unusual to have gas

19   alarms in situations where there can be a release of a gas

20   under pressure or a liquified under pressure or a gas under

21   pressure to serve as an alert system to those who might be

22   exposed.  What do we do; we have to get out; this is our

23   path, whatever.

24            Q    How did you come to acquire additional

25   information?

TRI-COUNTY COURT REPORTING

183

 1              A    I learned that there were garbled messages

 2   over this PA system and it wasn't intelligible.

 3              Q    Where did that information come in?

 4              A    Mrs. Storm and Mr. Newman.

 5              Q    Did Mr. Newman tell you he ever heard a sound

 6   like that before when he was on site at P&G?

 7              A    At a previous site visit?

 8              Q    For any reason at all.

 9              A    I certainly don't remember.

10              Q    And you have no notes from either telephone

11   conversations with Mr. Newman; is that correct?

12              A    That's correct.

13              Q    No tape recording?

14              A    No, I don't do business that way.

15              Q    You talked earlier about the issue of fans.

16   First of all, would you agree that in determining the extent

17   of exposure that the level or extent of natural ventilation

18   and mechanical ventilation is important for you as an

19   industrial hygienist to be aware of?

20              A    More important is mechanical, but sometimes I

21   consider natural ventilation, depending.

22              Q    And I think you said initially that

23   Mr. Newman told you that there was no fan in the area where

24   he was working.  Did I hear you correctly?

25              A    If I said that, I misspoke.  I asked him was

184

1    the fan on the outside wall adjacent to his workstation

2    operating and he said no.

3           Q    I thought what I heard you say is that in the

4    first conversation there was no fan and yesterday he told

5    you that that fan was not operating.  So your testimony is

6    he told you that there was a fan, but that it was not

7    operating?

8           A    Yes.

9           Q    Okay.  And is that something he volunteered

10   or something you asked him?

11          A    I asked him about ventilation in the area,

12   mechanical ventilation.

13          Q    Did he say anything else about any other

14   exhaust fans in the area of where he was working that may or

15   may not have been operational?

16          A    No.

17          Q    You're aware from any of the numerous

18   diagrams that we've looked at, including Exhibit 73, that

19   there are two fans depicted at least on the diagram on that

20   wall?

21          A    Yes.

22          Q    Do you have any understanding as to whether

23   either of the fans were operating at the time of the

24   incident?

25          A    I don't know.

TRI-COUNTY COURT REPORTING

185

1          Q     You do not know how the SO2 exposure

2     occurred; is that correct?

3          A     I believe it entered his work area through

4     one or all three mechanisms I explained before.

5          Q     I'm sorry, I meant to ask you or I was trying

6     to ask you, you don't know how the SO2 was released?

7          A     No, I don't.

8          Q     Have you been asked to perform any

9     investigation as to that aspect of this case?

10         A     No.

11         Q     Do you have any knowledge as to what if any

12    involvement Mesa, Inc., had with the release of SO2 on the

13    day of the incident?

14         A     No, I know there is dispute over what might

15    have happened, but that's why we're here I guess.

16         Q     Did Mr. Newman tell you anything about that?

17         A     No.

18         Q     Have you ever spoken with any employees of

19    Mesa, Inc., concerning this incident?

20         A     No.

21         Q     You talked earlier about -- and drew for

22    Mr. Thomas -- the windward leeward side in terms of your

23    explanation for the dissertation and the movement of the

24    SO2, correct?

25         A     Yes.


                    TRI-COUNTY COURT REPORTING

186

1          Q     I did not notice that in terms of any part of
2     the written report.  Am I correct that it was not addressed
3     in your written report?
4          A     You're correct, it was not.
5          Q     When did you come up with or develop those
6     opinions concerning air flow and dissipation of SO2 outside
7     the building?
8          A     I believe I had an earlier document that
9     showed wind flow and maybe someone somewhere on one of the
10    documents I had had an educated guess on the direction of
11    air flow or wind and it would have been at or about the time
12    I reviewed that.  It was fortified today when I saw other
13    buildings in the terrain and surrounding structures, and, in
14    fact, being there on a day when the wind direction was
15    almost identical as to what was portrayed earlier in the
16    diagram.
17         Q     What is a fault tree analysis?
18         A     It's one of several processes wherein
19    somebody can sit down and ask what could go wrong with a
20    system, how might the system fail in a predictive sense.
21    Well, it can be done both ways.  We can do it post injury,
22    post event, whatever, or pre-event in terms of predicting
23    what could go wrong, where might a system fail due to its
24    components, due to its entirety, with an eye toward
25    prevention.  It involves a series of yes or no decisions and

TRI-COUNTY COURT REPORTING

                                                                    187
1    other decisions that might require further information

2    gathering.

