## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **RICK E. NEWMAN,** | : | **Case No. 01-CV-67** |
| | : | |
| **Plaintiff,** | : | **Judge Herman J. Weber** |
| | : | |
| **v.** | : | **DEFENDANT THE PROCTER &** |
| | : | **GAMBLE COMPANY'S** |
| **THE PROCTER & GAMBLE** | : | **REPLY TO DEFENDANT, MESA,** |
| **COMPANY, et al.,** | : | **INC.'S MEMORANDUM** |
| | : | **OPPOSING SUMMARY** |
| **Defendants.** | : | **JUDGMENT** |

# REPLY

## I.     INTRODUCTION

Mesa now claims for the first time in its memorandum opposing P&G's motion for summary judgment that it is not obligated to defend and indemnify P&G because the indemnity agreement contained in the MOA is void as against public policy under Ohio Revised Code §2305.31.   Mesa's argument is shortsighted and not applicable to the case at bar.   The indemnity agreement in the MOA served as a risk-shifting mechanism that is proper under Ohio law.   Furthermore, Mesa makes no attempt to carry its burden as to a showing of spoliation; consequently, the issue is moot and Mesa is not entitled to any evidentiary presumptions in its favor.

## II.     ARGUMENT

### A.     OHIO REVISED CODE §2305.31 DOES NOT VOID THE INDEMNITY AGREEMENT IN THE MOA.

Generally, indemnity agreements are not against public policy. *Stickovich v. City of Cleveland*, 143 Ohio App.3d 13, 26, 757 N.E.2d 50, 60 (8th Dist. 2001).  Ohio Revised Code

§2305.31 creates a narrow exception for construction contracts that provide indemnity for the promisee's negligence. *Id.* Mesa, whose own employees were the only persons present in the room when the release occurred, has not presented any evidence that the sulfur dioxide release was due to P&G's negligence. Even if Mesa could assemble such evidence, Mesa would not be entitled to summary judgment.

Mesa invites this Court's attention to the Ohio Supreme Court's decision in *Kemmeter v. McDaniel Backhoe Service* (2000), 89 Ohio St.3d 409, 413, 732 N.E.2d 385, 388. First, the *Kemmeter* Court held that a "contract term that does not address the indemnification of the promisee's own negligence is not affected by [O.R.C. 2305.31]." *Id.* at 411, 732 N.E.2d at 387. Indeed, indemnification agreements which protect a promisee from damages and costs arising out of the promisor's negligence are valid and enforceable. *Id.* at 413, 732 N.E.2d at 388. Regardless of Plaintiff's allegations, the events arose in an area within Mesa's "contractual control." Because the MOA clearly excludes Mesa from indemnifying P&G for any damages or costs caused by P&G's sole negligence ("*this indemnity shall not apply to damages, injuries, or the costs incident thereto found to be caused by the sole negligence of Buyer*"), and Mesa has produced no evidence that Plaintiff's injuries are indeed the result of P&G's negligence, Mesa's duty to defend and indemnify still attaches. Only when the indemnity agreement "as applied" relieves the promisee of its own negligence is the statutory prohibition invoked. *Id.* syll.

In fact, Ohio courts have narrowed the applicability of Ohio Revised Code §2305.31 one step further. Regardless of whether Mesa can prove that P&G was negligent, the indemnity agreement in the MOA remains valid and enforceable under Ohio Revised Code §2305.31 unless P&G's negligence was the proximate cause of Plaintiff's injury. *Stickovich, supra,* 143 Ohio App.3d 13, 27, 757 N.E.2d 50, 61 (8th Dist. 2001). In *Stickovich*, a contractor was injured when

2

his uninsulated crane came into contact with energized power lines at the project site. *Id.* at 19. Because the activities which caused his injury were not within the contractual control of the city project owner, and there was no proof any actions of the owner proximately caused the contractor's injuries, the construction indemnity agreement was held to be enforceable. *Id.* at 27. Mesa has produced no evidence that P&G's negligence was the proximate cause of Plaintiff's injury; there is no issue of material fact and Mesa must indemnify and defend.

Most importantly, Ohio Revised Code §2305.31 is not a bar to indemnification because the contractual arrangement between P&G and Mesa was consistent with the *spirit* of the statute. When construing a statute, a court must consider the reason and spirit of that statute to arrive at a true understanding of the statute's intended purpose. *Amalgamated Industries, Inc. v. Tressa, Inc.*, June 13, 2003, 69 Fed. Appx. 255, *8, 2003 WL 21397898 (6th Cir.)(attached hereto at Exhibit A). The indemnification promise does not stand alone, and cannot be read in a vacuum. The same contract that set forth the indemnity required Mesa to obtain insurance in adequate amounts to provide coverage for that risk.[1] As such, the cost of that insurance was incorporated into the charges Mesa billed P&G.

By creating that mechanism, P&G and Mesa did not contract away or seek to shirk their responsibilities to provide a safe workplace. On the contrary, this mechanism served merely to ensure that any damages that did arise from the work—despite safe practices—would be resolved without the need to show fault on the part of any person, thereby minimizing the risk of expensive litigation. The propriety of this contractual risk shifting mechanism has been upheld by this Court and, on review, the Court of Appeals for the Sixth Circuit found it consistent with,

---

[1] The contract between P&G and Mesa is attached at Exhibit A to P&G's Memorandum in Opposition to Mesa's motion for summary judgment. The provisions imposing on Mesa the obligation to purchase insurance appear in ¶¶5.A-B.

3

rather than violative of, Ohio Revised Code §2305.31. *Legge Associates, Inc. v. Dayton Power and Light Co.*, Apr. 22, 1997, Nos. 95-4043, 95-4050, 113 F.3d 1235, 1997 WL 199491 (6th Cir.)(attached hereto at Exhibit B). For that reason, Mesa's motion for summary judgment must be denied.

### B.   MESA HAS OFFERED NO EVIDENCE TO SUPPORT ITS SPOLIATION CLAIM.

As P&G argued in its memorandum opposing Mesa's summary judgment motion, a claim of spoliation cannot move forward unless the alleging party makes a showing of: (1) the concrete evidence it was unable to obtain; (2) that the spoliating party's expert was permitted inspection of the evidence, and (3), that the spoliating party destroyed that evidence with the intention of fouling the opposing party's case. *Cincinnati Ins. Co. v. General Motors Corp.* (Ottawa 1994), Ohio App. 6 Dist., 1994 WL 590566, n. 3 (attached to P&G's memorandum in opposition at Exhibit A). Notwithstanding that Mesa has not properly moved for discovery sanctions under Fed. R. 37, Mesa has cannot make this necessary showing, as it was notified of Plaintiff's counsel's inquiry within days of P&G's receipt of that inquiry, thereby putting it on equal footing with P&G regarding any opportunity to evaluate the system. Moreover, no P&G expert evaluated the system at Mesa's expense, and Mesa has not identified what evidence it could have retrieved if the sulfur dioxide system were still in place and its expert had the opportunity to do so. Furthermore, Mesa has offered no evidence and cannot show that P&G intentionally dismantled the system with the purpose of sabotaging Mesa's defense. See *Nationwide Mutual Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 804 (6th Cir. 1999). Mesa cannot now cry prejudice that only individuals "who . . . had an interest in protecting P&G's coffers" were able to examine the system when Mesa had every opportunity to do so in the months prior to its dismantle but expressed no interest in doing so.

