UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| RICK E. NEWMAN, | : | Case No. 01-CV-67 |
| | : | |
| Plaintiff, | : | Judge Herman J. Weber |
| | : | |
| v. | : | DEFENDANT THE PROCTER & |
| | : | GAMBLE COMPANY'S |
| THE PROCTER & GAMBLE | : | REPLY TO PLAINTIFF, RICK |
| COMPANY, et al., | : | NEWMAN'S MEMORANDUM |
| | : | OPPOSING SUMMARY |
| Defendants. | : | JUDGMENT |

# REPLY

## I. INTRODUCTION

P&G's motion for partial summary judgment is based on Plaintiff's inability to offer any competent evidence remotely tending to establish a causal link between his atrial fibrillation and his alleged exposure to sulfur dioxide. Plaintiff argues in his memorandum that the testimony of his cardiologist, Dr. Hirsh, although based on a differential diagnosis, is sufficient to meet his burden.

P&G does not attack the differential diagnosis methodology *per se*, but rather Dr. Hirsh's use of that methodology in a manner that makes his conclusion unreliable as a matter of law. That methodology requires a physician to assemble potential causes of a condition and, through the process of eliminating some of the causes, yields an opinion as to the most likely cause. Dr. Hirsh's use of that methodology here is fatally flawed because sulfur dioxide exposure has no place on the differential list of potential causes of atrial fibrillation. Plaintiff can offer no evidence—competent under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993)—that a causal link between them exists.

When Dr. Hirsh's unsupportable opinions are properly excluded, Plaintiff has no evidence to withstand P&G's challenge under *Stinson v. England,* 69 Ohio St.3d. 451, 633 N.E.2d 532 (1994). Plaintiff cannot plug this gap with the testimony of Dr. Roger Wabeke, his risk management expert. Dr. Wabeke is not a physician and cannot speak to the causation issue. Accordingly, P&G is entitled to summary judgment.

## II.   ARGUMENT

### A.   DR. HIRSH'S TESTIMONY IS INADMISSIBLE UNDER RULES 702 AND 703; BECAUSE PLAINTIFF IS WITHOUT ANY EVIDENCE ON THE ELEMENT OF PROXIMATE CAUSATION, P&G IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.

Plaintiff misstates P&G's position in the hopes of defeating it. P&G does not contend that a physician may not offer expert opinion testimony merely because that opinion is the result of a "differential diagnosis." A differential diagnosis, when reliable and based on scientific principles, is a legitimate methodology for arriving at an admissible expert conclusion. Here, however, that foundation is lacking.

A differential diagnosis is a standard scientific technique of identifying the cause of a medical condition by eliminating alternate *likely* causes until the *most probable* one is isolated by virtue of the physician's inability to rule it out. *Baker v. Dalkon Shield Claimants Trust,* 156 F.3d 248, 252-53 (1st Cir. 1998); *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 807 (3rd Cir. 1997); *McCulloch v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2nd Cir. 1995); *Glaser v. Thompson Med. Co.,* 32 F.3d 969, 978 (6th Cir. 1994). The flaw in Plaintiff's evidence here is the absence of scientific support for his assertion that there is some causal connection between sulfur dioxide inhalation and atrial fibrillation.

2

The cornerstone of the reliability of the differential diagnosis methodology is the notion that each candidate diagnosis under scrutiny must be a recognized cause of the condition.

> The first step in the diagnostic process is to compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration. . . . The issue at this point in the process is which of the competing causes are *generally* capable of causing the patient's symptoms or mortality. Expert testimony that rules in a potential cause that is *not* so capable is unreliable.