3            Q    Mr. Wabeke, do you have any opinions

4    concerning anything that Mr. Newman's employer did or did

5    not do relative to his safety and protection on the day of

6    the incident?

7            A    No, I don't think they had a clue regarding

8    the hazards of this gas.

9            Q    But you have not interviewed anyone with Viox

10   owner Mr. Newman; is that correct?

11           A    That's correct.

12           MR. SCOTT:   Those are all the questions I have.

13   Thank you, sir.

14           MR. THOMAS:   I have a couple follow-up.

15                    RE-DIRECT EXAMINATION

16   BY MR. THOMAS

17           Q    "It could be 300.  I don't have a number.

18   Anybody who does is a fool."  You said that a few moments

19   ago and it made me wonder why we spent three hours

20   discussing the numbers 100 to 300?

21           A    Those are estimates.  It's a range.  If

22   anybody wants 307 parts per million, I think it's absurd to

23   even think it could be that precise, given the variables

24   involved.  Everybody has been looking for a specific number

25   from me and the suggestion if you don't have a specific

                    TRI-COUNTY COURT REPORTING

188

1    number I'm blowing air out of the top of my hat, that's not
2    the case.  Anybody that comes up with a specific number to
3    seven decimal points is frankly preposterous in my view.
4         Q    Well, I'm not asking for a specific number to
5    seven decimal points, I'm content with a range.  But my
6    question was with you earlier, I thought we had said -- and
7    part of the whole purpose of the deposition is to have a
8    clear understanding of what a witness is going to say at
9    trial and my understanding at the conclusion of my questions
10   was you were going to state your opinion of 100 to 200 parts
11   per million over a period of one to two minutes' range on
12   both concentration and duration.  Then you said it could
13   have been 300.  I want to know why one could be able to make
14   a cavalier jump and add 50 percent to a range, and then say
15   anybody who has a number is a fool.  Are we at 100 to 200?
16        A    A number is a specific number, excuse me.  A
17   range is something else.  You kept saying a number.
18        Q    All right.  Let me put it this way and maybe
19   I'm arguing over nothing.  As we sit here is it your best
20   opinion, the opinion to which you hold to the greatest
21   degree of confidence, that the range of exposure that
22   Mr. Newman experienced was 100 to 200 parts per million of
23   sulfer dioxide gas for a period of one to two minutes?
24        A    Yes, but it must be understood that there is
25   going to be a concentration build up.  So really the range

TRI-COUNTY COURT REPORTING

189

1      starts at ambient concentrations, outdoor air concentrations

2      absent any release from the Ivorydale plant and then it

3      builds up to that.

4              Q      Maybe the fool with the precise number, he

5      would have to specify an exact moment in time because it's

6      going to change?

7              A      Yes, exactly.

8              Q      You said something dispute about evacuation.

9      What does that mean?

10             A      I don't know what I said and in what context.

11             Q      He was asking you questions about alarms

12     versus intercoms and you said you understood there was a

13     dispute about evacuation?

14             A      My understanding is Mr. Newman had some

15     questions, should we evacuate the building or not; do I

16     leave or do I stay.  And that was the dispute.  That is what

17     I meant as dispute.  Maybe not a dispute, maybe a

18     questioning on his part whether it was safe to stay.

19             Q      And you don't have any information that

20     suggested he talked with anybody at P&G about that, correct?

21             A      That's right.

22             Q      The example you used in response to a

23     question about a supervisor asked why are all these people

24     choking or having these symptoms.  You used that to describe

25     some people have symptoms and others don't.  Let me just

TRI-COUNTY COURT REPORTING

190

1   make sure I understand.  Is it fair to say that some people

2   might not smell the gas at the same parts per million

3   concentration as their neighbor might?

4          A    Absolutely, that is what these data speak to,

5   among other things.

6          Q    Okay.  Yet the inability to smell it will not

7   prevent those people from having symptoms based upon, as we

8   discussed earlier, the indiscriminate manner in which sulfer

9   dioxide will form sulfurous acid in the moist mucous

10  membranes of the nose and mouth of whoever it happens to

11  contact; is that fair?