4

## III.    <u>CONCLUSION</u>

Mesa's arguments are not supported by the evidence. The indemnification provision of

the MOA complies with the spirit of O.R.C. 2305.31, and Mesa's claim of spoliation is

unfounded and contradicted by the fact that Mesa has always been on equal evidentiary footing

with P&G.  Summary judgment in favor of Mesa is improper; Mesa must defend and indemnify

P&G.

Respectfully submitted,

Scott R. Thomas (0061040)
Jeanette N. Dannenfelser (0069614)
FURNIER & THOMAS, LLP
One Financial Way, Suite 312
Cincinnati, Ohio 45242
(513) 745-0400
Fax:  (513) 792-6724
sthomas@FandTLaw.com

Attorneys for Defendant/Cross-Claimant
The Procter & Gamble Company

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served this 15th day of September 2003,

via First Class U.S. Mail, postage prepaid, upon

John C. Scott, Esq.                      Beverly R. Storm, Esq.
Joseph Mordino, Esq.                     David Zahniser, Esq.
FAULKNER & TEPE                          ARNZEN, PARRY & WENTZ, P.S.C.
2200 Fourth & Vine Tower                 600 Greenup Street
Cincinnati, Ohio 45202                   P.O. Box 472
                                         Covington, Kentucky 41012-0472
Counsel for Mesa, Inc.

                                         Counsel for Plaintiff

6

# EXHIBIT A

69 Fed.Appx. 255                                                                    Page 1
**(Cite as: 69 Fed.Appx. 255, 2003 WL 21397898 (6th Cir.(Ky.)))**

This case was not selected for publication in the Federal Reporter.

NOT RECOMMENDED FOR FULL--TEXT PUBLICATION

Sixth Circuit Rule 28(g) limits citation to specific situations. Please see Rule 28(g) before citing in a proceeding in a court in the Sixth Circuit. If cited, a copy must be served on other parties and the Court.

Please use FIND to look at the applicable circuit court rule before citing this opinion. Sixth Circuit Rule 28(g). (FIND CTA6 Rule 28.)

United States Court of Appeals,
Sixth Circuit.

AMALGAMATED INDUSTRIES LTD.,
Plaintiff-Appellee,
v.
TRESSA, INC., Defendant-Appellant.

No. 01-5708.

June 13, 2003.

Licensor of hair care products sued licensee for breach of licensing agreement and misappropriation of trade secrets. Following bench trial, the United States District Court for the Eastern District of Kentucky entered judgment in licensor's favor. Licensee appealed. The Court of Appeals held that: (1) licensing agreement was rescinded by parties' prior litigation, and (2) misappropriation claim was properly considered as same claim that previously had been raised by licensor in prior litigation and thus was not barred by statute of limitations.

Affirmed.

West Headnotes

**[1] Contracts ☞272**
95k272 Most Cited Cases

**[1] Contracts ☞274**
95k274 Most Cited Cases

**[1] Judgment ☞601**
228k601 Most Cited Cases

Under Kentucky law, licensing agreement was rescinded in parties' prior litigation, in which licensor was found to have materially breached agreement and damages were calculated so as to place parties in position they would have been in had contract never existed; therefore, licensor could not subsequently bring new claim for breach of that agreement.

**[2] Limitation of Actions ☞115**
241k115 Most Cited Cases

Claim raising issue of continuing misappropriation by licensee of trade secret obtained from licensor pursuant to licensing agreement was, under Kentucky's Uniform Trade Secrets Act, properly considered as same misappropriation claim previously asserted by licensor in parties' prior litigation, and therefore claim was not barred by statute of limitations; rather, claim should have been asserted in prior case, through motion to enforce final judgment in that litigation, instead of being asserted in new case. KRS 365.880 et seq., 365.890.
**\*255** On Appeal from the United States District Court for the Eastern District of Kentucky.

Before: BOGGS and NORRIS, Circuit Judges; and BELL, Chief District Judge. [FN*]

> FN* The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

PER CURIAM.

**\*\*1** Tressa, Inc. (Tressa), a manufacturer and distributor of hair care products, appeals a district court judgment in favor of Amalgamated Industries Ltd. (AIL), a developer of hair care products, stemming from the breach of a 1989 Licensing Agreement between the two parties. The district court, following a three-day bench trial in December 2000, found in AIL's favor on claims of breach of contract and of misappropriation of trade

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

69 Fed.Appx. 255
(Cite as: 69 Fed.Appx. 255, 2003 WL 21397898 (6th Cir.(Ky.)))

secrets. Tressa claims that the district court judgment *256 must be vacated on the grounds that it cannot be held to have breached a contract previously breached by AIL, as determined by the district court in a prior suit between the parties, and furthermore that the action is barred by the doctrine of *res judicata* or, alternatively, collateral estoppel. Tressa also argues that AIL's claim for misappropriation of trade secrets is barred by the statute of limitations.

For the reasons that follow, we agree that the Licensing Agreement between the parties was effectively terminated in the prior suit. Nevertheless, we affirm the district court's award of damages to AIL on the basis of Kentucky's Uniform Trade Secrets Act (the Act), Ky.Rev.Stat. Ann. §§ 365.880 to 365.900, which provides civil remedies for the misappropriation of trade secrets outside of a contractual relationship. Furthermore, we view AIL's current complaint of new acts of misappropriation by Tressa as part of a single claim under the Act that began with Tressa's initial misappropriation of AIL's trade secret litigated in the prior suit, since each act is a misappropriation of the same information obtained by Tressa when the parties entered into the Licencing Agreement in 1989. As a result we hold that AIL's claim is not barred by the statute of limitations, since it was timely filed in the prior suit and these new claims should have remained within the context of that suit, instead of being filed as a separate suit.

### I

Tressa and AIL entered into a Licensing Agreement (the Agreement) on July 5, 1989, in which AIL granted to Tressa the non-transferable right and exclusive license to manufacture and sell professional hair care products developed from AIL's information, technical data, processes, formulas and other data relating to the products (the Information). The contract states in relevant part:

> ...
> *2. License. Subject to the terms of this agreement, licensor grants to licensee the nontransferable right and exclusive license to use "the information" to manufacture "the products" and to sell "the products" throughout the world. No license, express or implied, is granted to employ the information for any other purposes whatsoever.*
> *3. Representations. Licensor represents, warrants*

*and agrees that "the products" and "the information" will provide to licensee a complete line of permanent haircolor products satisfactory in performance and shade range to compete in the professional (salon) hair care industry and will include a powdered bleach.*
> **2 ...