*Clausen v. M/V New Carissa*, 339 F.3d 1049, 1057-58 (9th Cir. 2003)(citations omitted; emphasis in original). In every case upholding the admission of expert testimony on the basis of a differential diagnosis, the "specific cause" isolated was first established by generally accepted scientific principles satisfying Rule 702 to be a "general cause" of the condition.[1]

The cases cited by Plaintiff illustrate this requirement as well. In *Hardyman v. Norfolk & Western Ry. Co.*, 243 F.3d 255 (6th Cir. 2001) for example, the Sixth Circuit held that Hardyman's expert should have been allowed to testify that his differential diagnosis yielded the opinion that Hardyman's carpal tunnel syndrome was caused by his work activities. The record

---

[1] *See e.g., Baker, supra* (Chlamydia was recognized potential cause of pelvic inflammatory disease); *Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d 1378, 1384 (4th Cir. 1995)(differential diagnosis that tylenol toxicity affected patient's liver was supported by history, examination, lab and pathology data, and peer-reviewed literature); *Kannankeril, supra* (differential diagnosis that pesticide Dursban caused plaintiff's cognitive condition was supported by widely accepted scientific knowledge of the harmful nature of organophosphates); *McCulloch, supra* (differential diagnosis that glue fumes caused throat injury supported by Material Safety Data Sheet); *Glaser, supra* (differential diagnosis that phenylpropanolamine (PPA), the active ingredient in Dexatrim, caused acute hypertension was supported by peer reviewed literature and expert's five published studies); *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228-30 (9th Cir.1998) *cert. denied*, 526 U.S. 1099 (1999)(differential diagnosis that collagen injection of Zyderm caused autoimmune disorders including atypical systemic lupus erythematosus was supported by peer-reviewed publications, clinical studies, and independent state investigation); *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1413 (D.Or. 1996)(differential diagnosis not admissible to show pulmonary fibrosis was caused by breast implants in the absence of general causation).

3

contained ample evidence—satisfying the criteria of Rule 702[2] and *Daubert*—that repetitive work activities can indeed cause carpal tunnel syndrome. *Id.* at 263.[3]

Similarly, in *Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999), the trial court permitted Westberry's doctor to testify—based on a differential diagnosis—that Westberry's sinus problems were caused by his inhalation of airborne talc in the workplace. The trial court did not abuse its discretion because the parties *conceded* that airborne talc irritated mucous membranes. *Id.* at 264. As such, the talc was legitimately included in the differential "ladder."

This case, by contrast, is analogous to *Raynor v. Merrell Pharmaceuticals, Inc.*, 104 F.3d 1371 (D.C. Cir. 1997). In *Raynor*, the proffered differential diagnosis was properly excluded. Raynor's expert was not permitted to testify that a mother's use of the drug Bendectin caused this child's birth defects ("specific causation") where there was no evidence satisfying *Daubert* and Rule 702 that Bendectin was a cause of birth defects generally ("general causation"). *Id.* at 1376.

This showing of "general causation" in a manner that satisfies *Daubert* and Rule 702 is a necessary predicate to admission of a differential diagnosis on "specific causation." The

---

[2] Rule 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

[3] The *Hardyman* decision is not otherwise apt, given that the claim there was brought under the Federal Employer's Liability Act. The causation test in FELA cases is relaxed, asking only whether the employer's negligence played the slightest part in producing the injury. *Id.* at 259, citing *Rogers v. Missouri Pac. R.R. Co.*, 352 U.S. 500, 506 (1957).

4

requirement is fundamental because an expert's testimony is admissible only if it "rests on a reliable foundation." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999). Thus, the Court must examine each step[4] in methodology underlying the expert's proffered opinion is reliable, i.e., whether it is supported by adequate validation to render it trustworthy. *Daubert,* at 590.

This Court's proper exercise of its "gatekeeping" function, *Daubert,* at 597, requires that Dr. Hirsh's opinions here be excluded. Without any causal link between sulfur dioxide and atrial fibrillation, Plaintiff's claim against P&G must fail as a matter of law. Dr. Hirsh's testimony, and Plaintiff's case, fall apart because there is no showing of general causation, *i.e.*, competent, scientifically-sound testimony that sulfur dioxide inhalation is a cause of atrial fibrillation. Testimony regarding specific causation is irrelevant unless general causation is established by means satisfying Rule 702 and *Daubert. Rutigliano v. Valley Business Forms,* 929 F.Supp. 779, 783 (D.N.J. 1996)(expert testimony excluded where no general causal link between chemical CCP and formaldehyde sensitization was established); *Lust v. Merrell Dow Pharmaceuticals, Inc.,* 89 F.3d 594 (9th Cir. 1996)(expert testimony excluded where no general causal link shown between drug Clomid caused birth defects; such opinion was not held even by a minority of