12         A    Is that a question?  I'm sorry, I didn't

13  follow you.

14         Q    I just want to make sure that you and I agree

15  or at least if you agree with me, we can explore it.  People

16  may have different powers of perceiving sulfer dioxide using

17  their sense of smell?

18         A    That's a given; we know that.

19         Q    And there is a range, as indicated in the

20  table you read from a few moments ago which when people can

21  smell it and when people can smell and identify it, I guess,

22  is what it's saying, agreed?

23         A    Agreed.

24         Q    Yet even if a person can't smell it, that

25  sulfur dioxide is going to not discriminate on the basis of

TRI-COUNTY COURT REPORTING

191

1    olfactory power, but just simply if I have a mucous membrane

2    where this reaction can begin, what is it stichometrical

3    reaction can begin and the sulfurous acid begin to form,

4    they're going to begin experiencing the symptoms of teary

5    eyes or sneezing or that burning sensation; fair enough?

6            A    Well, as you're talking I can postulate all

7    sorts of scenarios, but fair enough in a general sense.

8    Yes.

9            Q    Because sulfur dioxide doesn't know and it

10   doesn't care as long as it has the things it needs to make a

11   reaction, it's going to make a reaction?

12           A    Concentration determines the depth of

13   penetration and the tissue sites where the damage might

14   occur.

15           Q    Assuming the concentration for two different

16   people are the same, that is going to take care of itself?

17           A    Exactly.

18           Q    One of the letters that you were provided was

19   a letter from Procter & Gamble regarding a quote that said

20   there was only a small release?

21           A    Right.

22           Q    But while that letter was provided to you, I

23   did not see it.  This issue came up in another deposition.

24   I still have not seen that letter?

25           MS. STORM:  I faxed it to Jeanette, I'm sure I

192

1    did.

2         A    It wasn't a letter.  It was a response to an

3    interrogatory.

4         Q    No, there is a letter as well.

5         MS. STORM:   There is a letter.  Off the record.

6              (Off-the-record discussion.)

7         Q    You mentioned with respect to pulmonary

8    problems experienced by Mr. Newman that he had one component

9    that was restrictive and one that was obstructive?

10        A    It seems to me I read that in some of the

11   medical reports and I don't recall where.

12        Q    All right.

13        A    Off the top of my head I'm sorry, I can't.

14        Q    I'm trying to get an understanding of what

15   the difference would be between those.

16        A    I really -- I think I would be getting far

17   afield in the field of pulmonology.  I'm not a

18   pulmonologist.

19        Q    Would it be fair for me to say then that with

20   respect to those pulmonary issues, you would refer me to the

21   pulmonary specialist?

22        A    Yes.

23        MR. THOMAS:  All right.  I have no further

24   questions.

25        MR. SCOTT:  No further questions.


                 TRI-COUNTY COURT REPORTING

193

1        (Deposition concluded at 4:48 p.m.)

2

3                        (Signature Waived.)
                          Roger Wabeke
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TRI-COUNTY COURT REPORTING

194

1

2                          C E R T I F I C A T E

3      STATE OF OHIO        :
                                  SS
4      COUNTY OF CLERMONT :

5              I, Kathy Simpson, Notary Public for the State

6      of Ohio, duly qualified and commissioned, do hereby

7      certify before giving of his deposition, the within-

8      named Roger Wabeke was by me, Kathy Simpson, first duly

9      sworn to depose the truth, the whole truth, and nothing

10     but the truth; that the foregoing is the deposition given

11     at said time and place by the said Roger Wabeke; that

12     said deposition was taken in all respects pursuant to

13     agreement as to time and place; that said deposition was

14     taken by me in stenotype and transcribed into typewriting

15     by computer under my supervision; and that the signature of

16     the deponent was expressly waived

17             I further certify that I am not counsel attorney,

18     relative or employee of any of the parties hereto, or in

19     any way interested in the within action, and that I was

20     at the time of taking said deposition a Notary Public for

21     State of Ohio.

22             IN WITNESS WHEREOF, I have hereunto set my hand

23     and Notarial seal this 27th day of November, 2002.

24     My commission expires
       February 20, 2007          _____
25                                          Kathy Simpson
                                   Notary Public - State of Ohio


                       TRI-COUNTY COURT REPORTING