The Agreement further stipulated that Tressa would pay AIL a "nonrefundable technical development fee" of $100,000 and a licensing fee of four percent of the net sales collected by Tressa on each product sold, to continue "for as long as the formulas, "the products" and "the information" from [AIL] is being used." In essence, AIL was to give Tressa a formula consisting of a "base" and a "shade," which Tressa would then use to manufacture a line of hair-coloring products in exchange for a development fee and a licensing fee.

Tressa paid the development fee, but it is undisputed that the base part of the formula given by AIL to Tressa under the Agreement was unstable. Tressa modified the formula in order to remedy the problem and additionally claims to have changed certain shade formulas to provide coverage for gray hair, which it claims AIL's formulas could not do. Tressa marketed this modified product as a line of 35 hair-coloring shades under the name Colourage, *257 21 of which were determined by the district court to be derived from AIL shade formulas "without substantial alteration" and 14 of which were blends of the original 21. Tressa did not pay AIL the royalties due under the Agreement for any of the shades of hair color it was producing, stating that it believed it had developed the formulas for Colourage without any assistance from AIL.

Tressa filed a complaint against AIL alleging breach of contract on August 10, 1990, commencing what the parties now refer to as the "prior litigation." AIL counterclaimed for misappropriation of trade secrets. At the conclusion of a five-day bench trial in 1992, a judgment was issued holding that AIL had breached the Agreement by providing an unstable base formula and that Tressa had misappropriated AIL's trade secrets, in violation of the Act, by using AIL's shade formulas in the development of its Colourage line. There was no issue with regard to the statute of limitations, since AIL's counterclaim was filed well within the three-year limitation period.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

69 Fed.Appx. 255
(Cite as: 69 Fed.Appx. 255, 2003 WL 21397898 (6th Cir.(Ky.)))

There was considerable confusion over the awarding of damages as calculated by the district court in the prior litigation. Although the court initially stated that its intention was to measure the damages for AIL's breach in terms of expectation damages, thereby placing the injured party in the same position it would have been in had the contract been performed, the court ultimately awarded damages for restitution, placing the party in breach in its position before the contract, and then disgorging any unjust enrichment. [FN1] The court simultaneously ruled on the counterclaim for misappropriation of trade secrets brought by AIL, holding that "Tressa in developing its own color shades, used and benefitted from [AIL's] color shades to the extent that Tressa misappropriated a trade secret owned by Amalgamated." Accordingly, the district court awarded AIL a "judgment against Tressa in the form of a licensing fee amounting to 1.68% of the net annual sales of Colourage," or 42% of the original license fee of 4% assessed in the contract. [FN2] In sum, the court effectively rescinded the contract and assessed damages resulting from Tressa's use of AIL's trade secret pursuant to the Act.

> FN1. The court held that Tressa should recover its $100,000 technical development fee, less the amount it would have paid for the shades that it produced on the basis of AIL's formulas without such a contract and additionally subtracted Tressa's out-of-pocket expenses.

> FN2. In awarding this figure, the district court used the contract as a basis for assessing the value of AIL's Information and reasoned that since Tressa had appropriated 21 of AIL's shades with a value of $42,000, instead of the originally agreed $100,000 development fee, AIL had in effect appropriated 42% of the product.

**3 Directly after the final judgment was rendered in this prior litigation, cross motions for reconsideration were filed disputing whether or not Tressa should pay the newly assessed 1.68% licensing fee on the net sales of eight "new" shades, which were developed by Tressa subsequent to this

first trial. AIL complained of this omission and Tressa claimed, as it similarly claimed in the prior litigation with regard to the original Colourage shades, that it had developed these eight new shades independently, from scratch, and without any use or benefit from AIL's shade formulas. The court held that it could not resolve this matter since additional proof would be needed in order to determine whether Tressa had used AIL's Information in developing the eight new shades, and thus it would be necessary to reopen the case. On July 26, 1993, Tressa tendered payment to AIL for the royalty *258 payments due and owing on Colourage from 1990 through 1992, but did not include in its calculations the sales of the eight new Colourage shades.

Tressa continued to pay royalty payments on the 21 original shades until February 1995, when it advised AIL that it had reformulated the shades because a key ingredient had become unavailable and that AIL should therefore expect to see a decrease in royalty payments as Tressa "phase[d] in the sales of the new formulations." [FN3] AIL advised Tressa that it must evaluate Tressa's formulas with the new ingredient in order to assess whether or not the reformulated shades were substantially different so as to justify the termination of royalty payments. In June 1995, Tressa provided AIL with the new formulas for the reformulated shades and AIL concluded that they were substantially derived from AIL's original formulas.

> FN3. Ultimately, Tressa claimed to have reformulated the vast majority of its shades and from February 1995 until February 1999, Tressa paid royalties on the net sales of the remaining shades that it agreed had not been reformulated. After February 1999, Tressa stopped paying royalties even on the shades that were not in dispute.

After attempting to resolve the dispute by agreement, Magistrate Judge Wehrman convened a telephone conference call with counsel for the parties on May 19, 1997, to discuss whether AIL should move to reopen the prior litigation or file a new action. Magistrate Judge Wehrman considered the issue and subsequently advised the parties on May 20, 1997, that the proper course of action would be to file a motion in the original lawsuit. As

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

69 Fed.Appx. 255                                                                                    Page 4
**(Cite as: 69 Fed.Appx. 255, 2003 WL 21397898 (6th Cir.(Ky.)))**

a result, AIL filed a motion on October 16, 1997, to enforce the prior litigation's final judgment. On the basis of AIL's motion, Magistrate Judge Wehrman reopened the prior litigation on October 29, 1997, setting a schedule for discovery.

During the course of discovery, AIL discovered that Tressa had developed two more hair-color products: Irresistible and Facets. AIL decided to file a new action alleging that Tressa had misappropriated the use of AIL's formulas in the development of these two new lines. On March 1, 1999, the parties filed a joint status report in which they agreed to consolidate this action with the prior litigation. However, on June 3, 1999, Magistrate Judge Wehrman instead removed the prior litigation from the docket and advised AIL that it should pursue all claims in the context of a new lawsuit.

**\*\*4** Judge Bertlesman convened a three-day bench trial on December 4, 2000. At the conclusion of AIL's case, Tressa moved to dismiss AIL's misappropriation of trade secrets claim on the ground that it was not timely filed. The parties were instructed to file briefs on this issue. AIL proffered evidence in the form of an affidavit by its counsel, relating the parties' pre-filing discovery, their attempts to resolve the case extrajudicially, and the guidance offered by Magistrate Judge Wehrman. Tressa filed its brief almost a month after AIL's brief and did not contradict the factual account in AIL's affidavit.