---

[4] "[S]cience is a process . . . . This court need not and should not ignore any step in that process, but must ensure that in each step, from initial premise to ultimate conclusion, the expert faithfully followed valid scientific methodology. In other words, this court need not accept, as scientifically reliable, any conclusion that good science does not permit to be drawn from the underlying data but which, instead, constitutes 'unsupported speculation,' or, in the words of Dr. Stenzel-Poore, a 'leap of faith.'" *Hall,* at 1401 (citations omitted). "[*A*]*ny* step that renders the analysis unreliable under the *Daubert* factors *renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.*" *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 745 (3rd Cir. 1994), *cert. denied,* 513 U.S. 1190 (1995)(emphasis in original).

scientists in the field[5]); *Schmaltz v. Norfolk & Western Ry. Co.*, 878 F.Supp. 1119, 1122 (N.D. Ill. 1995)(expert testimony excluded where general causal link between the herbicide atrazine and respiratory disease was not established); *Grimes v. Hoffmann-LaRoche, Inc.*, 907 F.Supp. 33, 35, n.2 (D.N.H. 1995)(expert testimony excluded where no general causal link between prescription drug Accutane and cataracts was established; "an expert cannot establish that a fact is generally accepted merely by saying so"); *Chikovsky v. Ortho Pharmaceutical Corp.*, 832 F.Supp. 341, 346 (S.D. Fla. 1993)(expert testimony excluded and amounts of Retin-A absorbed by plaintiff were irrelevant where expert could not show general causal link between Vitamin A and birth defects); *Jones v. United States*, 933 F.Supp. 894, 900 (N.D. Cal. 1990)(expert testimony excluded where no general causation or interaction between penicillin and oral contraceptives was established).

Application of the factors articulated by the *Daubert* court compels a finding that Dr. Hirsh's opinions are inadmissible. *Daubert*, at 593-94. First, Dr. Hirsh's theory has not been tested and cannot be tested. A review of his theory illustrates why. Dr. Hirsh admits that atrial fibrillation—heart rate exceeding 300 beats per minute—is an uncommon condition. *Hirsh depo., at 16.* Of those patients who do have the uncommon condition of atrial fibrillation, Mr. Newman is among the "probably less than one percent" that have "lone atrial fibrillation," i.e., fibrillation without other cardiac or pulmonary disease. *Id.*, at 17, 22.

Turning to the objective evidence, Dr. Hirsh notes that the pulmonary function studies "indicate that [Plaintiff] has no chronic *preexisting* lung condition that would have caused this and that he does not have asthma." *Hirsh depo., at 34* (emphasis added). It must be noted here

---

[5] "When a scientist claims to rely on a method practiced by most scientists, yet presents conclusions that are shared by no other scientist, the district court should be wary that the method has not been faithfully applied. [T]he district court can exclude the opinion if the expert fails to identify and defend the reasons that his conclusions are anomalous." *Lust*, at 598.

6

that all the available pulmonary function studies were conducted *after* the alleged inhalation of sulfur dioxide. *Anderson depo., at 73.* Faced with the absence of any evidence of lung injury, Dr. Hirsh speculates as follows:

Q.  Are there any tests that have been done that show the level of impairment in his lungs?

A.  I see. Yes, and the answer is no. There is no residual impairment. The problem is it was there at the time of the injury, lasted long enough to cause some permanent heart damage, and has resolved. ...

*Hirsh depo., at 35.* Asked about his theory that the injury "lasted long enough," Dr. Hirsh testified that the pulmonary injury—evidence of which has never been observed by anybody—need only last "a few seconds." *Hirsh depo., at 70.* As such, it is clear that Dr. Hirsh's theory has never been tested and never could be tested because there are no tests, x-rays or other objective physical evidence to evaluate.[6]

As such, the circularity of Dr. Hirsh's reasoning is complete; he effectively opines: (1) he had no lung condition before the alleged exposure; and (2) there is no evidence of lung "scarring" or "infiltrates" after the exposure; but (3), I can nevertheless conclude that there must have been some scarring for "a few seconds" to cause the injury *to the heart*. It was precisely this kind of "junk science" that let the *Daubert* Court to warn that unsupported opinions that do not satisfy Rule 702 have the potential to "be both powerful and quite misleading." *Daubert* at

---

[6] It is in this respect—the absence of foundational evidence—that Dr. Hirsh's testimony also runs afoul of Rule 703, which provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

7

595. Particularly where experts are concerned, evidence that has a greater potential to mislead than to assist the jury should be excluded. *United States v. Dorsey,* 45 F.3d 809, 815-16 (4th Cir.1995).