On May 15, 2001, the district court held that Tressa breached the Agreement by failing to pay AIL royalties on Colourage sales and by using and altering AIL's formulas in an attempt to circumvent the Agreement. In addition, the district court held that AIL's claim for misappropriation of trade secrets with regard to the eight new shades was barred as untimely, but that the statute of limitations was equitably tolled with regard to the reformulated shades and that Tressa was continuing to misappropriate AIL's trade secret formulas by substantially using and benefitting from them without authorization from \*259 AIL. Ultimately the court awarded AIL damages arising out of Tressa's breach of contract in the amount of unpaid royalties at 1.68% of the net annual sales for the eight new shades, and 1.68% unpaid royalties on the reformulated shades on the basis of the misappropriation of trade secrets claim. AIL's claims with respect to Tressa's Facets and

Irresistible lines were dismissed by the district court at the conclusion of AIL's evidence.

## II
### Contract Claim

[1] Tressa first argues that AIL's claim for breach of contract in this case must fail since Kentucky law mandates that a party who has breached a material provision in a contract cannot sue to enforce that same contract. AIL contends that Tressa waived this argument because it failed to raise this defense at trial. However, Tressa made the following statement to the district court, effectively presenting this defense, at the close of AIL's case, when it moved to have AIL's claims dismissed:

> The Court has already ruled that AIL breached the contract. It has awarded Tressa damages under that contract. AIL is the breaching party here. It cannot now try to enforce the contract. The relationship between these parties has terminated long ago. long before the first litigation was even concluded. There is no contract left. The Court did not modify the contract. It entered judgment against AIL on the breach of contract claim. The contract claim fails as a matter of law and should be dismissed.

Tressa's argument, which we hold to have been raised at trial, has merit. Kentucky law requires that AIL's undisputed initial material breach of the Agreement in this case, although done in good faith, be considered in determining the ultimate status of the contract. *See West Kentucky Coal v. Nourse,* 320 S.W.2d 311 (Ky.1959) (holding that an option to convey land was not enforceable against the defendant since, among other things, the plaintiff had not fulfilled its reciprocal obligation to provide the defendant with information regarding preliminary mineral findings); *Webb v. Welcome Wagon, Inc.,* 255 S.W.2d 459, 461 (Ky.1953) (holding in the case of a dispute between a company and an employee with regard to a noncompete clause in their contract that if the company "had breached a material provision of the contract, the company cannot enforce by injunction the employee's covenant not to engage in a competing business."). Furthermore, while this rule has generally been applied where the relief sought was one of equity in the nature of specific performance, the Kentucky courts have stated that "even at law (as distinguished from equity) a party who commits the first breach of a contract is deprived of the right

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

69 Fed.Appx. 255

(Cite as: 69 Fed.Appx. 255, 2003 WL 21397898 (6th Cir.(Ky.)))                                                Page 5

to complain of a subsequent breach by the other party." *Nourse*, 320 S.W.2d at 315 (citing *Williamson*, 49 S.W.2d at 1006).

**\*\*5** In fact, in *Daniel v. Ohio Casualty Insurance Co.*, No. 90-5806, 1991 WL 93118, at \*4 (6th Cir. June 4, 1991), we addressed a similar argument from a party who contended that *Nourse* stood for the proposition that "Kentucky courts will not enforce options to purchase [land] where the person seeking to enforce the option has not complied with all of the provisions of the agreement." Although the panel in *Daniel* held that the proposition relied upon was not wholly dispositive, it agreed that a first breach is a factor to be considered. *Ibid.*

Finally, when one views the situation as a whole, it is apparent that the Agreement was effectively rescinded by the prior litigation **\*260** and has not been adhered to since then. Even though the district court did not explicitly state that the Agreement was terminated, the damages awarded were calculated so as to place the parties in the same position they would have been in had the contract never existed and all prospective damages awarded by the court were calculated pursuant to the Kentucky Trade Secrets Act, with neither party performing according to the terms of the contract since. For these reasons, we hold that the contract was rescinded and that AIL's claim for breach cannot stand. As a result, Tressa's defenses of *res judicata* and collateral estoppel are rendered moot.

### Misappropriation of Trade Secrets

[2] Rather than being a contract dispute, this case constitutes the continuing misappropriation by Tressa of a trade secret obtained from AIL as part of the Licencing Agreement and thus, according to the Act, should be considered one single claim. Furthermore, since AIL filed its original complaint within the statute of limitations in the prior litigation and all future use of the protected Information should have been seen in the context of enforcing that original judgment, AIL's claim is not barred by the statute of limitations. The district court should not have closed the prior litigation and should instead have joined any further acts of misappropriation stemming from the original Information gained by way of the agreement to the prior litigation, as originally proposed by AIL. As a result, the ultimate award of damages granted by the district court remains valid under the Act, instead of

under the contract claim.

It is worth pointing out initially that there is no dispute over the fact that AIL's Information constitutes a trade secret pursuant to the Act and, as the district court held. Tressa has "substantially used and benefitted from AIL's formulas without authorization from AIL" in its development of the eight new shades and the reformulated shades, "both of which were substantially derived from AIL's original formulas." As a result, Tressa's actions constitute a misappropriation of trade secrets under the Act. What is disputed is the application of the statute of limitations in this case.

The owner of a trade secret is traditionally protected by law against the appropriation of that secret by improper means and the subsequent use or disclosure of the improperly acquired secret. However, there has historically been a split in authority on the question of whether trade secret misappropriation should be considered a continuing tort, or as a single tort arising only at the time of the initial misappropriation, for purposes of the statute of limitation. *Compare Underwater Storage, Inc., v. United States Rubber Company*, 371 F.2d 950, 953-55 (D.C.Cir.1966) (holding that the misappropriation and continuing use of a trade secret constitutes a misappropriation tort and rejecting the approach taken by others that the tort of misappropriation "lies in the wrongful acquisition" of the trade secret) *with Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.*, 407 F.2d 288, 292-293 (9th Cir.1969) (explicitly rejecting the continuing tort approach and holding that the plaintiff's cause of action fully matured for purposes of the statute of limitations when the defendant "first made adverse use or disclosure of the trade secret in violation of its confidential relationship."). These different approaches are grounded in two competing views on the theoretical basis for legal protection of trade secrets: the "property" view and the "confidential relationship" view. Under the property view, each unauthorized use of a trade secret by the misappropriator is a separate claim, representing the continuing tort of **\*261** misappropriating the intellectual property of another, and the statute of limitations runs on each new act of misuse anew. Under the confidential relationship view, the first discovered (or discoverable) misappropriation of a trade secret commences the limitation period, placing the focus instead on the breach of the relationship between

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

69 Fed.Appx. 255

(Cite as: 69 Fed.Appx. 255, 2003 WL 21397898 (6th Cir.(Ky.)))

Page 6

the parties at the time the secret is disclosed.