Continuing with the application of the *Daubert* criteria, Plaintiff's evidence doesn't satisfy the second prong because Dr. Hirsh's theory has not been subjected to peer review. He has identified no literature on the subject.[7] Third, for those reasons, there is no known or potential rate of error for his theory. Fourth, Dr. Hirsh's theory has never appeared in the medical community, much less gained "general acceptance." "Personal opinion, not science, is testifying here." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1319 (9th Cir. 1995)(on remand).

In fact, Plaintiff's own pulmonologist is unwilling to make that causal connection:

    A. Does sulfur dioxide contribute to atrial fibrillation exposure?
    Q. That's one way.
    A. Or does the sulfur --
    Q. Do you have an opinion on that subject?
    A. I do not know of any, and I'm not a cardiologist. And in my simple pulmonary mind, I do not have a relationship that way.

*Anderson depo., at 78:1-8.* For these reasons, Dr. Hirsh's opinions are unreliable and inadmissible. Plaintiff cannot make those unreliable opinions admissible merely by cloaking them in the differential diagnosis methodology. In this instance, Dr. Hirsh's opinions are best characterized as falling into a category he described at his deposition: "[W]hen you make a

---

[7] Q. What are some good sources of information about atrial fibrillation then if there is no authoritative text on it?

A. The sarcastic answer is me. . . .

*Hirsh depo., at 51-52.*

8

diagnosis, there are diagnoses that are made just purely on speculation because you don't have the information you need to prove or disprove that hypothesis." *Hirsh depo., at 14-15*. That speculation does not satisfy Rule 702 or *Daubert*. Reduced to its essentials, Dr. Hirsh's opinion is merely another recitation of "post hoc, ergo propter hoc," which is insufficient to create a material issue of causation. *Austin v. Children's Hospital Medical Center*, 92 F.3d 1185, 1996 WL 422484, Case No. 95-3880, *3 (6th Cir. 1996)(Held that fact that a patient developed an infection after being treated by a sick nurse does not rise to the requisite level of proof of causation to withstand summary judgment)(copy attached hereto at Exhibit A). Clearly, "[i]n the absence of an established scientific connection between exposure and illness, . . . the temporal connection between exposure to chemicals and an onset of symptoms, standing alone, is entitled to little weight." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278 (5th Cir. 1998), *cert. denied*, 526 U.S. 1064 (1999). This is particularly so here, where six days elapsed between the alleged exposure and onset of symptoms. P&G is entitled to summary judgment.

**B.   THE TESTIMONY OF DR. WABEKE IS INCOMPETENT UNDER FED. EVID. R. 702, AND DOES NOT ESTABLISH A CAUSAL LINK BETWEEN PLAINTIFF'S HEART CONDITION AND SULFUR DIOXIDE EXPOSURE.**

Plaintiff cannot fill the void left by the proper exclusion of Dr. Hirsh's opinions with equally incompetent opinions of his risk management expert, Dr. Roger Wabeke. Dr. Wabeke—a Ph.D., not a physician—cannot testify regarding Plaintiff's assertion that exposure to sulfur dioxide was, to a reasonable degree of medical probability, the proximate cause of his injuries. Dr. Wabeke is a chemical engineer; he has never been to medical school, is not trained in cardiopulmonary medicine, and does not teach clinical medicine. *Wabeke depo., at 7:20-23;*

*11:17-20; 18:14-18; 32:23-33:2; 133:13-14; 139:9-10; 192:16-22.* As a result, Dr. Wabeke *admits* that he is not qualified to diagnose the effect of sulfur dioxide on the human body:

> Q. And you're getting that on the basis of the medical records that you reviewed. You're not qualified to make a diagnosis [of chemical pneumonitis]?
>
> A. No, I'm not.