**\*\*6** In 1979, the National Conference of Commissioners on Uniform State Laws approved of the Uniform Trade Secrets Act (the Uniform Act), which rejected the continuing tort approach. In 1990, the Uniform Act was adopted without significant change by Kentucky and we apply it here. Section 365.890 of Kentucky's Uniform Trade Secrets Act, which repeats verbatim Section 6 of the Uniform Act, provides that "[a]n action for misappropriation must be brought within three (3) years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. *For the purposes of this section, a continuing misappropriation constitutes a single claim."* (emphasis added). In the comments to this section of the Uniform Act, the Commissioners state in relevant part:

> This Act rejects a continuing wrong approach to the statute of limitations but delays the commencement of the limitation period until an aggrieved person discovers or reasonably should have discovered the existence of misappropriation. If objectively reasonable notice of misappropriation exists, three years is sufficient time to vindicate one's legal rights.

Unif. Trade Secrets Act, com. to § 6, p. 462.

Section 365.894 of the Act states that the Act "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of [the Act] among states enacting it." It is therefore appropriate to accord substantial weight to the Commissioners' comments on this section, and to turn to decisions in other jurisdictions for guidance in interpreting and applying the Uniform Act. This is especially true since no Kentucky court has published a decision interpreting or applying the Act, whereas other jurisdictions have considered the particular section at issue in this case in some detail.

The unanimous conclusion of courts considering this issue has been that a *claim* for misappropriation arises only once for statute of limitation purposes--at the time of the initial misappropriation, subject to the discovery rule provided for in the text of section 6 of the Uniform Act or section 365.890 of Kentucky's version. *See, e.g., Cadence Design Sys., Inc., v. Avant! Corp.,* 29 Cal.4th 215, 127 Cal.Rptr.2d 169, 57 P.3d 647, 651-52 (Cal.2002) (addressing a certified question from the Ninth Circuit Court of Appeals with regard to the section

of the California Uniform Trade Secrets Act that is equivalent to Section 6 of the Uniform Act, and holding that the continued improper use of a trade secret after the defendant's initial misappropriation is part of a single claim, which accrues at the time of the initial misappropriation for statute of limitation purposes). *See also Read & Lundy, Inc., v. The Washington Trust Co. of Westerly,* No. PC99-2859, 2002 WL 31867868, at \*8-\*9 (R.I.Super. Dec. 13, 2002) (holding that the initial misappropriation or disclosure for statute of limitation purposes occurred when the plaintiff first had knowledge of the defendant's misuse of the confidential information at stake in the case, and a later act of misappropriation of that same information did not constitute a separate cause of action under the Uniform Act); *McLeod v. Northwest Alloys, Inc.,* 90 Wash.App. 30, 969 P.2d 1066, 1070 (1998) (holding that **\*262** the period of limitation established under the Uniform Act as adopted by the state of Washington was triggered by the unauthorized disclosure of the trade secret at issue in the case and that a new period of limitation was not "triggered when [the defendants] actually implemented or 'used' the trade secret in its operation."); *McCaffree Fin. Corp. v. Nunnink,* 18 Kan.App.2d 40, 847 P.2d 1321, 1328-29 (Kan.Ct.App.1993) (holding that the limitation period for a cause of action under the Kansas Uniform Trade Secrets Act, which replicates section 6 of the Uniform Act, begins to run when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the misappropriation of the trade secret at issue).

**\*\*7** The California Supreme Court in *Cadence,* 127 Cal.Rptr.2d 169, 57 P.3d at 651-52, carefully reasoned through the intended purpose of section 6 of the Uniform Act, clearly distinguishing between an act of "misappropriation" and a "claim" within the meaning of the Uniform Act. *Id.* at 651. On the one hand, an act of misappropriation occurs "not only at the time of the initial acquisition of the trade secret by wrongful means, but also with each misuse or wrongful disclosure of the secret." *Ibid.* Whereas a *claim* for misappropriation "arises for a given plaintiff against a given defendant only once, at the time of the initial misappropriation, subject to the discovery rule ... [and e]ach new misuse or wrongful disclosure is viewed as augmenting a single claim of continuing misappropriation rather than as giving rise to a separate claim." *Ibid.*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

69 Fed.Appx. 255                                                                          Page 7
**(Cite as: 69 Fed.Appx. 255, 2003 WL 21397898 (6th Cir.(Ky.)))**

In our case, there is no question that if Tressa's acts of misappropriation resulting in the eight new shades and the reformulated shades were to be considered separate claims under the Act, AIL's complaint would be barred by the statute of limitations, since AIL became aware of the eight new shades at least as early as September 1993, and the reformulated shades at least as early as July 1995, and although AIL filed a motion to enforce the judgment on October 16, 1997, AIL did not file a complaint in the present litigation until February 1999, well after the three-year limitations period.

Nevertheless, according to the Act, the only relevant event for purposes of determining when AIL's cause of action accrued is the initial act of misappropriation, which occurred when Tressa misappropriated AIL's trade secrets in its development of the Colourage line. Each misappropriation of that same Information obtained from AIL as part of the original Licensing Agreement constitutes another misuse, but not another claim for purposes of the statute of limitations. Therefore, had AIL filed a new complaint with regard to the reformulated shades after having discovered that they had been developed in 1995 from AIL's Information, in the absence of the prior litigation, the courts would have been compelled to dismiss AIL's complaint as barred by the statute of limitations since the initial act of misappropriation by Tressa occurred and was readily discoverable in 1990, when Tressa developed the Colourage line from AIL's Information. However, because AIL filed its original complaint within three years of the initial act of misappropriation, and properly sought relief for these new acts of misappropriation by seeking to enforce the prior litigation's final judgment, its claim here is saved.

We further note that an alternative holding by us would produce a result that is both illogical and inconsistent with the statutory scheme of the Act. If we were to hold that the lower court properly required AIL to initiate a new law suit in order to deal with these new acts of misappropriation, we would effectively bar plaintiffs *263 from bringing claims for new acts of misappropriations that occur three years after the discovery of the initial misuse by a defendant, in cases in which the plaintiff has been diligent in pursuing its rights under the Act. In other words, if we take the initial act of misappropriation by Tressa as the triggering event,

but hold that this claim is properly new, it is barred by the statute of limitations. This cannot be the right result.

**8 We conclude, therefore, that the district court in this case should not have closed the prior litigation, and the case before us now should be seen as part of that claim, which was in fact filed well within the limitations period set by the Act. We hold on this basis that the statute of limitations does not bar AIL's claim. To rule otherwise would be inconsistent with the statutory scheme, as it would undermine the Act's principle of not splitting a cause of action, would condone the "continuing wrong" approach, which has been repudiated by the Act, and would allow tortfeasors to commit new acts of misappropriation with impunity when done more than three years after initially misappropriating a trade secret. In construing a statute, we "must consider 'the intended purpose of the **statute**--the reason and **spirit** of the **statute** --and the mischief intended to be remedied.' " *Commonwealth v. Kash,* 967 S.W.2d 37, 43-44 (Ky.Ct.App.1997) (quoting *City of Louisville v. Helman,* 253 S.W.2d 598, 600 (Ky.1952)).