*Id. at 97:22-25* (emphasis added). Dr. Wabeke emphasized: "[I]'m not here to render an opinion regarding atrial or ventricular fibrillation as a sequela from $SO_2$, that is not my area of expertise." *Id. at 172:10-12.* Clearly, then, Dr. Wabeke is not qualified to offer any opinions about the cause of Plaintiff's injuries, and any testimony that Plaintiff may attempt to glean in support of causation is inadmissible under Fed. Evid. R. 702.

## III. CONCLUSION

For the foregoing reasons, P&G's motion for summary judgment on all of Plaintiff's claims should be granted.

Respectfully submitted,

_____
Scott R. Thomas (0061040)
Jeanette N. Dannenfelser (0069614)
FURNIER & THOMAS, LLP
One Financial Way, Suite 312
Cincinnati, Ohio 45242
(513) 745-0400
Fax: (513) 792-6724
Attorneys for Defendant,
The Procter & Gamble Company

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served this 23rd day of September 2003, via First Class U.S. Mail, postage prepaid, upon

John C. Scott, Esq.  
Joseph Mordino, Esq.  
FAULKNER & TEPE  
2200 Fourth & Vine Tower  
Cincinnati, Ohio 45202

Counsel for Mesa, Inc.

Beverly R. Storm, Esq.  
David Zahniser, Esq.  
ARNZEN, PARRY & WENTZ, P.S.C.  
600 Greenup Street  
P.O. Box 472  
Covington, Kentucky 41012-0472

Counsel for Plaintiff

11

# EXHIBIT A

92 F.3d 1185 (Table)                                                                                             Page 1
**Unpublished Disposition**

(Cite as: 92 F.3d 1185, 1996 WL 422484 (6th Cir.(Ohio)))

C

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Sixth Circuit.

Benjamin AUSTIN; Vickie Austin, Co-Administrators of the Estate of Zachary Allen Austin, deceased, Plaintiffs-Appellants,
v.
CHILDREN'S HOSPITAL MEDICAL CENTER; Susan Hall, Defendants-Appellees,
Xavier University, Defendant.

No. 95-3880.

July 26, 1996.

On Appeal from the United States District Court for the Southern District of Ohio, No. 93-00326; S. Arthur Spiegel, Judge.

S.D.Ohio

AFFIRMED.

Before: MERRITT, Chief Judge; BROWN and SUHRHEINRICH, Circuit Judges.

PER CURIAM.

**1 In this diversity action, plaintiffs Benjamin and Vickie Austin allege that Children's Hospital Medical Center ("CHMC") and Susan Hall negligently exposed plaintiffs' son Zachary to a viral infection which resulted in Zachary's death. Plaintiffs appeal from the grant of summary judgment dismissing their cause of action. We conclude that plaintiffs failed to create a triable issue of fact on the issue of causation and AFFIRM the dismissal.

BACKGROUND

Zachary Austin was born on November 11, 1990, in Alabama. Shortly after birth, Zachary was diagnosed with beta thalassemia major, a blood disorder which inhibits the production of red blood cells. The Austins elected to have Zachary undergo a bone marrow transplant at CHMC in Cincinnati. Zachary was admitted to CHMC on February 12, 1992, and the transplant was performed on February 28, 1992.

After the procedure, Zachary was placed in an isolation room. On March 10, 1992, Susan Hall, a student nurse from Xavier University, entered Zachary's room wearing a mask. Hall indicated at the time that she had a scratchy throat. Later that same day, Hall reentered Zachary's room to attend to Zachary, this time without a mask. Hall went home early that day with a fever.

Zachary subsequently developed signs of an infection. Cultures taken on March 13, 1992, tested positive for adenovirus. Zachary was treated for his adenovirus infection and discharged from CHMC. After traveling to his home in Alabama, Zachary had to be rehospitalized. Zachary died of a viral infection on May 17, 1992.