Moreover, this holding is entirely in keeping with the purpose of statutes of limitations, which are statutes of repose that preclude the presentation of stale claims and encourage diligence on the part of those whose rights have been infringed upon. In furthering these objectives, such statutes serve a worthy purpose. In this case AIL's claim is neither stale nor has AIL been anything less than diligent in pursuing its claim. It is only by virtue of a procedural twist initiated by the district court that AIL here presented a "new" claim, rather than a motion to enforce the prior litigation's final judgment.

### III

For the reasons given above, we AFFIRM the district court's award of damages to AIL on the basis of Kentucky's Uniform Trade Secrets Act.

69 Fed.Appx. 255, 2003 WL 21397898 (6th Cir.(Ky.))

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

# EXHIBIT B

113 F.3d 1235 (Table)                                                                                     Page 1
**Unpublished Disposition**

(Cite as: 113 F.3d 1235, 1997 WL 199491 (6th Cir.(Ohio)))

C

NOTICE:     THIS     IS     AN     UNPUBLISHED
OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. Use FI CTA6 Rule 28 and FI
CTA6 IOP 206 for rules regarding the citation of
unpublished opinions.)

United States Court of Appeals, Sixth Circuit.

LEGGE ASSOCIATES, INC., an Indiana
Corporation, Plaintiff-Appellant,
v.
DAYTON POWER & LIGHT COMPANY,
Defendant/Counterclaimant-Appellee,
v.
UNITED STATES FIDELITY & GUARANTY
COMPANY, Counterclaim Defendant-Appellant.

**Nos. 95-4043, 95-4050.**

April 22, 1997.

On Appeal from the United States District Court
for the Southern District of Ohio, No. 91-00310;
Herman J. Weber, Judge.

S.D.Ohio

AFFIRMED.

Before: SUHRHEINRICH and DAUGHTREY,
Circuit Judges, and GIBSON, Senior Circuit Judge.
[FN*]

> FN* The Honorable John R. Gibson,
> Senior Circuit Judge of the United States
> Court of Appeals for the Eighth Circuit,
> sitting by designation.

JOHN R. GIBSON, Senior Circuit Judge.

**\*1** Legge Associates, Inc., and its insurer, United
States Fidelity & Guaranty Company, appeal from
the judgment entered against them in favor of
Dayton Power & Light Company. Legge argues
that the district court [FN1] erred in refusing to
disqualify Dayton Power's counsel because a
member of its law firm represented Legge in this
matter before he joined the firm. Legge also argues
that the district court should not have held Legge
liable to indemnify Dayton Power for damages to
Dayton Power's property because the contractual
indemnity provision violates public policy as
declared in Ohio Revised Code Annotated section
2305.31 (Banks-Baldwin 1994). Legge also
contends that the district court should not have
entered summary judgment against Legge on its
other contract and tort claims against Dayton
Power. USF & G contends that the district court
erred in construing its policy to provide coverage on
Dayton Power's claim. We affirm the judgment of
the district court.

> FN1. The Honorable Herman J. Weber,
> United States District Judge for the
> Southern District of Ohio.

Legge was the maintenance contractor at Dayton
Power's Stuart Station in Ohio. Relations between
Dayton Power and Legge were governed by
Purchase Agreement No. 642, which in turn was
governed by a document entitled: "General
Conditions for CCD Contracts." The General
Conditions contained a hold harmless clause
requiring Legge to indemnify Dayton Power for any
property damage that might occur during the course
of Legge's work:

> Contractor shall indemnify and save harmless
> Owner from any and all costs and expenses,
> including but not restricted to attorney's fees and
> court costs, arising from, caused by, incident or
> related to injuries, damages to property (including
> property of Owner) or persons ... which may arise
> out of, be incident or related in any way to any of
> the work or things to be performed hereunder,
> irrespective or [sic] whether or not such injuries,
> damages and/or death may or shall be the result

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

113 F.3d 1235 (Table)
**Unpublished Disposition**

Page 2

**(Cite as: 113 F.3d 1235, 1997 WL 199491 (6th Cir.(Ohio)))**

of the negligence of Owner ... subject, however, to the provisions of Section 2305.31 of the Revised Code of Ohio where applicable....

Besides these General Conditions, Dayton Power issued purchase orders for particular jobs, which Legge would sign and return. The purchase orders contained hold harmless clauses [FN2] similar to that in the General Conditions.

> FN2. The purchase order hold harmless clause was substantially the same as the clause in the General Conditions, but did not contain the language: "irrespective or [sic] whether or not such injuries, damages and/or death may or shall be the result of the negligence of Owner."

In the course of Legge's work, Legge employees used a crane that Dayton Power had leased from F & M Mafco. Dayton Power owned the cable used in the crane. On November 12, 1990, Legge workers were using the crane to lift a valve that weighed several tons. The cable on the crane snapped, and the valve crashed down onto a coal conveyor. The accident caused more than $346,000 in damage to Stuart Station property.

Dayton Power presented a notice of claim to Legge based on the indemnity provision in the contract. Legge, in turn, made a claim on its insurer, USF & G. Because the claim was not paid promptly, Dayton Power withheld $346,000 from a payment due to Legge.

The dispute escalated, leading to a complete rupture of Dayton Power's and Legge's business relationship.

**\*\*2** Legge sued Dayton Power alleging breach of contract, tortious business interference, extortion, and defamation. Legge claimed that it had suffered damages from lost business with Dayton Power and other companies as a result of Dayton Power's actions. Dayton Power counterclaimed against Legge for a declaration that it was entitled to indemnity.

Dayton Power joined USF & G, seeking a

declaration that the USF & G policy covered Dayton Power's indemnity claim. USF & G responded that it had no duty to indemnify Legge, because its policy excluded coverage for property damage for which Legge became liable by contractual assumption of liability.

Early in the case, USF & G had retained Stephen Shaw, a member of the firm of Bloom & Greene, to represent Legge on Dayton Power's counterclaim. Bloom & Greene announced on December 11, 1992, that as of January 1, 1993 it would merge with Dinsmore & Shohl, which was currently representing Dayton Power. Shaw applied for permission to withdraw from representing Legge on December 22, 1992, and the court permitted him to withdraw on December 28, 1992.

Legge and USF & G moved to disqualify Dayton Power's attorneys, Dinsmore & Shohl. The magistrate judge [FN3] concluded that disqualifying Dinsmore & Shohl would work an unjustifiable hardship on Dayton Power because of the great amount of time Dinsmore & Shohl already had invested in the case. The magistrate judge determined Legge would not be harmed by allowing Dinsmore & Shohl to continue to represent Dayton Power, because the firm had shown that Shaw had not shared Legge's confidences with his new firm. Further, Dinsmore & Shohl had raised elaborate barriers to prevent any future disclosure of confidences. The magistrate judge considered this adequate protection under *Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222 (6th Cir.1988). The district court found that the magistrate judge had correctly assessed the facts and law. Therefore, the court denied the motion to disqualify Dayton Power's attorneys.

> FN3. The Honorable Michael R. Merz, United States Magistrate Judge for the Southern District of Ohio.