Plaintiffs, residents of Alabama, filed this action in federal district court in May 1993 alleging wrongful death under Ohio law. The initial named defendants were CHMC, Susan Hall, and Xavier University; plaintiffs subsequently settled with Xavier University. Diversity jurisdiction was proper pursuant to 28 U.S.C. § 1332. Defendants moved for summary judgment. Plaintiffs opposed, submitting the affidavit of Dr. Raff, a board certified physician in infectious diseases and Chief of the Section of Infectious Diseases at the University of Louisville School of Medicine. The district court granted summary judgment on the grounds that plaintiffs had failed to establish the cause or source of Zachary's infection. Plaintiffs timely appealed.

ANALYSIS

We review the grant of summary judgment de novo, applying the same test as the district court. *Ayoub v. National R.R. Passenger Corp.*, 76 F.2d 794, 795 (6th Cir.1996). Summary judgment is proper if the record, when viewed in the light most favorable to the nonmoving party, reveals that there are no

genuine issues of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *Maldonado v. National Acme Co.,* 73 F.3d 642, 644 (6th Cir.1996).

To establish medical malpractice under Ohio law, the plaintiff must establish: (1) the existence of a standard of care within the medical community; (2) a breach of the standard of care by the defendant; (3) injury; and (4) direct and proximate causation. *Littleton v. Good Samaritan Hosp. & Health Ctr.,* 529 N.E.2d 449 (Ohio 1988).

**2 In the case at bar, plaintiffs introduced the affidavit of their expert witness, Dr. Raff, to establish the necessary elements of their wrongful death claim. Dr. Raff's affidavit on the issue of causation may be summarized as follows. Decedent tested negative for adenovirus antibodies indicating that he had not been exposed to adenovirus as of February 5, 1992. Decedent was shedding adenovirus and was febrile within three days of exposure to Susan Hall, the only person with symptomatic illness known to have been in contact with decedent. Based upon his education, training and experience, and his review of the record, Dr. Raff concluded that it was probable that decedent contracted the adenovirus from Susan Hall on March 10, 1992. Plaintiffs assert that Dr. Raff's affidavit creates a material issue of fact with respect to causation.

A plaintiff may not escape summary judgment merely by producing an expert witness. "If a court concludes that the evidence supporting the expert's position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, then the court remains free to prohibit the case from proceeding to the jury." *Glaser v. Thompson Medical Co.,* 32 F.3d 969, 972 (6th Cir.1994) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 113 S.Ct. 2786, 2798 (1993)). Although courts should be careful to respect scientific opinion, nevertheless courts apply a "hard look" to the reasoning of qualified scientific opinions to determine whether a triable issue has been created. *Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349, 1252-53 (6th Cir.) (cited with approval in *Daubert,* 113 S.Ct. at 2798), *cert. denied,* 506 U.S. 826 (1992); *Glaser,* 32 F.3d at 972. Of course, an expert opinion which is conclusory and fails to set forth the underlying rationale is not adequate. *Turpin,* 959 F.2d at 1360.

Dr. Raff's affidavit suffers from numerous flaws.

First, Dr. Raff states only that Hall's symptoms were "consistent" with an adenovirus. He fails to identify the basis for his subsequent conclusion that Hall in fact had adenovirus and not another ailment such as a fungal or bacterial infection. *See Conde v. Velsicol Chem. Corp.,* 24 F.3d 809, 814 (6th Cir.1994) (holding insufficient showing of causation where testimony stated only that the symptoms were consistent with chlordane exposure without excluding other possible causes). Further, defendants introduced evidence that there are forty-two different recognized serotypes of adenoviruses, and that adenoviruses are ubiquitous and may be carried by individuals who are asymptomatic. Dr. Raff does not give his reasons for concluding that Zachary had the same serotype of adenovirus that Hall allegedly had, nor does he explain why he excluded the myriad of other potential sources of the adenovirus which infected Zachary. *Cf. Glaser,* 32 F.3d at 977-78 (holding expert testimony sufficient where expert engaged in **differential diagnosis** to reach his conclusion).