The parties filed cross-motions for summary judgment. The motions were initially considered by the magistrate judge.

The magistrate judge concluded that Dayton Power

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

113 F.3d 1235 (Table)
**Unpublished Disposition**

Page 3

**(Cite as: 113 F.3d 1235, 1997 WL 199491 (6th Cir.(Ohio)))**

was entitled to summary judgment on its indemnity claim against Legge. Legge argued that the indemnity was void as against public policy as expressed in Ohio Revised Code Annotated section 2305.31. [FN4] The magistrate judge rejected this argument because section 2305.31 "only applies to indemnity against liability, and not indemnity against loss, whereas the Hold Harmless Clause provides for indemnity against loss." He therefore recommended the district court enter summary judgment for Dayton Power on its claim for indemnity. By the same reasoning, the magistrate judge concluded Dayton Power was entitled to withhold its damages from amounts it owed Legge under their contract. Therefore, he recommended the court enter summary judgment against Legge on Legge's claim that Dayton Power breached its contract by withholding damages from amounts due to Legge.

> FN4. Ohio Revised Code Annotated § 2305.31 provides:
> A covenant, promise, agreement, or understanding in, or in connection with or collateral to, a contract or agreement relative to the design, planning, construction, alteration, repair, or maintenance of a building, structure, highway, road, appurtenance, and appliance, including moving, demolition, and excavating connected therewith, pursuant to which contract or agreement the promisee, or its independent contractors, agents or employees has hired the promisor to perform work, purporting to indemnify the promisee, its independent contractors, agents, employees, or indemnities against liability for damages arising out of bodily injury to persons or damage to property initiated or proximately caused by or resulting from the negligence of the promisee, its independent contractors, agents, employees, or indemnities is against public policy and is void.

**\*\*3** The magistrate judge further concluded Legge had not produced evidence to support its other

contract and tort claims and that its mechanic's lien claim was untimely filed. The magistrate judge recommended that Legge's tort and contract claims be dismissed with prejudice and the mechanics' lien be declared void.

In accordance with the magistrate's recommendations, the district court entered summary judgment against Legge on its claims against Dayton Power and granted summary judgment to Dayton Power on its counterclaim against Legge for indemnity.

The magistrate judge also recommended that USF & G's policy be held to cover Legge's liability. USF & G's insurance policy did not insure Legge against liability Legge had assumed by contract unless the contract fit within the policy definition of an "insured contract." The magistrate judge concluded that the indemnity clause in the Dayton Power-Legge contract fit within the policy's definition of "insured contract" and therefore was not excluded from coverage. The magistrate judge thus recommended that USF & G be declared liable on Dayton Power's coverage claim. The district court entered judgment in accordance with this recommendation.

I.

On appeal, Legge contends that the district court erred in denying its motion to disqualify Dayton Power's attorneys, Dinsmore & Shohl. Legge argues that when a lawyer who has represented a party in a case joins a firm that represents an adverse party in the same case, the "conflict is obvious," and "[n]o 'Chinese Wall' can be constructed that can eliminate this obvious impropriety." This argument ignores the distinction we have made between lawyers who cease their representation before joining the new firm and those who continue the representation.

In *Manning,* we addressed "the classic question of whether the entire law firm should be disqualified by a conflict of interest presented by the fact that a member of the firm had represented a certain client prior to his joining the firm." 849 F.2d at 226. We held that where the lawyer's representation of the client ends before he joins the firm, the firm may

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

113 F.3d 1235 (Table)                                                                    Page 4
**Unpublished Disposition**

**(Cite as: 113 F.3d 1235, 1997 WL 199491 (6th Cir.(Ohio)))**

continue representing the adverse party if it can prove that the former client's confidences have not been shared with others at the law firm. Further, even if the lawyer has not shared his client's confidences with the new firm, the firm must show that it has established screening procedures that will prevent any future disclosure of confidences--the sort of "Chinese Wall" that Legge says can never suffice. *Id.* at 227. On the other hand, we also held in *Manning* that if the lawyer's representation does not end before he joins the new firm, then an actual conflict exists and the firm should be disqualified, absent a showing that the client consented. *Id.* Legge refuses to acknowledge the distinction *Manning* drew between representing a client before joining a firm that represents its adversary and representing the client after joining such a firm. That distinction is determinative here.

**\*\*4** In this case, Shaw withdrew from representing Legge before joining Dinsmore & Shohl. Therefore, under *Manning* we must ask whether Shaw ever shared Legge's confidences with Dinsmore & Shohl and whether Dinsmore & Shohl adopted sufficient safeguards to assure that no confidences would be disclosed in the future. The magistrate resolved these questions in favor of Dayton Power, and the district court approved the recommendations. The district court observed that Legge failed to dispute the factual findings concerning the safeguards. Neither does Legge attack those factual findings on appeal.

Since Legge's only argument is a legal one, inconsistent with our holding in *Manning,* we must affirm the district court's denial of the motion to disqualify Dinsmore & Shohl.

### II.

Legge contends that the district court erred in holding that the indemnity clause in the Dayton Power contract documents is valid under Ohio law, despite Ohio Code section 2305.31. As in its disqualification argument, Legge again ignores the distinction the district court drew in deciding the issue below. The district court held: "[T]he plain meaning of the statute is to invalidate agreements that purport to indemnify the promisee against liability for damages to a third party, thereby

encouraging safe workplaces. Section 2305.31 does not invalidate an agreement to indemnify the promisee for damage to the promisee's property, even when due to the promisee's own negligence." No Ohio cases address the question of whether section 2305.31 prohibits agreements to indemnify for damage to the indemnitee's property.

The operative language of section 2305.31 voids construction contracts "purporting to indemnify the promisee ... against *liability* for damages arising out of bodily injury to persons or damage to property initiated or proximately caused by ... the negligence of the promisee." Ohio Rev.Code Ann. § 2305.31 (emphasis added). This language prohibits agreements to indemnify another for liability to third persons, but not agreements to indemnify the other for his own loss. *See Fireman's Ins. Co. v. Antol,* 471 N.E.2d 831, 833 (Ohio Ct.App.1984) (distinguishing between contracts to indemnify for liability and contracts to indemnify for loss); *Henderson-Achert Lithographic Co. v. John Shillito Co.,* 60 N.E.2d 295, 298-99 (Ohio 1901) (same). The statutory aim of giving owners the incentive to keep workers from being injured on their property only requires prohibiting agreements to indemnify for liability. This prohibition prevents owners from contracting themselves out of responsibility to injured workers. At the same time, the statutory goal of protecting workers is not frustrated by allowing owners to contractually allocate the risk of damage to their own property. *See Dayton Power & Light Co. v. Mobile Pressure Cleaning, Inc.,* No. C-1-89-231, slip op. at 7-8 (S.D. Ohio Feb. 27, 1991) (section 2305.31 policy of protecting workers satisfied by prohibiting indemnity from liability to third persons but allowing indemnity for loss). Thus, the purpose of section 2305.31 is effectuated by the plain language of the statute, and we have no reason to venture beyond that language to invalidate the indemnity for loss provisions in the hold harmless clause.