**3 Indeed, the only identifiable reason for Dr. Raff's opinion appears to be post hoc, ergo propter hoc. This alone is not sufficient to create a material issue of causation. *Abbott v. Federal Forge, Inc.,* 912 F.2d 867, 875 (6th Cir.1990); *Hasler v. United States,* 718 F.2d 202, 205 (6th Cir.1983), *cert. denied,* 469 U.S. 817 (1984).

We do not doubt that it is possible for Hall to have been the one to infect Zachary. Without evidence that this was more likely than not the case, however, the mere possibility of infection is not sufficient to avoid summary judgment. *Hasler,* 718 F.2d at 205 ("While an antibody antigen reaction can cause rheumatoid arthritis, there is no showing that it did cause the plaintiff's disease in this case.").

CONCLUSION

The grant of summary judgment dismissing plaintiffs' wrongful death suit is AFFIRMED.

92 F.3d 1185 (Table), 1996 WL 422484 (6th Cir.(Ohio)), Unpublished Disposition

END OF DOCUMENT



RECEIVED SEP 0 9 2003

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| RICK E. NEWMAN, | : | Case No. C-1-01 0067 |
| Plaintiff, | : | Judge Herman J. Weber |
| v. | : | PLAINTIFF RICK E. NEWMAN'S COUNTER STATEMENT OF PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| THE PROCTER & GAMBLE COMPANY, ET AL., | : | |
| Defendants. | : | |

Plaintiff Rick E. Newman ("Mr. Newman") submits the following Proposed Findings of Fact and Conclusions of Law in support of his Memorandum in Opposition to Defendants' Motions for Summary Judgment:

### MR. NEWMAN'S PROPOSED FINDINGS OF FACT

1. On March 17, 1999, Mr. Newman was exposed to, and inhaled, sulfur dioxide gas while he was insulating a soap tank located in Building 179 at Defendant Procter & Gamble Company's ("P&G") Ivorydale facility in St. Bernard, Ohio.

2. Sulfur dioxide is a compound that is known to be hazardous to humans.

3. At the time of his exposure to the sulfur dioxide gas, Mr. Newman was employed by Viox Services, Inc., an independent contractor hired by P&G.

4. Neither Viox nor Mr. Newman knew there was sulfur dioxide gas present in the pipes of Building 179; P&G had neither notified Viox nor Mr. Newman that there was sulfur dioxide gas present in the pipes of Building 179, nor had P&G posted warnings that sulfur dioxide gas was present in the pipes of Building 179.

5. Defendant Mesa, Inc. ("Mesa") was another independent contractor hired by P&G, and at the time of Mr. Newman's exposure to the sulfur dioxide gas on March 17, 1999, Mesa employees were installing a unit heater in Building 179.

6. On March 18, 1999, the day after he was exposed to the sulfur dioxide gas, Mr. Newman was sent to the emergency room at Bethesda Care in Norwood, Ohio because he had trouble breathing, a bad cough, a congested chest, and a sore throat; at Bethesda Care, Mr. Newman was diagnosed with chemical pneumonitis (which is an inflammation of the respiratory tract tissues due to chemical inhalation) and was treated with steroids.

7. Mr. Newman's exposure to the sulfur dioxide gas injured him, subsequently causing atrial fibrillation – an uncommon and incurable heart condition – which Mr. Newman did not have prior to March 17, 1999.

8. Between March 17, 1999 and October 2001, Mr. Newman has had four documented episodes of atrial fibrillation; since October 2001, several more episodes of atrial fibrillation and/or irregular heart activity have been documented.

9. Future episodes of atrial fibrillation are expected.

10. Every episode of atrial fibrillation exposes Mr. Newman to a risk of stroke or embolus going somewhere else in his body which could cause further serious injury or death.

11. Two experts testifying on behalf of Mr. Newman, Dr. Paul D. Hirsh and Roger L. Wabeke, have opined that it is more likely than not that Mr. Newman's injuries were the result of his exposure to sulfur dioxide gas.

12. Dr. Hirsh's conclusion was based on the fact that he could not detect – after

examining Mr. Newman and reviewing his medical history and symptoms — any other cause for atrial fibrillation in Mr. Newman, such as hypertension, alcoholism, hyperthyroidism, nervous system problems, asthma, chronic lung conditions, structural heart disease, coronary disease, excessive use of stimulants, or that Mr. Newman's atrial fibrillation episodes were caused by exercise or stress.