**\*\*5** We do not need to decide whether some part of the hold harmless clause might contain a promise to indemnify Dayton Power for liability, since the promise at issue in this case is the promise to indemnify Dayton Power from loss. Here, the loss is the damage to Dayton Power's property arising out of the work to be performed under the contract

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

113 F.3d 1235 (Table)
Unpublished Disposition

Page 5

(Cite as: 113 F.3d 1235, 1997 WL 199491 (6th Cir.(Ohio)))

documents. Under Ohio law, if an agreement contains some valid promises and some that are void as against public policy, and if the promises are separable, the courts will enforce the valid promises. *See Suesskind v. Wilson,* 176 N.E. 889, 890 (Ohio 1931). The promise to indemnify for loss in this case is separable from the promise to indemnify from liability, and Dayton Power's suit depends only on the former.

Legge does not point to any case in which an indemnity for loss provision has been invalidated under section 2305.31, but relies on an unpublished [FN5] Ohio case stating that if a contract's terms come within the prohibition of section 2305.31, the "underlying suit, its allegations or outcome, is irrelevant" to the enforceability of the contract. *Toledo Edison v. P & W Painting & Sandblasting Co.,* L-91-412, 1992 Ohio App. LEXIS 4615 at *4 (Ohio Ct.App. Sept. 11, 1992). *Toledo Edison* was an indemnity for liability case, not an indemnity for loss case. The promisee argued that section 2305.31 did not bar its claim, because section 2305.31 only bars indemnity against liability for one's own negligence and the promisee had been adjudged not negligent. Thus, in *Toledo Edison,* the promisee argued that the contractual terms on their face may have violated section 2305.31, but that the facts of the case did not involve indemnification of a negligent party. Here, in contrast, Dayton Power argues that the contract contains separable promises, and that the promise it relies on does not come within section 2305.31's terms at all. *Cf. Moore v. Dayton Power and Light Co.,* 650 N.E.2d 127, 129-30 (Ohio Ct.App.1994) (enforcing costs and expenses provision of hold harmless clause virtually identical to clause in this case), *appeal not allowed,* 645 N.E.2d 1260 (Ohio 1995).

FN5. Ohio Supreme Court Rule 2(G) provides that unpublished Court of Appeals decisions have only persuasive authority in unrelated cases.

Therefore, we conclude that the hold harmless provision in question does not contravene Ohio public policy. [FN6] We uphold the district court's

conclusion that Legge is liable under the indemnity provision; consequently, we affirm the district court's grant of summary judgment against Legge on Count I of its complaint.

FN6. Legge makes a further argument that the hold harmless provision does not by its terms cover Dayton Power's property damage claim. Merely reading the language of the hold harmless clause convinces us that this argument has no merit. *See General Accident Fire & Life Assurance Corp. v. Smith & Oby Co.,* 272 F.2d 581, 585 (6th Cir.1959) (rejecting similar argument).

III.

Legge argues that the district court erred in granting summary judgment against it on its other contract and tort claims. However, Legge does not pursue this argument seriously, since it does not point to any record evidence to substantiate its claims. Under *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986), Legge's failure to marshal evidence supporting its claim must result in summary judgment against it. We are not obliged to search the record for evidence that Legge failed to cite. *See Guarino v. Brookfield Township Trustees,* 980 F.2d 399, 405-06 (6th Cir.1992). We uphold the district court's grant of summary judgment against Legge on Counts II-VI of its complaint.

IV.

**6 USF & G argues that the district court erred in entering judgment against USF & G, declaring USF & G obligated under its policy to pay the damages for which Legge was liable. USF & G contends that its policy excludes coverage for Dayton Power's indemnity claim. The USF & G policy states an exclusion:

This insurance does not apply to: ...
 b. "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

113 F.3d 1235 (Table)
**Unpublished Disposition**

Page 6

**(Cite as: 113 F.3d 1235, 1997 WL 199491 (6th Cir.(Ohio)))**

or agreement. This exclusion does not apply to liability for damages:
    (1) Assumed in a contract or agreement that is an "insured contract;" ....
An insured contract is defined in the policy as (inter alia):
    That part of any other contract or agreement pertaining to your business under which you assume the tort liability of another to pay damages because of "bodily injury" or "property damage" to a third person or organization, if the contract or agreement is made prior to the "bodily injury" or "property damage." Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

The magistrate judge concluded that the Dayton Power hold harmless clause was sufficiently broad to render Legge liable for the valve accident damages, no matter who might eventually be held to have been at fault in causing the accident. The magistrate judge observed that USF & G initially denied coverage based on a report indicating that Mafco was at least partly to blame, and USF & G makes no attempt to counter this evidence except to argue there must be a trial. Therefore, the hold harmless clause constituted a part of a contract pertaining to Legge's business under which it assumed the tort liability of another--i.e., Mafco. The magistrate judge concluded that this meets the definition of an "insured contract" in the USF & G policy. Once the magistrate judge had determined that the hold harmless clause constituted an insured contract, he concluded that the USF & G policy did not exclude from coverage Legge's liability arising from the hold harmless clause. The district court adopted the magistrate judge's reasoning.

USF & G contends that Mafco cannot be the "another" referred to in the insured contract definition ("you assume the liability of another"), because Mafco is not a party to any contract with Legge. Nothing in the policy's definition of insured contract requires that "another" and Legge deal with each other directly, as long as Legge has agreed to assume "another's" tort liability. Legge assumed responsibility for the harm caused in some part by Mafco. Therefore, under the policy the hold harmless clause is an insured contract. If this result is unexpected to USF & G, it could have been

avoided by better draftsmanship.

USF & G further argues that the amount of its liability cannot be ascertained without a trial to establish the proportionate shares of fault attributable to Mafco and other tortfeasors. Again, the policy does not on its face require this. Under the policy, once a contract is deemed an "insured contract," it is covered. USF & G would have us add language that, though the claim under an insured contract is covered, it is only covered to the extent it results from "another's" liability. The policy has no such language. We could infer that the insured contract should only be covered up to the amount of the third party's liability, but an insurance contract must be construed liberally in favor of the insured, especially where an exclusion from liability is concerned. *See American Fin. Corp. v. Fireman's Fund Ins. Co.,* 239 N.E.2d 33, 35 (Ohio 1968); *Pearne, Gordon, McCoy & Granger v. American Home Assurance Co.,* 634 N.E.2d 1032, 1034 (Ohio Ct.App.1993), *motion to certify overruled,* 624 N.E.2d 1066 (1994); *see also United States v. A.C. Strip,* 868 F.2d 181, 185 (6th Cir.1989). We cannot save USF & G from its own drafting.

                    V.

**7 We affirm the judgment of the district court.

113 F.3d 1235 (Table), 1997 WL 199491 (6th Cir.(Ohio)), Unpublished Disposition

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works