13. Dr. Hirsh's method of diagnosing the cause of Mr. Newman's atrial fibrillation episodes is known as "differential diagnosis."

14. P&G and Mesa dispute which one of them was responsible for allowing the sulfur dioxide gas to be released in Building 179.

15. The Court previously denied P&G's prior motion for summary judgment which alleged that P&G did not owe a duty of care to Mr. Newman under premises liability law.

## MR. NEWMAN'S PROPOSED CONCLUSIONS OF LAW

1. In moving for summary judgment, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

2. The Sixth Circuit has noted that a party may move for summary judgment if it can demonstrate that the non-moving party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. See Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989).

3. In responding to a motion for summary judgment, Rule 56(e) of the Federal Rules of Civil Procedure "requires the non-moving party to go beyond the pleadings," and present some type of evidentiary material in support of its position. Celotex Corp., 477 U.S. at 324.

4. Summary judgment shall be denied "if there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).

5. "Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party." United States v. Atlas Lederer Co., 97 F.Supp.2d 834, 835 (S.D. Ohio 2000) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

6. "If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder." Atlas Lederer, 97 F.Supp.2d at 835 (citing 10A Charles Alan Wright, et al., Federal Practice and Procedure § 2726).

7. Mesa, as an independent contractor, owed Mr. Newman, an employee of another independent contractor working on the same premises, a duty of care not to cause him injury. See McGeary v. Reed, 105 Ohio App. 111, 114, 151 N.E.2d 789, 793 (Ohio App. 1957).

8. A factual determination must be made as to whether Mesa breached its duty, thus making summary judgment inappropriate. See Commerce & Industry Ins. Co. v. City

4

of Toledo, 45 Ohio St.3d 96, 98, 543 N.E.2d 1188, 1192 (Ohio 1989); Cogar v. Scheetz Construction Co., C.A. No. 18501, 1998 Ohio App. LEXIS 81, *5 (Jan. 14, 1998).

9. Mr. Newman has presented a prima facie case of negligence against P&G, specifically as to causation based on probability, thus making summary judgment inappropriate. See Stinson v. England, 69 Ohio St.3d 451, 455, 633 N.E.2d 532, 537 (Ohio 1994).

10. Mr. Newman's expert testimony on causation is sufficiently reliable under the standards stated in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

11. The Sixth Circuit noted that "[i]n Daubert, the Supreme Court provided extensive guidance for the application of the dictates of [Evidence] Rule 702. The Court explained that Rule 702 displays a 'liberal thrust' with the 'general approach of relaxing the traditional barriers to 'opinion testimony.'" Jahn v. Equine Services, PSC, 233 F.3d 382, 388 (6th Cir. 2000) (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 588 (1993).

12. "Differential diagnosis," the method employed by Dr. Hirsh in diagnosing the cause of Mr. Newman's atrial fibrillation episodes, fulfills the Daubert standards in the Sixth Circuit, and is admissible. See Hardyman v. Norfolk & Western Railway Co., 243 F.3d 255, 260 (6th Cir. 2001); see also Westberry v. Gislaved Gummi AB, 178 F.3d 257 (4th Cir. 1999).

Respectfully submitted,

ARNZEN & WENTZ, P.S.C.

BY: s/ Mary K. Molloy
MARY K. MOLLOY (0003067)
MARK G. ARNZEN
BEVERLY R. STORM
600 Greenup Street
P.O. Box 472
Covington, Kentucky 41012-0472
(859) 431-6100

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the above was mailed via U.S. mail, postage prepaid, this 8th day of September 2003 to the following:

John C. Scott, Esq.
Joe Mordino, Esq.
Faulkner & Tepe, LLP
2200 Fourth & Vine Street
5 West Fourth Street
Cincinnati, Ohio 45202

Scott R. Thomas, Esq.
Jeanette N. Dannenfelser, Esq.
Furnier & Thomas, LLP
One Financial Way
Suite 312
Cincinnati, Ohio 45242

S/ Mary K. Molloy

AV0018.WPD/2                                6